1  Hans S. Croteau
   Rejeanne M. Bernier
2  6792 Maury Drive
   San Diego, California 92119
3  (619) 466-9381 telephone
   (619) 337-4653 cell
4

5                                                                FILED

   Plaintiffs In Pro Se                                    10 AUG 12 PH 2: 50
6
                                                        CLERK, U.S. DISTRICT C···
7                                                    SOUTHERN DISTRICT OF CALIF ···

8                                                    BY: _____  DEPUTY

9            UNITED STATES DISTRICT COURT

          SOUTHERN DISTRICT OF CALIFORNIA
10
   Rejeanne M. Bernier, an individual;          )   '10 CV 1698 DMS    POR
11 Hans S. Croteau, an individual;              )   Case No. _____
                                                )
12          Plaintiffs,                          )   COMPLAINT FOR:
                                                )   1) VIOLATION OF
13 v.                                            )   CONSTITUTIONAL RIGHTS
                                                )   UNDER COLOR OF LAW [42
14 Jocelyn G. Croteau, aka Jessie G. Croteau, an )  U.S.C. 1983]; 2) CONSPIRACY TO
   individual; ICS Professional Services, Inc., a California ) HINDER CALIFORNIA'S
15 corporation; The Croteau Living Trust dated 4/6/2005, ) CONSTITUTED AUTHORITIES
   an individual; Paul M. King, an individual; Royal )  AND DENY EQUAL
16 Electric, Inc., a California corporation; Christopher D. ) PROTECTION [42 U.S.C. §
   Celedon, an individual; William J. Ward, an individual; ) 1985(3)]; 3) CONSPIRACY TO
17 Sharmila R. Parkman, an individual; William J. Ward & ) DEFEAT CALIFORNIA'S DUE
   Associates, an unknown association; Thomas F. Olsen, ) COURSE OF JUSTICE TO DENY
18 an individual; Lorber, Greenfield & Polito, a Limited ) PLAINTIFFS' EQUAL
   Liability Partnership, Laurence F. Haines, an individual; ) PROTECTION [42 U.S.C. §
19 James M. McNair, an individual, HainesLaw, an )  1985(2)]; 4) VIOLATION OF
   unknown entity; Eugene E. Kinsey, an individual, ) EQUAL PROTECTION UNDER
20 Curtis W. Herron, an individual; Eugene E. Kinsey, )  COLOR OF LAW [42 U.S.C. §
   Inc., a California corporation; Patrick M. Howe, an ) 1983]; 5) DECLARATORY
21 individual, Paul R. Greenwood, as an individual and in ) JUDGMENT [28 U.S.C. §§ 2201-
   his official capacity; Julie Korsmeyer, as an individual ) 2202]; 6) ELDER ABUSE [CA Wel.
22 and in her official capacity; Bonnie Dumanis, as an ) & Ins. § 15600]; 7) MALICIOUS
   individual and in her official capacity; the San Diego ) PROSECUTION; 8) ABUSE OF
23 County District Attorney's Office, as an individual and ) PROCESS; 9) INTENTIONAL
   in its official capacity; California Attorney General ) INFLICTION OF EMOTIONAL
24 Edmund G. Brown Jr., as an individual and in his ) DISTRESS; AND, 10) FRAUD.
   official capacity; the State of California; and DOES 1 )
25 through 100, inclusive;                       )
                                                )
26          Defendants.                          )   (JURY TRIAL DEMANDED)
27
28
                                          1
   ─────────────────────────────────────────────────────────
   BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

1     **COMES NOW,** to this United States District Court in the Southern District of

2    California, plaintiffs Rejeanne M. Bernier ("BERNIER"), an individual, and Hans S. Croteau

3    ("H CROTEAU"), an individual, alleging Ten (10) Counts of a Tentacular Conspiracy to

4    Violate plaintiffs' Civil Rights, and for a Declaratory Judgment that California's Vexatious

5    Litigant Statute [California C.C.P. § 391 et. seq.] be held Unconstitutional under the First, and

6    Fourteenth Amendments to the United States Constitution [28 U.S.C. §§ 2201-2202]; against

7    Defendants Jocelyn G. Croteau, aka Jessie G. Croteau, ("J CROTEAU") an individual; ICS

8    Professional Services, Inc., ("ICS") a California corporation; The Croteau Living Trust dated

9    4/6/2005, ("TRUST") an individual; Paul M. King, ("KING") an individual; Royal Electric, Inc.,

10    ("ROYAL") a California corporation; Christopher D. Celedon, ("CELEDON") an individual;

11    William J. Ward, ("WARD") an individual; Sharmila R. Parkman, ("PARKMAN") an individual;

12    William J. Ward & Associates, ("WARD'S OFFICE") an unknown association; Thomas F.

13    Olsen, ("OLSEN") an individual; Lorber, Greenfield & Polito, ("LORBER LAW") a Limited

14    Liability Partnership, Laurence F. Haines, ("HAINES") an individual; HainesLaw, ("HAINES

15    LAW") an unknown entity; Eugene E. Kinsey, ("KINSEY") an individual, Curtis W. Herron,

16    ("HERRON") an individual; Eugene E. Kinsey, Inc., ("KINSEY LAW") a California

17    corporation; Patrick M. Howe, ("HOWE") an individual; Paul R. Greenwood,

18    ("GREENWOOD") as an individual and in his official capacity; Julie Korsmeyer,

19    ("KORSMEYER") as an individual and in her official capacity; Bonnie Dumanis,

20    ("DUMANIS") as an individual and in her official capacity; the San Diego County District

21    Attorney's Office ("SAN DIEGO DA"), as an individual and in its official capacity; Edmund G.

22    Brown Jr., ("BROWN") as an individual and in his official capacity; the State of California; and

23    DOES 1 through 100, inclusive. **WHEREFORE,** plaintiffs H CROTEAU and BERNIER,

24    encaptioned above as co-plaintiffs in pro se under Rules 19(a)(1) and 20(a)(1) of the Federal

25    Rules of Civil Procedure, allege as follows:

26                                          **JURISDICTION**

27          1.      Jurisdiction of this U.S. District Court arises from 28 U.S.C. §§ 1331, 1343(a),

28    1367(a); and 42 U.S.C. §§ 1983, 1985, and 1986.

---

2

## PARTIES / CAPACITIES / STANDINGS

2.      At all times herein mentioned, plaintiff BERNIER was a natural person residing at 6792 Maury Drive, San Diego 92119, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court. At all times herein mentioned, plaintiff BERNIER was and remains a citizen of the Country of Canada, Province of Quebec.  BERNIER is the mother of H CROTEAU and J CROTEAU.

3.      At all times herein mentioned, plaintiff H CROTEAU, son of plaintiff BERNIER, was a natural person residing at 6792 Maury Drive, San Diego 92119, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court. At all times herein mentioned, plaintiff H CROTEAU was and remains a citizen of the Country of Canada, Province of Quebec.

4.      Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant J CROTEAU was a natural person residing at 2512 Montclaire Street, San Diego 92104, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court.  At some point in time during all times herein mentioned, J CROTEAU was a citizen of the Country of Canada, Province of Quebec, who became a naturalized U.S. citizen.

5.      Plaintiffs are informed and believe and on such information and belief allege that ICS is, and at all times herein mentioned was, a corporation duly licensed, bonded, and insured, to do business as a "General Contractor" in the State of California.  Defendant J CROTEAU is the Chairman Executive Officer of ICS, and the qualifying State of California Contractors State License Board ("CSLB") contractor's license holder for ICS.

6.      Plaintiffs are informed and believe and on such information and belief allege that TRUST is, and at all times herein mentioned was, J CROTEAU's alternate capacity in its individualized form.

7.      Plaintiffs are informed and believe and on such information and belief allege that KING is, and at all times herein mentioned was, a natural person residing at 6839 Caminito Mundo #2, San Diego 92119, in the United States of America, in the State of California, County

1  of San Diego, within the jurisdiction of this United States District Court.  KING's national

2  citizenship is unknown to plaintiffs.

3      8.    Plaintiffs are informed and believe and on such information and belief allege that

4  ROYAL is, and at all times herein mentioned was, a corporation duly licensed and bonded to do

5  business as a "General Contractor" in the State of California.  Defendant KING is the Chairman

6  Executive Officer of ROYAL, and the qualifying State of California Contractors State License

7  Board ("CSLB") contractor's license holder for ROYAL.

8      9.    Plaintiffs are informed and believe and on such information and belief allege that

9  at all times herein mentioned, defendant CELEDON was a natural person residing at 2532

10  Boundary Street, San Diego 92104, in the United States of America, in the State of California,

11  County of San Diego, within the jurisdiction of this United States District Court.  CELEDON's

12  national citizenship is unknown to plaintiffs.

13      10.    Plaintiffs are informed and believe and on such information and belief allege that

14  at all times herein mentioned, defendant WARD was a natural person and legal professional

15  who's principal place of business is located at 4330 La Jolla Village Drive, Suite 330, San Diego

16  92122, in the United States of America, in the State of California, County of San Diego, within

17  the jurisdiction of this United States District Court.  WARD's residential address and national

18  citizenship are unknown to plaintiffs.

19      11.    Plaintiffs are informed and believe and on such information and belief allege that

20  at all times herein mentioned, defendant PARKMAN was a natural person and legal professional

21  who's principal place of business is located at 4330 La Jolla Village Drive, Suite 330, San Diego

22  92122, in the United States of America, in the State of California, County of San Diego, within

23  the jurisdiction of this United States District Court.  PARKMAN's residential address and

24  national citizenship are unknown to plaintiffs.

25      12.    Plaintiffs are informed and believe and on such information and belief allege that

26  at all times herein mentioned, defendant WARD'S OFFICE was an unknown association located

27  at 4330 La Jolla Village Drive, Suite 330, San Diego 92122, in the United States of America,

28  State of California, County of San Diego, in the jurisdiction of this District Court.

4

13.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant OLSEN was a natural person and legal professional who's principal place of business is located at 13985 Stowe Drive, Poway 92064, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court.  OLSEN's residential address and national citizenship are unknown to plaintiffs.

14.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant LORBER LAW was a Limited Liability Partnership who's principal place of business is located at 13985 Stowe Drive, Poway 92064, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court.

15.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant HAINES was a natural person and legal professional who's principal place of business is located at 139 East 3rd Avenue, Suite 108, Escondido 92025, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court.  HAINES' residential address and national citizenship are unknown to plaintiffs.

16.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant HAINES LAW was an unknown entity who's principal place of business is located at 139 East 3rd Avenue, Suite 108, Escondido 92025, in the United States of America, in the State of California, County of San Diego, within the jurisdiction of this United States District Court.

17.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant KINSEY was a natural person and legal professional who's principal place of business is located at 323 Main Street, 2nd Floor, Seal Beach 90740, in the United States of America, State of California, County of San Diego.  KINSEY's residential address and national citizenship are unknown to plaintiffs.

/ / / / / / /

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

18.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant HERRON was a natural person and legal professional who's principal place of business is located at 323 Main Street, 2nd Floor, Seal Beach 90740, in the United States of America, State of California, County of San Diego. HERRON's residential address and national citizenship are unknown to plaintiffs.

19.    Plaintiffs are informed and believe and on such information and belief allege that KINSEY LAW is, and at all times herein mentioned was, a professional legal corporation duly licensed to do business in the State of California (KINSEY LAW was suspended on June 1, 2009). Defendant KISNEY is the Chairman Executive Officer of KINSEY LAW.

20.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant HOWE was a natural person and legal professional who's principal place of business is located at 600 West Broadway, Suite 1150, San Diego California 92101, in the United States of America, State of California, County of San Diego, within the jurisdiction of this United States District Court. HOWE's residential address and national citizenship are unknown to plaintiffs.

21.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant GREENWOOD was a natural person and County of San Diego Deputy District Attorney Governmental Official who's principal place of business is located at 330 West Broadway, 12th Floor, San Diego California 92101, in the United States of America, State of California, County of San Diego, within the jurisdiction of this United States District Court. GREENWOOD's residential address and current national citizenship are unknown to plaintiffs.

22.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant KORSMEYER was a natural person and County of San Diego Chief Deputy District Attorney Governmental Official who's principal place of business is located at 330 West Broadway, 12th Floor, San Diego 92101, in the United States, State of California, County of San Diego, within the jurisdiction of this United States District Court. KORSMEYER's residential address and national citizenship are unknown to plaintiffs.

23.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant DUMANIS was a natural person and County of San Diego District Attorney Governmental Official who's principal place of business is located at 330 West Broadway, 12th Floor, San Diego 92101, in the United States of America, State of California, County of San Diego, within the jurisdiction of this United States District Court. DUMANIS' residential address and national citizenship are unknown to plaintiffs.

24.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant SAN DIEGO DA was a "person" within the meaning of 42 U.S.C. § 1983, and a County of San Diego District Attorney Governmental Entity who's principal place of business is located at 330 West Broadway, 12th Floor, San Diego 92101, in the United States of America, State of California, County of San Diego, within the jurisdiction of this United States District Court.

25.    Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendant BROWN was a natural person and a California State Attorney Governmental Official who's principal place of business is located at 50 Fremont Street, Suite 300, San Francisco 94105, in the United States of America, State of California, County of San Diego, within the jurisdiction of this United States District Court.

26.    There exists, and at all times herein mentioned there existed, a unity of interest and ownership between the individual defendants and the corporate defendants, such that any individuality and separateness between them have ceased, and the individuals are the alter ego of the corporations they control, in that those corporate defendants were mere shells, instrumentalities, and conduits through which these individuals exercised complete control and dominance of such businesses, to such an extent that any individuality or separateness between them does not, and at all times herein mentioned did not, exist. The fictitious defendants were conceived, intended, and abused by said individual defendants as a device to avoid individual liability and for the purpose of substituting a financially insolvent fictitious entity in their place. At no time after they became incorporated were any of their stock authorized to be issued or issued, nor has any such permit been applied for with the Commissioner of Corporations.

27.    Adherence to the fiction of the separate existence of the corporate defendants and financial trusts, as entities distinct from the individual defendants that solely control or own them would permit an abuse of the corporate privilege and would produce an inequitable result, and would promote injustice in that such a claim of a separate existence would only be made in bad faith, and in order to avoid the individual defendants' liabilities and responsibilities for the acts or omissions of their respective corporations and financial trusts.

28.    Plaintiffs are informed and believe and on such information and belief allege that defendants DOES 1 through 100, inclusive, were and are at all times mentioned in this claim involved and participated in the wrongful conduct which is the basis of this claim.  The true names and capacities, whether individual, corporate, associate, partnership or otherwise, of defendants DOES 1 through 100, inclusive, are unknown to plaintiffs at this time.  Plaintiffs will sue those defendants by such fictitious names pursuant to the *Federal Rules of Civil Procedure, Rule 15,* and will seek leave of court to amend this claim to show their true names and capacities when and if the same have been ascertained.  Plaintiffs are informed and believe, and based on that allege, that at all times herein mentioned, each of the defendants sued herein as DOE was the agent, servant, contractor, and employee of the defendants and each is responsible in some manner for the events and occurrences referred to, and caused damages hereinafter alleged.

29.    Plaintiffs are informed and believe and on such information and belief allege that each of the defendants, including DOES 1 through 100, inclusive, at all times mentioned in this claim, were each the agents, authorized representatives and employees of each of the other remaining defendants, and in doing the things alleged in this claim, defendants were acting within the course, purpose and scope of their agency and employment, with the knowledge, consent, and express and implied permission of the other defendants.

## STATEMENT OF THE FACTS

### (Relevant to all Counts, and as against all Defendants)

30.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 29 above as if fully set forth herein, and further allege:

/ / / / / / /

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

31.    At age 39, BERNIER moved to California with H CROTEAU, age 11, and J CROTEAU, age 17. J CROTEAU resided with BERNIER and H CROTEAU at the 6792 Maury Drive, San Diego California, 92119 address ("PROPERTY"), until the mid 1980's when BERNIER evicted J CROTEAU from BERNIER's PROPERTY with police intervention as a result of J CROTEAU's alleged violence and drug related behavioral problems.

32.    After J CROTEAU's eviction, BERNIER and H CROTEAU undertook an entrepreneurial venture as partners to design, patent, and market an invention known as a "self lacing shoe". During this approximate ten (10) year period of time, said partners were required to obtain the products and services of, *inter-alia*, engineers, product designers, accountants, material suppliers, industrial machining tool and die makers, patent and trademark attorneys, marketing consultants, and athletic shoe component manufacturers.

33.    Because said partners were required to invest their own limited capital to fund this "kitchen tabletop conceptualization", and because said partners' capitalistic venture could not provide a return on this investment until the ultimate sale of this fully developed and marketable product, the same could not afford to retain counsel each time a new dispute with one of these consultants or suppliers arose, as one might expect to frequently occur when dealing with any given type of unproven invention and experimental design.

34.    In addition, BERNIER and H CROTEAU each had several of their own private unfortunate personal dealings with individuals and businesses alike, which sometimes required litigation to address such disputes. Accordingly, and when the economic circumstances of these disputes demanded it, BERNIER and H CROTEAU proceeded with their necessary California State tort litigation in pro per.[1]

35.    On July 23, 2001, BERNIER and H CROTEAU filed a pro per complaint right before the statute of limitations expired, against one of these engineers over the breach of an $80,000.00 prototype development contract, in the matter of Rejeanne Bernier et. al. v. Millered Universal Enterprises, Inc. ("BERNIER v. MUE"), Superior Court Case Number GIC771170.

[1]California State Courts refer to pro se litigants as litigants "in propria persona" a.k.a. "pro per".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

36.    Thereafter, BERNIER substituted attorney Joseph Guy Maiorano into said State tort action, who then filed an amended complaint on BERNIER's behalf.  However, attorney Maiorano neglected BERNIER's civil action in every other respect, and failed to propound any discovery upon the defendants in that action.  Accordingly, those defendants moved the State Court for an order declaring BERNIER and H CROTEAU to be vexatious litigants[1], and to post security for the benefit of defendant Millered Universal Enterprises, Inc. in that action.

37.    The State Court granted those defendants' motion to declare BERNIER and H CROTEAU to be vexatious litigants pursuant to section 391(b)(1), requiring a minimum of five (5) unsuccessful pro per litigations in the preceding seven (7) year period.  Pursuant to the order, the State Court ordered plaintiffs to post security in the amount of $30,000.00 for the benefit of those defendants.  The State Court noted that plaintiffs were represented at the time, and yet had not timely presented any admissible evidence at that hearing.  See Exhibit "1".

38.    None of the cases lodged by those defendants as exhibits to that vexatious litigant motion had ever been finally adjudicated against plaintiffs on their true merits.  In fact, most of these cases had been settled favorably to plaintiffs, but had not been properly procedurally dismissed thereafter.  Accordingly, the Court had dismissed these settled cases without prejudice on its' own motions, ultimately resulting in "dismissed cases", each of which had been counted by default against plaintiffs' under section 391(b)(1).

39.    Attorney Maiorano admitted to plaintiffs that Mr. Maiorano had little to no experience with California's vexatious litigant statutes.  Attorney Maiorano's opposition to those defendants' vexatious litigant motion had failed to offer any contrary proof that those defendants' lodged cases had in fact not been determined adversely to plaintiffs.  See *Tokerud v. Capitolbank Sacramento*, 38 Cal. App. 4th 775, (1995).

40.    Plaintiffs could not afford to post security, and the Court dismissed said action pursuant section 391.4.  Plaintiffs could not afford an appeal, and therefore did not appeal.

---

[1]Under CA Code of Civ. Proc. § 391.1, a defendant to an action initiated or maintained by a pro per may move the Court to order the plaintiff to furnish security if certain conditions are met [C.C.P. § 391(b)(1) through (4)].

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

41.     Several years after J CROTEAU's eviction from BERNIER's PROPERTY, BERNIER, H CROTEAU, and J CROTEAU began communications with each other again.  In casual conversations, BERNIER and H CROTEAU would repeatedly complain to J CROTEAU about the highly discriminatory and invidiously prejudicial effects of the vexatious litigant law.

42.     Plaintiffs would often discuss with J CROTEAU how attorneys and judges had allegedly reacted to the mere mention of the words "vexatious litigant", on each occasion. Plaintiffs' often complained that although it is clear that a judgment by presumption is always cheaper and easier than an individualized determination of the issues, that plaintiffs' opponents would always manage to abuse the vexatious litigant law by running roughshod over plaintiffs' fundamental interests, and groundlessly derogate plaintiffs credibility on each occasion.

**A.     BERNIER's swimming pool remodeling problems, and the Lakeside Land Company, Inc. v. Mark Karim Quintero et. al. limited jurisdiction inter-pleader action.**

43.     In 1997, BERNIER employed Michael Spice dba Pearl Pools to re-pipe and re-plaster her PROPERTY's swimming pool.  J CROTEAU worked alongside Mr. Spice for the entire length of the project.  Mr. Spice abandoned the project, allegedly leaving construction defects which fell substantially below the industry's standard of workmanship.  BERNIER complained to the CSLB, which issued citations against Mr. Spice for the defective work.

44.     BERNIER was again required to litigate against Mr. Spice, which resulted in a $30,000.00 settlement in BERNIER's favor.  In fact, J CROTEAU had served the summons and complaint in that litigation upon Mr. Spice.  Together, and on more than just one occasion, J CROTEAU and H CROTEAU reviewed the CSLB's citations against Mr. Spice which had itemized the defects in the swimming pools' construction, in order to consider all available remedies.  BERNIER was so fearful of hiring another bad contractor, that BERNIER did not seek to repair or even attempt to use her own swimming pool, until 2005.

45.     Prior to 2005, J CROTEAU picked out two (2) contractors from BERNIER's list of three (3) candidates, which J CROTEAU indicated might competently repair BERNIER's swimming pool issues, one of which was Aquatic Renovations, Inc. ("AQUATIC"), which possessed a general contractor's license in addition to a swimming pool contractor's license.

46.    In 2005, BERNIER employed AQUATIC to re-pipe and re-plaster her PROPERTY's swimming pool.  AQUATIC allegedly failed to address any of the problems which BERNIER had employed AQUATIC to resolve, besides performing another futile re-plastering of her PROPERTY's swimming pool.

47.    After unsuccessfully attempting to reach AQUATIC on several occasions, BERNIER asked J CROTEAU to inspect her swimming pool's air and water leaks.  J CROTEAU inspected the swimming pool, and attempted repairs which did not resolve the problem.  J CROTEAU then advised BERNIER to file a claim against that contractor's surety bond, and wrote an extensive report to that surety on BERNIER's behalf.  See Exhibit "2".

48.    Due to a multiplicity of claims against AQUATIC's surety bond, American Contractor's Indemnity Company ("ACIC") responded with a limited jurisdiction[1] inter-pleader suit[2] against BERNIER to enjoin all claimants to interplead their claims against Mark Karim Quintero as the sole owner of "Aquatic Renovations".  BERNIER had never heard of Mark Karim Quintero, and confusion resulted from ACIC's allegation that Aquatic Renovations was a sole owner, and not a California corporation as BERNIER had believed she had dealt with.

49.    BERNIER investigated, and discovered an association between Mark Karim Quintero's CSLB contractor's license, and a California corporation named South Coast Pool Plastering, Inc. ("SCPP"), which was operated by Quintero's family.  BERNIER's further investigation revealed an unlimited California power of attorney between Mr. Quintero and SCPP's officer and sibling to Mr. Quintero, Ms. Yvonne Chastang.

50.    With limited time remaining to plead her cross complaint[3], BERNIER cross complained in pro per against Mr. Quintero dba Aquatic Renovations, SCPP as the alter ego of Mr. Quintero, ACIC, SCPP's surety bond company Insurance Company of the West ("ICW"), and DOES 1 through 50.

---

[1]In California, suits under $25,000.00 are subject to the "limited jurisdiction" of the Superior Court, which replaced Municipal Court jurisdiction when State Courts were unified in the year 2000 by Proposition 220.

[2]See California Code of Civ. Proc. § 386.

[3]California State Courts refer to counterclaims as "cross complaints".

---

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

51.    BERNIER obtained a judgment against Mr. Quintero in the amount of $18,500.00, in the matter of Lakeside Land Company, Inc. v. Mark Karim Quintero et. al., San Diego Superior Court Case Number IC878406.  Attorneys WARD, PARKMAN, and WARD'S OFFICE represented SCPP against BERNIER's cross complaint, and successfully defended SCPP upon a motion for summary judgment[1], on July 27, 2007.

**B.    BERNIER's negotiations with J CROTEAU concerning the PROPERTY's remodeling project in 2007.**

52.    At or about the same time that J CROTEAU inspected and attempted to repair BERNIER's swimming pool air and water leaks in June of 2006, BERNIER and J CROTEAU also began negotiations for the remodeling of BERNIER's PROPERTY ("PROJECT"). BERNIER's desired general scope of remodeling included a room over the PROPERTY's garage, an exterior deck over that new room addition, the expansion of the front entryway, the reorganization of the stairwell, the expansion of the kitchen, and a back yard balcony on the PROPERTY's second story.  See BERNIER's general "Wish List" as Exhibit "3".

53.    H CROTEAU labored for J CROTEAU in preparation for the PROJECT, and pursuant to an oral employment agreement between H CROTEAU and J CROTEAU at the rate of $20 per hour, to be deducted[2] from the total cost of that construction work on BERNIER's PROPERTY.  J CROTEAU complied with the terms of that oral employment agreement, and credited $600 against that total work and materials invoice to BERNIER to compensate for H CROTEAU's labor.  See that invoice to BERNIER as Exhibit "4".

54.    J CROTEAU represented to BERNIER that J CROTEAU had self remodeled J CROTEAU's own home for about eighty thousand dollars and BERNIER's PROJECT would cost one hundred to one hundred fifty thousand dollars.  J CROTEAU introduced BERNIER to J CROTEAU's friend, Mr. Ron Lyons, and BERNIER paid Mr. Lyons directly to draft the construction plans pursuant to BERNIER's desired PROJECT remodeling changes.

[1]California State Courts refers to a Federal Court motion to dismiss as a motion for "summary judgment".

[2]Neither H CROTEAU nor BERNIER intended that BERNIER implicitly adopt H CROTEAU's right to sue J CROTEAU over J CROTEAU's breach of a third party beneficiary employment contract.  See Lucas v. Hamm (1961) 56 Cal.2d 583.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

55.   In or about October to November of 2006, BERNIER and J CROTEAU reviewed Mr. Lyons' rough draft construction plan for the PROJECT, and BERNIER and J CROTEAU discussed revisions to those plans which would more adequately represent BERNIER's desired remodeling PROJECT.   At this point in time, BERNIER did not have any type of binding agreement with J CROTEAU for the PROJECT.

56.   In January of 2007, J CROTEAU informed BERNIER that the PROJECT would cost BERNIER up to two hundred fifty thousand dollars, in accordance with the final plan design as discussed between J CROTEAU and BERNIER in October to November of 2006. BERNIER sought another estimate from an alternative[1] to traditional contractors, and decided to continue negotiations with J CROTEAU as a result of the cost of that alternative approach.

57.   On February 25, 2007, J CROTEAU presented the final construction plan to BERNIER for its signing, and informed BERNIER that J CROTEAU would perform the PROJECT for a guaranteed maximum price ("GMP") of three hundred thousand dollars, including the PROPERTY's exterior landscape and highest quality construction materials.

58.   BERNIER signed said final construction plan on February 25, 2007, and accordingly construed an oral agreement with J CROTEAU for the performance of the PROJECT.   At that same time, J CROTEAU also promised BERNIER a follow up written contract for the PROJECT which would provide a breakdown of the PROJECT's labor and materials in detail, at or below the promised GMP of three hundred thousand dollars.

**C.   Performance and abandonment of the PROJECT.**

59.   On March 19, 2007, J CROTEAU informed BERNIER that J CROTEAU needed to do destructive testing to the PROPERTY's interiors in order to provide BERNIER with said detailed written contract.   J CROTEAU started work on the PROJECT under this pretense, but then continued with the PROJECT without ever providing BERNIER with the promised detailed written contract.

/ / / / / / /

---

[1]BERNIER obtained an estimate from a self help contracting alternative named "U-Build-it", in the amount of approximately $400,000.00.

---

14

60. On March 23, 2007, J CROTEAU entered into an oral employment agreement with H CROTEAU for labor on the PROJECT at the flat rate of $20 per hour, to be deducted from the PROJECT's cost to BERNIER, exactly as had been done in June of 2006. As before, the employment agreement did not require any particular hourly schedule to be maintained by H CROTEAU on the PROJECT.

61. During performance of the PROJECT, J CROTEAU substantially diverted from Mr. Lyons' final and approved construction plan, and mostly demolished BERNIER's PROPERTY. Without city approval, J CROTEAU demolished and dumped the main roof of BERNIER's PROPERTY, along with the PROPERTY's entire second story. BERNIER and H CROTEAU continued to live at the PROPERTY during and throughout its' destruction.

62. BERNIER repeatedly requested that J CROTEAU produce the promised written contract, and J CROTEAU would repeatedly respond that it would be produced at some later point in time. H CROTEAU repeatedly requested J CROTEAU's accountancy of H CROTEAU's labor credit on the PROJECT's cost to BERNIER, and J CROTEAU would repeatedly respond that said accountancy would be produced at some later point in time.

63. Throughout the PROJECT's performance, J CROTEAU demanded progress payments from BERNIER, and BERNIER paid by checks made out to J CROTEAU's personal name at J CROTEAU's specific request. In total, BERNIER paid about two hundred thousand dollars between March and August of 2007 to J CROTEAU, J CROTEAU's sub-contractors, and the PROJECT's materials suppliers. In August of 2007, J CROTEAU went on vacation in Mexico, and failed to cover BERNIER's roofless PROPERTY from the elements of nature.

64. On Sunday, August 26, 2007, BERNIER's PROPERTY was flooded by extensive rainfall. Accordingly, BERNIER contacted an emergency restoration company to clean up the water damages, and later BERNIER's homeowner's insurance company was also notified of these water damages. BERNIER's insurance company thereafter inspected the PROPERTY, and deemed J CROTEAU and his construction company, ICS, potentially liable for these rain incident damages. J CROTEAU was still on vacation in Mexico at that time, and returned to the PROPERTY to realize the damages on September 4, 2007.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

65.    J CROTEAU instantly denied liability for the water damages, and returned to BERNIER's PROPERTY on September 5, 2007, with an ultimatum for BERNIER. J CROTEAU demanded that BERNIER sign an indemnity agreement which had been back dated to March 19, 2007. J CROTEAU offered no consideration in return for the execution of said indemnity agreement, except for J CROTEAU's continued maintenance of J CROTEAU's existing contractual obligations to BERNIER. See the "indemnity agreement" as Exhibit "5".

66.    J CROTEAU returned to BERNIER's PROPERTY in the evening of September 5, 2007, to further pressure BERNIER's execution of the indemnity agreement. Due to J CROTEAU's threats and BERNIER's fear that J CROTEAU would become violent, BERNIER asked J CROTEAU for permission to record the expected oral argument between J CROTEAU and BERNIER. J CROTEAU granted BERNIER's request to record the argument, and H CROTEAU thus found a recording device, and openly recorded the argument between J CROTEAU and BERNIER. See a partial transcript of that recording as Exhibit "6".

67.    BERNIER demanded an opportunity to consult with BERNIER's attorney before considering the execution of said indemnity agreement. CROTEAU denied BERNIER's request for an attorney consultation, and abandoned the PROJECT in the evening of September 5, 2007. See J CROTEAU's *"Notice"* of the PROJECT's abandonment and threat of BERNIER's eviction from the unsafe PROPERTY dated September 5, 2007, as Exhibit "7".

**D.    J CROTEAU's conspiracy with KING, CELEDON, WARD, PARKMAN, WARD'S OFFICE, DOES 1 through 10, and a State Actor to enter a corrupt "pre-filing order" under the color of law, and intentionally tamper with the judicial machinery.**

68.    On September 6, 2007, J CROTEAU returned to the PROPERTY to deliver the September 5, 2007 *"Notice"* to BERNIER, and retrieve J CROTEAU's tools, along with the construction materials BERNIER had already paid for directly to the PROJECT's materials suppliers. BERNIER did not respond to J CROTEAU's September 5, 2007 *"Notice"* of the PROJECT's abandonment. On September 7, 2007, J CROTEAU again returned to the PROPERTY to deliver another letter to BERNIER concerning the PROJECT's abandonment. See J CROTEAU's letter of September 6, 2007 to BERNIER as Exhibit "8".

69.     Upon review of J CROTEAU's September 6, 2007 letter, BERNIER learned that J CROTEAU had been harboring a grudge as a result of BERNIER's eviction of J CROTEAU from the PROPERTY in the mid 1980's, and since before the PROJECT's negotiations.    J CROTEAU's September 6, 2007 letter states: *"...being dragged down by you improper actions that have left literal life long markings that are more serious than you ever imagine and not easy to deal with just as recently as my becoming a naturalized US citizen."*

70.     In addition, J CROTEAU's letter insinuates BERNIER's rain incident damages claim to her own homeowner's insurance company was fraudulent, that BERNIER was defrauding the "Satellite TV industry" and BERNIER's utilities provider San Diego Gas and Electric ("SDG&E"), and refers to BERNIER's alleged *"well known extensive litigious past history"*.    J CROTEAU's letter admits BERNIER's PROPERTY was *"not considered habitable"*, and that BERNIER was allegedly risking eviction from her own PROPERTY.

71.     On page 6 of said letter, J CROTEAU warns *"you need to advised me of you're intentions no later than Monday September 10th"*.    On the last page, J CROTEAU states *"in the end you might just get what you feared the most...another lawsuit on your hands and possibly lose a lot more than what you have at stake"* [emphasis added], and ends with *"O.K., that's it. Your turn"*.    BERNIER did not respond to J CROTEAU's September 6, 2007 letter.

72.     On September 11, 2007, H CROTEAU discovered a threatening document pinned to BERNIER's PROPERTY.    See that document as Exhibit "9".    BERNIER concluded the document was J CROTEAU's, and contacted BERNIER's attorney, Mr. Edward W. Freedman, for advice.    Mr. Freedman advised BERNIER not to call the police, and advised BERNIER to inform J CROTEAU that a lawsuit concerning the abandonment of the PROJECT would be filed by September 14, 2007.    BERNIER complied with Mr. Freedman's advice.

73.     On information and belief, J CROTEAU contacted SDG&E on September 11, 2007, and informed SDG&E that BERNIER was involved with 1) satellite piracy, 2) marijuana cultivation, 3) tampering with the PROPERTY's electrical meter, and had 4) 25 pending lawsuits for various reasons.    J CROTEAU also informed SDG&E that J CROTEAU had an attorney fighting *"if client cons company"*, and J CROTEAU *"would like documentation that*

17

1 | *he (J CROTEAU) called this in because customer (BERNIER) has put a fraudulent claim into*

2 | *his (J CROTEAU) insurance agency"*. See SDG&E's subpoenaed documents as Exhibit "10".

3 |      74.    In August of 2007, SCPP sued BERNIER for malicious prosecution in relation

4 | to the Lakeside Land Company, Inc. v. Mark Karim Quintero et. al. summary judgment.

5 | WARD, PARKMAN, and WARD'S OFFICE represented SCPP in that State Court malicious

6 | prosecution action entitled South Coast Pool Plastering, Inc. v. Rejeanne Bernier, San Diego

7 | Superior Court Case No. 37-2007-00072488-CU-NP-CTL.

8 |      75.    On information and belief, WARD, PARKMAN, and WARD'S OFFICE

9 | purchased SCPP's interests in said malicious prosecution lawsuit against BERNIER, and would

10 | not have pursued the same, if not for the State Court's "vexatious litigant" declaration against

11 | plaintiffs in the BERNIER v. MUE matter in May of 2002.  Before the PROJECT's

12 | abandonment on September 5, 2007, WARD'S OFFICE had subpoenaed J CROTEAU's

13 | business records.  Accordingly, J CROTEAU learned of BERNIER's surety bond inter-pleader

14 | lawsuit, and ultimately said resulting malicious prosecution action against BERNIER.

15 |      76.    On or about September 11, 2007, Mr. Freedman informed BERNIER that

16 | WARD'S OFFICE had telephonically contacted Mr. Freedman.  Mr. Freedman told BERNIER

17 | that J CROTEAU had telephonically contacted WARD'S OFFICE, and that WARD'S OFFICE,

18 | together with J CROTEAU, would prove BERNIER's vexatiousness and litigiousness, and

19 | accordingly prevail in said malicious prosecution matter against BERNIER.

20 |      77.    BERNIER thereafter received a letter from ICS on September 20, 2007, which

21 | stated: "Our attorneys have already started to review this case and public records... and found

22 | out that you're branded as **"vexatious litigants"** having more than your share of legal suits in

23 | our local court, not to mention that you are being sued by a pool company as we speak." [no

24 | emphasis added]  See ICS' September 20, 2007 letter to BERNIER as Exhibit "11".

25 |      78.    Despite claiming to be represented by "attorneys", J CROTEAU had not retained

26 | any attorneys at this point in time.  In fact, after serving J CROTEAU with BERNIER's

27 | summons and complaint in October of 2007, Mr. Freedman granted J CROTEAU more time to

28 | retain counsel.  See the November 21, 2007 letter to Mr. Freedman as Exhibit "12".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

79.    Also after the PROJECT's abandonment, J CROTEAU coerced KING to testify falsely in favor of J CROTEAU's fabricated accusation that the PROPERTY's electrical meter had been tampered with.    BERNIER had paid KING approximately $12,000.00 for KING's electrical work on the PROJECT.    KING had only performed approximately $2,000.00 worth of electrical work, and had a motive to conspire with J CROTEAU to discredit BERNIER and unlawfully keep BERNIER's money.    See Exhibit "11", and ICS' letter to BERNIER dated September 21, 2007 as Exhibit "13".    BERNIER did not respond to either of ICS' letters.

80.    J CROTEAU contrived the false electrical meter tampering accusations pursuant to the conspiracy between J CROTEAU and WARD, PARKMAN, and WARD'S OFFICE's, in order to fabricate the missing element of malice on BERNIER's part for having cross complained against SCPP and its surety bond, ICW, in said malicious prosecution action.

81.    After the PROJECT's abandonment, J CROTEAU coerced CELEDON to sign falsified timesheets concerning CELEDON's work on the PROJECT, and to testify falsely in derogation of H CROTEAU and BERNIER.    CELEDON later admitted on March 2, 2010 that CELEDON and J CROTEAU got together after September 5, 2007, and approved and signed J CROTEAU's falsified timesheets concerning CELEDON's work on the PROJECT.    See an excerpt of CELEDON's testimony in the separate matter of Hans Croteau v. Jessie Croteau et. al., San Diego Superior Court Case No. 37-2008-00087054-CU-PT-CTL, as Exhibit "14".

82.    Prior to October 16, 2007, J CROTEAU, KING, CELEDON, WARD, PARKMAN, and WARD'S OFFICE conspired with DOES 1 through 10 ("PRIVATE CO-CONSPIRATORS") to compose a corrupt pre-filing order[1] in the dismissed matter of BERNIER v. MUE, and purportedly on behalf of defendant Millered Universal Enterprises, Inc. Said pre-filing order was composed by all PRIVATE CO-CONSPIRATORS with the intention of presenting it to the Presiding Judge of the San Diego Superior Court, Hon. Judge Kenneth So., for its execution and entry in the dismissed BERNIER v. MUE State Court's file.

/ / / / / / /

---

[1]Pursuant to California Civ. Code of Proc. § 391.7, the State Court may enter an injunction preventing the filing of any new litigation by a pro per plaintiff declared to be a "vexatious litigant" if certain conditions are met.

83.    On or about October 16, 2007, all PRIVATE CO-CONSPIRATORS conspired with Hon. Presiding Judge Kenneth So to execute and enter said corrupt pre-filing order in the BERNIER v. MUE State Court's file.   Despite the fact that said corrupt pre-filing order 1) intentionally omitted the name and address of the party or party's attorney presenting the same for the Court's approval, 2) was purportedly an order being presented to the Court over five (5) years after the BERNIER v. MUE action's dismissal, and 3) that there was no genuine order in the BERNIER v. MUE file directing that H CROTEAU and BERNIER be placed on California's Vexatious Litigant Judicial Council List[1] pursuant to California Civ. Code of Proc. 391.7; Hon. Presiding Judge Kenneth So nevertheless executed and entered said pre-filing order in the BERNIER v. MUE State Court's file.   See that corrupt pre-filing order as Exhibit "15".

84.    Hon. Presiding Judge So violated BERNIER and H CROTEAU's procedural and substantive Due Process rights by not providing any notice or opportunity to be heard before said pre-filing order's entry.  *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972); relying on *Wisconsin v. Constantineau*, 400 U.S. 433, 437; *Wieman v. Updegraff*, 344 U.S. 183, 191; *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123; *United States v. Lovett*, 328 U.S. 303, 316 -317; *Peters v. Hobby*, 349 U.S. 331, 352.  Hon. Presiding Judge So did not thereafter attempt to notify H CROTEAU and BERNIER that said corrupt pre-filing order now affected said litigants' future filings, in direct defiance of the very nature of the order itself.  See *McColm v. Westwood Park Assn.*, 62 Cal.App.4th at p. 1216 (1998).

85.    Judge So is immune from liability in a § 1983 suit because the injunction was a judicial act within the jurisdiction of the State Court.  *Ashelman v. Pope*, 793 F.2d 1072, 1075 (1986) (en banc).   However, that immunity *"does not change the character of the judge's action or that of his coconspirators."* Dennis v. Sparks, 449 U.S. 24 (1980).  *"[T]here was no good reason in law, logic, or policy for conferring immunity on private persons who persuaded the immune judge to exercise his jurisdiction corruptly."* Id. at 27.

/ / / / / / /

---

[1]Pursuant to California Civ. Code of Proc. § 391.7, a pre-filing order entered by any CA State Court will thereafter be sent to California's Vexatious Litigant Judicial Council List, effectively blacklisting the pro per.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

86.    Later in July of 2008, and pursuant to the limitation upon plaintiffs' right of access to the Courts which said conspiracy had been previously calculated to affect, J CROTEAU would cause a motion[1] to declare BERNIER a "vexatious litigant" to be filed with the State Court, in the matter of Rejeanne Bernier v. Jessie Croteau et. al., San Diego Superior Court Case No. 37-2007-00076024-CU-BC-CTL (Filed 10/1/07), which relied upon said corrupt pre-filing in order to demonstrate BERNIER's vexatiousness and litigiousness.

87.    At or about that same time, plaintiffs discovered the existence of said corrupt pre-filing order as an attached exhibit to J CROTEAU's vexatious litigant motion, and confronted Judge So to reveal the identity of all PRIVATE CO-CONSPIRATORS.  Instead of doing so, Hon. Presiding Judge So issued another order, this time striking said State Actor's own pre-filing order as having been entered in the BERNIER v. M.U.E. file *"in error"*.  See Hon. Presiding Judge So's order striking Judge So's corrupt pre-filing order, as Exhibit "16".

**E.    Despite State Actor's Striking of its' own Corrupt Pre-Filing Order, PRIVATE CO-CONSPIRATORS Continued Calculated Violation of Plaintiffs' Constitutional Right to *Meaningful* Petition of Governmental Redress of Grievances.**

88.    On March 17, 2008, BERNIER and Mr. Freedman appeared at the State Court ordered mediation concerning WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution action against BERNIER.  On information and belief, WARD, PARKMAN, and WARD'S OFFICE appeared on behalf of real party in interest, SCPP.

89.    BERNIER and Mr. Freedman explained to the mediator that WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution action against BERNIER would fail because of the missing element of malice.  The mediator then communicated with WARD, PARKMAN, and WARD'S OFFICE outside of BERNIER and Mr. Freedman's presence.  The mediator then returned to BERNIER and Mr. Freedman to explain that BERNIER would not be likely to prevail in said malicious prosecution action as a result of BERNIER's current status as a "vexatious litigant", as evidenced by California's Vexatious Litigant Judicial Council List.

[1]Defined earlier in the footnote on page 10 of this complaint.

21

90.    BERNIER denied being on California's Vexatious Litigant Judicial Council List to the mediator, and attempted to educate the mediator as to the nuances of California's vexatious litigant statutes.  BERNIER explained the Court's declaration in the BERNIER v. M.U.E. case in 2002 was limited to that action only, and that BERNIER had not been declared a vexatious litigant in relation to WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution action.  On behalf of BERNIER, but without BERNIER's express approval, Mr. Freedman offered "in the low thousands" to settle the malicious prosecution claim.

91.    The mediator then again communicated with WARD, PARKMAN, and WARD'S OFFICE outside of BERNIER and Mr. Freedman's presence, and returned to BERNIER and Mr. Freedman to relate WARD, PARKMAN, and WARD'S OFFICE's flat out refusal of Mr. Freedman's offer, and to emphasize that BERNIER's undeniable status as a vexatious litigant would make BERNIER's attempted defense of WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution, an exercise in futility.  The mediation was fruitless.

92.    *Meanwhile* on January 3, 2008, J CROTEAU had filed a cross complaint in response to BERNIER's breach of contract action against J CROTEAU, alleging a breach of a **written** contract (allegedly dated November 3, 2006, and July 13, 2007; without an attached copy of the purported written contracts), common counts, and fraud.  J CROTEAU's cross complaint alleged BERNIER had terminated the services of ICS on September 11, 2007, and claimed special damages of $168,357.33, as well as punitive and exemplary damages against BERNIER.  Mr. Freedman did not demurrer to J CROTEAU's cross complaint.

93.    On February 27, 2008, OLSEN and LORBER LAW substituted into said Bernier v. Croteau et. al. action, purportedly to legally and ethically represent J CROTEAU in that action.  OLSEN and LORBER LAW's concerted activity to limit plaintiffs' *meaningful* right of access to the Courts via the continued abuse of said corrupt pre-filing order on J CROTEAU's behalf is tantamount to a tactic conspiracy agreement with said PRIVATE CO-CONSPIRATORS.  See *Hudspeth v. Figgins*, 584 F.2d 1345, 1347, 1348 (1978); also see *Hafner v. Brown*, 983 F.2d 570, 576, 577 (1992).

/ / / / / / /

22

94.    In addition to said corrupt pre-filing order, OLSEN and LORBER LAW further attached J CROTEAU's purported written contracts for the PROJECT dated November 3, 2006 and July 13, 2007, as exhibits to that motion. At the same time as the discovery of the corrupt pre-filing order, H CROTEAU and BERNIER discovered J CROTEAU's purported written contracts for the PROJECT, and immediately retained their own forensic document expert to analyze the signatures of both questioned documents.

95.    BERNIER opposed said vexatious litigant motion and addressed J CROTEAU's alleged fabricated / forged written contracts, as well as the anonymous nature of said corrupt pre-filing order. OLSEN and LORBER LAW replied, again arguing BERNIER should post security as a "vexatious litigant". On July 25, 2008, Hon. Judith Hayes denied J CROTEAU's "vexatious litigant" motion to declare BERNIER a "vexatious litigant" in the Bernier v. Croteau et. al. matter, specifically noting that:

> "The Motion of Defendants Jocelyn Gabriel Croteau and ICS Professional Services, Inc. to Require Plaintiff ReJeanne Bernier to Post Security as a Vexatious Litigant is DENIED. (CCP section 391)
>
> Defendant has the burden to establish Plaintiff should be deemed a vexatious litigant. (Camerado Ins. Agency, Inc. v. Superior Court (1993) 12 Cal.App.4th 838, 842 [The defendant who moves for security must prove the plaintiff is a vexatious litigant].) Here, Defendant has failed to show that Plaintiff is a vexatious litigant. Plaintiff persuasively shows the prior litigation involving Plaintiff does not meet the criteria mandated in section 391. More importantly, the prefiling order issued against her before the instant action was filed has been vacated as unsupported. Further, Plaintiff is not unrepresented and has retained counsel in this matter. The issues in this lawsuit are different from the previous litigation involving Plaintiff. The facts here do not support Defendant's contention that allowing Plaintiff to proceed because she is currently represented contravenes the legislative intent of the statutes. Thus, the motion is denied.
>
> The minutes are the order of the Court. No formal order is required."

[emphasis added] See Judge Hayes' July 25, 2008 order, as Exhibit "17".

96.    On May 2, 2008, H CROTEAU filed a State tort action against J CROTEAU and ICS for damages arising out of the PROJECT. OLSEN and LORBER LAW responded for J CROTEAU by filing yet another vexatious litigant motion against H CROTEAU in that separate action, and once again attached said corrupt prefiling order in support of the same.

97.    In October of 2008, OLSEN and LORBER LAW consulted with a forensic document expert named David Oleksow.  Curiously, OLSEN and LORBER LAW did not retain said experts.  Instead, OLSEN and LORBER LAW continued the abuse of the judicial process by taking H CROTEAU and BERNIER's depositions in November of 2008 for improper purposes, namely, to harass H CROTEAU and BERNIER with J CROTEAU's wild fabrications of moral turpitude, and requested volumes upon volumes of deposition transcripts of irrelevant matters such as BERNIER's divorce and alleged litigiousness in Canada.

**F.    *Meanwhile*, WARD, PARKMAN, and WARD'S OFFICE Continued to Conspire with J CROTEAU and all PRIVATE CO-CONSPIRATORS to Further Violate BERNIER's Constitutional Right to a *Meaningful* Governmental Petition.**

98.    WARD, PARKMAN, and WARD'S OFFICE subpoenaed J CROTEAU to testify personally at trial in the matter of South Coast Pool Plastering, Inc. v. Rejeanne Bernier.  Accordingly, Mr. Freedman took J CROTEAU's deposition on behalf of BERNIER's defense in that malicious prosecution matter.

99.    OLSEN and LORBER LAW attended said deposition along with WARD, Mr. Freedman, and BERNIER, wherein J CROTEAU denied having any knowledge of BERNIER's alleged malice for having filed BERNIER's cross complaint in the Lakeside Land Company, Inc. v. Mark Karim Quintero et. al. underlying inter-pleader matter.  See J CROTEAU's entire deposition transcript in said malicious prosecution action on July 28, 2008, as Exhibit "18".

100.    On August 13, 2008, WARD, PARKMAN, and WARD'S OFFICE and all PRIVATE CO-CONSPIRATORS continued their conspiracy with J CROTEAU by calling J CROTEAU to the witness stand in the matter of South Coast Pool Plastering, Inc. v. Rejeanne Bernier.  OLSEN and LORBER LAW were present in the Courtroom, and on information and belief, OLSEN and LORBER LAW frequently commented and snickered to Mr. Freedman about the daily progress of WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution action against BERNIER, and how J CROTEAU's testimony had been effective in discrediting BERNIER's defense thereto.  See J CROTEAU's entire trial transcript testimony at that malicious prosecution trial on August 13, 2008, as Exhibit "19".

101.   WARD, PARKMAN, and WARD'S OFFICE opened J CROTEAU's examination by leading J CROTEAU into to explaining away J CROTEAU's own surety bond report (Exhibit "2"), as being the unfortunate byproduct of BERNIER's malicious deception of J CROTEAU.  See Exhibit "19", page 3, line 7 to page 13, line 25.  See *QSP, Inc. v. Aetna Casualty & Surety Co.*, 256 Conn. 343, 361 (2001), *"In a malicious prosecution or vexatious litigation action, it is necessary to prove want of probable cause"*.  [emphasis added]

102.   In continuation of the conspiracy, WARD, PARKMAN, and WARD'S OFFICE deliberately led J CROTEAU into explaining J CROTEAU's fabricated visceral allegations to SDG&E, and how those egregious allegations of moral turpitude related to the condition of BERNIER's swimming pool, and ultimately BERNIER's state of mind for having filed a claim against SCPP's surety bond, ICW.  See Exhibit "19", page 14, line 19 through page 18, line 17.

103.   And finally to complete the arc on the missing element of malice, WARD, PARKMAN, and WARD'S OFFICE led J CROTEAU into explaining allegedly how BERNIER's surety bond claim against ICW was a "whole fabrication", and at that point J CROTEAU continuously insisted that WARD, PARKMAN, and WARD'S OFFICE play an audio recording[1] for the jury which had been accidently released during the discovery phase of that instant action.  See Exhibit "19", page 18, line 19 through page 24, line 18.

104.   On cross examination, Mr. Freedman solicited J CROTEAU to admit J CROTEAU's dislike of H CROTEAU "Because my (J CROTEAU) mother (BERNIER) went ahead and filed a lawsuit for which my brother (H CROTEAU) is writing the pleadings in the background".  See Exhibit "19", page 50, line 28 through page 51, line 2.

105.   Also on cross, Mr. Freedman solicited J CROTEAU to further admit that while J CROTEAU had no actual evidence of malice on BERNIER's part regarding said cross complaint, J CROTEAU had *"an idea"* that BERNIER's cross complaint against SCPP was *"nothing more than for money"*.  See Exhibit "19", page 70, line 20 through page 71, line 17.

---

[1]Due to PARKMAN's deception of the Court in the underlying inter-pleader matter, BERNIER had notified WARD'S OFFICE that all communications between BERNIER and WARD'S OFFICE would be recorded.  That recorder had been accidentally left on after WARD's deposition of H CROTEAU's in said underling matter.

106.    WARD, PARKMAN, and WARD'S OFFICE continued the conspiracy with J CROTEAU by leading J CROTEAU into testifying about J CROTEAU's fabricated allegations of marijuana cultivation on BERNIER's PROPERTY.    See Exhibit "19", page 25, line 20 through page 27, line 1; and page 74, line 4 through page 76, line 19.

107.    To further persuade the jury about BERNIER's malicious / vexatious state of mind in claiming against ICW; WARD, PARKMAN, and WARD'S OFFICE further led J CROTEAU into testifying to yet another scandalous allegation that BERNIER had defrauded BERNIER's insurance company.    See Exhibit "19", page 79, line 22 through page 82, line 21. (J CROTEAU had harassed BERNIER's insurance company with threats of a lawsuit against BERNIER's insurance company for having conspired with BERNIER to defraud BERNIER's insurance company.    See all of J CROTEAU's letters to BERNIER's insurance company as Exhibit "20", and that insurance company's chronological events printout as Exhibit "21".)

108.    J CROTEAU's feigned lack of knowledge of BERNIER's malice at J CROTEAU's deposition was explained by arguing that J CROTEAU had only been provided with H CROTEAU's deposition transcript **after** J CROTEAU's deposition in July of 2008.    See Exhibit "19", page 28, line 22 to page 35, line 7.    Based upon J CROTEAU's complete SCPP trial testimony attached hereto as Exhibit "19", plaintiffs allege that J CROTEAU and all PRIVATE CO-CONSPIRATORS' conspiracy was the moving force at said trial.

109.    Further during trial, WARD, PARKMAN, and WARD'S OFFICE successfully introduced the BERNIER v. M.U.E. action, and it's boiler plate "General Allegations", reserving a claim against M.U.E. for a possible alter ego relationship between the corporation and its C.E.O., Don Millered, in BERNIER's original pro per complaint in said 2001 action.

110.    The matter went to deliberations and the jury was apparently split with deep passions on both sides for days on end.    Eventually while deliberating, the jury asked the State Court to further define an "improper purpose".    Accordingly, BERNIER decided to follow Mr. Freedman's advice and accept the judge's recommendation that BERNIER pay half of WARD, PARKMAN, and WARD'S OFFICE's attorney's fees at issue in that action.    The Court properly noted H CROTEAU and BERNIER had impeached J CROTEAU's trial testimony.

111.   BERNIER settled the SCPP v. Bernier purported malicious prosecution matter under duress with real party in interest SCPP for half of WARD, PARKMAN, and WARD'S OFFICE's alleged attorney fee bill, payable by deposit and $500 a month payments, as a result of BERNIER's benign cross complaint against SCPP in the Lakeside Land Company, Inc. v. Mark Karim Quintero et. al. matter. See BERNIER's settlement with SCPP as Exhibit "22".

**G.   Having Successfully Damaged BERNIER's Credibility, Dignity, and Financial Condition, all PRIVATE CO-CONSPIRATORS Relied Upon California's Vexatious Litigant Statutes to Stay Necessary and Immediate Use of Plaintiffs' Property[1].**

112.   *Meanwhile*, BERNIER's forensic document expert had discovered that J CROTEAU's purported "Contract Agreement"[2] dated November 3, 2006, contained BERNIER's signature which had been "cut and pasted" onto said "Contract Agreement" from another document[3] dated in 2004 which also had J CROTEAU's signature, and was admitted in deposition testimony as being in J CROTEAU's possession at all times mentioned herein.

113.   In October of 2008, Mr. Freedman served OLSEN and LORBER LAW on behalf of ICS, with BERNIER's written discovery demands upon ICS, including ICS' production of both its alleged original and highest generation copies of its "Contract Agreement" and "Contract Change(s)" documents, in order for BERNIER's forensic document experts to examine these documents under proper laboratory conditions.

114.   OLSEN and LORBER LAW provided mostly unmeritorious objections to all of BERNIER's written discovery requests upon ICS, and absolutely refused to let go of ICS' original and highest generation copies of its "Contract Agreement" and "Contract Change(s)"[4] documents at any time, citing an: "*Objection. Relevance and equally available to plaintiff. Any originals will not be produced, but instead will be retained by counsel.*"

---

[1] California's "stay" scheme under §391.6 constitutes a temporary governmental "taking" of property rights to causes of action. A CA cause of action is property. *Haro v. Southern Pac.R.Co.* (1936) 17 Cal.App.2d 594.

[2] See J CROTEAU's purported written "Contract Agreement" to the PROJECT, dated 11/3/06, as Exhibit "23".

[3] See the "model signature document" from which BERNIER's signature had been lifted, and placed onto J CROTEAU's purported "Contract Agreement" document, as Exhibit "24".

[4] See J CROTEAU's purported written "Contract Change(s)" to the PROJECT, dated 7/13/07, as Exhibit "25".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

115.    After several requests for BERNIER's forensic experts to have access to ICS' original and highest generation copies of its "Contract Agreement" and "Contract Change(s)" documents, OLSEN and LORBER LAW finally agreed to allow conditional access to the questioned documents within OLSEN and LORBER LAW's office only, on December 30, 2008.  See Mr. Freedman's declaration attached hereto, as Exhibit "26".  Shortly before that date, OLSEN and LORBER LAW changed their mind and refused the examination until after an opportunity to consult with their client[1] regarding said documents' authenticity.

116.    On December 12, 2008, BERNIER filed a forgery criminal report with the San Diego County Sheriff's Department, Report No. 08-077870.  BERNIER substituted attorney KINSEY LAW into the Bernier v. Croteau et. al. case on January 6, 2009, with trial call already set therein for March 27, 2009.  KINSEY represented to BERNIER that KINSEY was the sole officer of KINSEY LAW, and KINSEY asked HERRON to sit in during KINSEY LAW's initial consultation with BERNIER and H CROTEAU.  Even before that substitution, BERNIER had provided KINSEY LAW with a summary review brief of the issues in the Bernier v. Croteau et. al. case, complete with BERNIER's relevant evidence attached thereto.

117.    *Meanwhile*, H CROTEAU had been unsuccessfully trying to depose J CROTEAU due to a stay of litigation, pursuant to CA C.C.P. § 391.6, in the matter of Hans S. Croteau v. Jocelyn G. Croteau et. al., San Diego Superior Court Case No. 37-2008-00087054-CU-PT-CTL.  On February 4, 2009, Hon. Judge Oberholtzer also placed, this time *sua sponte*, a stay of H CROTEAU's litigation against J CROTEAU and ICS, until March 27, 2007.

118.    On February 11, 2009, KINSEY and KINSEY LAW appeared on BERNIER's behalf to move the Court to shorten time to 1) compel compliance with BERNIER's questioned documents examination, 2) compel further discovery responses, and 3) continue the trial date and all discovery / motion cut off dates.  See that *ex parte* motion transcript as Exhibit "27".  OLSEN and LORBER LAW appeared on J CROTEAU's behalf at that hearing, and learned from KINSEY and KINSEY LAW that:

---

[1] On information and belief, OLSEN wouldn't permit the exam unless J CROTEAU concurs with approval.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

> Mr. KINSEY: *"We had stipulation and agreement to have a critical document, the actual contract that is the subject of this action, be examined by a forensic examiner. ... We believe ... the signature is a cut and paste job."* See that complete *ex parte* motion transcript of February 11, 2009 as Exhibit "27".

119. Two days later in an email to HERRON on February 13, 2009, OLSEN and LORBER LAW announced they would be substituting out of the Bernier v. Croteau et. al. case. OLSEN and LORBER LAW then filed a motion to withdraw as J CROTEAU and ICS' attorneys upon a "conflict of interest" with J CROTEAU and ICS. OLSEN and LORBER LAW's motion to be relieved as attorneys was heard before Judge Judith Hayes on February 27, 2009. See the transcript of the 2/27/09 motion, as Exhibit "28".

120. J CROTEAU was present during OLSEN and LORBER LAW's motion to be relieved as attorneys for J CROTEAU and ICS. J CROTEAU had not yet been deposed by BERNIER or H CROTEAU in either litigants' separate, but equal civil actions. OLSEN and LORBER LAW had previously composed a declaration on J CROTEAU's behalf in further support of OLSEN and LORBER LAW's motion to declare H CROTEAU a vexatious litigant, and in obvious light of the vehemently contested authenticity of J CROTEAU's purported written contracts. See J CROTEAU's declaration dated September 22, 2008, as Exhibit "29". Hon. Judge Oberholtzer had also previously denied OLSEN and LORBER LAW second vexatious litigant motion against H CROTEAU, on November 21, 2008.

121. At that hearing to relieve OLSEN and LORBER LAW from further representing J CROTEAU and ICS, KINSEY and KINSEY LAW again intentionally revealed BERNIER's forensic expert "cut and paste" findings, this time directly before J CROTEAU, so that J CROTEAU could personally be aware of the same, and fabricate new malicious testimony to circumvent this impeachment evidence. See Exhibit "28", page 2, line 8 to page 8, line 21.

122. The Court relieved OLSEN and LORBER LAW, and further ordered J CROTEAU to appear for the taking of J CROTEAU and ICS' deposition on March 5, 2009. That day, J CROTEAU appeared for J CROTEAU and ICS' deposition, as represented by attorney James McNair and HAINES LAW. See J CROTEAUs entire deposition transcript in the matter of Bernier v. Croteau et. al. dated March 5, 2009, as Exhibit "30".

123.    J CROTEAU appeared at the ordered deposition with a box full of things, including what appeared to be a total of at least three (3) sets of construction plans, presumably all allegedly related to the PROJECT.  J CROTEAU was not questioned about any of those construction plans, with the only exception being the incidental questioning of J CROTEAU as related to the true and correct set of construction plans genuinely approved on March 23, 2007.

124.    Contrary to J CROTEAU's September 22, 2008 declaration, J CROTEAU now claimed J CROTEAU had dropped off the purported PROJECT's contract with BERNIER in about October of 2006, and picked up a signed copy of the same from BERNIER one month later.  See Exhibit "30", page 63, line 4, through page 67, line 23.  Further, the entire tenure of J CROTEAU's testimony was directed at argumentative attempts to demean BERNIER.

125.    J CROTEAU's March 5, 2009 deposition was continued to March 23, 2009, wherein J CROTEAU would then explain away OLSEN and LORBER LAW's inconsistent declaration that J CROTEAU *"was present and personally witnessed BERNIER sign the ORIGINAL CONTRACT"*, by alleging that said declaration which OLSEN and LORBER LAW had composed for J CROTEAU had been *"just a mistake"*, precisely as J CROTEAU's attorney James McNair had instructed J CROTEAU to say.  See J CROTEAUs deposition transcript of March 23, 2009, as Exhibit "31", page 333, line 21, through page 334, line 9.

**H.    HAINES and HAINES LAW Accepts the Torch of Conspiracy, Passed on by all PRIVATE CO-CONSPIRATORS, to Again Foreclose BERNIER's Right to a *Meaningful* Governmental Petition, and Trigger the Domino Effect of Plaintiffs' Demise.**

126.    HAINES and HAINES LAW had substituted into the Bernier v. Croteau et. al. case on March 4, 2009, again under the false pretense endowed by all of California's attorneys' licenses which make them all private officers of the States' Courts, purportedly to legally and ethically represent J CROTEAU in that action.  HAINES and HAINES LAW's concerted activity to limit plaintiffs' *meaningful* right of access to the Courts via the continued abuse of said corrupt pre-filing order at BERNIER's trial is tantamount to a tactic conspiracy agreement with all PRIVATE CO-CONSPIRATORS.  See *Hudspeth v. Figgins*, 584 F.2d 1345, 1347, 1348 (1978); also see *Hafner v. Brown*, 983 F.2d 570, 576, 577 (1992).

127.    On March 17, 2009, HERRON and KINSEY LAW successfully moved the Court to order the California Licensed Court Reporter which had taken J CROTEAU's deposition and simultaneously obtained the elusive original and highest generation copies of J CROTEAU's questioned "Contract Agreement" and "Contract Change(s)" documents, to be maintained and displayed for BERNIER's forensic document expert to examine immediately. See that *ex parte* motion transcript of March 17, 2009, as Exhibit "32".

128.    On March 25, 2009, attorney James McNair again appeared *ex parte* on J CROTEAU and ICS' behalf to successfully overturn Judge Hayes' order of March 17, 2009. See that transcript of March 25, 2009, as Exhibit "33". Accordingly, BERNIER's document expert was never provided any opportunity to examine said questioned documents before trial.

129.    On the first day of trial on April 6, 2009, HAINES and HAINES LAW attempted to move the Court on eight motions in limine. HAINES and HAINES LAW attempted to exclude all of BERNIER's experts, as well as the damming deposition transcripts of J CROTEAU in that action. HAINES and HAINES LAW further attempted to exclude both the audio recording on September 5, 2007, as well as J CROTEAU's problematic false testimony in the previous SCPP v. Bernier malicious prosecution matter. Before trial, HAINES and HAINES LAW admitted to having listened to the entire September 5, 2007 audio recording. Said HAINES and HAINES LAW's motions in limine were unsuccessful.

130.    During trial, HAINES and HAINES LAW and all PRIVATE CO-CONSPIRATORS continued their conspiracy with J CROTEAU by reviving all of J CROTEAU's falsified accusations of BERNIER's alleged acts of moral turpitude, exactly as had been originally contrived, developed, planned, and rehearsed between J CROTEAU, KING, CELEDON, WARD, PARKMAN, and WARD'S OFFICE in September of 2007:

a)    HAINES and HAINES LAW first led J CROTEAU into explaining away OLSEN and LORBER LAW's declaration on behalf of J CROTEAU. (Making sure J CROTEAU would not forget to read the invidiously prejudicial title of the declaration to the Court by the way HAINES and HAINES LAW's question was worded) See that trial transcript excerpt of April 7, 2009, as Exhibit "34", page 307, line 13 through page 308, line 8.

b)     HAINES and HAINES LAW further led J CROTEAU into testifying that BERNIER's rain incident damages claim with BERNIER's homeowners' insurance company was fraudulent, and that BERNIER's insurance claim was a breach of ICS' purported written contract.  See Exhibit "34", page 314, line 26 through page 317, line 26; and also the trial transcript excerpt of April 8, 2009, as Exhibit "35", page 320, line 21 through page 326, line 2.

On page 321, line 6, THE COURT:  *"I think what Mr. Haines is trying to do is to show the witness' knowledge, or at least alleged knowledge, of fraud involved in the claims so his testimony would have more weight than if he merely made that accusation. Am I correct, Mr. Haines?"* [emphasis added]

MR HAINES: *"Yes, your Honor."*

c)     HAINES and HAINES LAW additionally led J CROTEAU into testifying that KING had informed J CROTEAU that SDG&E's electrical meter on BERNIER's PROPERTY had been tampered with, and that BERNIER and H CROTEAU's alleged electrical meter tampering was also a breach of ICS' purported written contract.  See that trial transcript excerpt of April 8, 2009, as Exhibit "36", page 357, line 22 through page 362, line 10.

d)     HAINES and HAINES LAW finally misled the Court by stating BERNIER had *"countersued and paid money after a judgment for malicious prosecution"*, in reference to WARD, PARKMAN, and WARD'S OFFICE's malicious prosecution action against BERNIER in August of 2008.   Of course, HAINES and HAINES LAW conveniently omitted J CROTEAU's problematic participation in that action.  See that trial transcript excerpt of April 14, 2009, as Exhibit "37", page 882, line 24 through page 885, line 20.

On page 885, line 3, THE COURT:  *"Well, it's been established that she is a vexatious litigant, or at least as of October 16, 2007, was..."* [emphasis added]

e)     HAINES and HAINES LAW overzealously interrogated BERNIER in an attempt to connect J CROTEAU's fabricated marijuana consumption accusations, and now BERNIER's alleged alcohol consumption accusations, to the purported reasoning behind the inconsistencies of BERNIER's alleged signatures on J CROTEAU's purported written contracts for the PROJECT.  See that trial transcript excerpt of April 13, 2009, as Exhibit "38", page 806, line 2 through page 810, line 19.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

f)    HAINES and HAINES LAW then argued to the Court that BERNIER had "cut and paste" her own signature on J CROTEAU's purported "Contract Agreement" of November 3, 2006, in anticipatory repudiation of the alleged written contract between BERNIER and allegedly ICS, for the PROJECT.  See that trial transcript excerpt of April 16, 2009, as Exhibit "39", page 1236, line 2 through line 7.

On page 1236, line 2, MR. HAINES: *"What motivation would plaintiff have to take a faked signature and put it on Exhibit 38 in November or December of 2006? The relevance of the fact that she's a vexatious litigant gives us the answer. She did that in order to have the opportunity, if she wished in the future, to claim it wasn't her signature; it was just a copy."* [emphasis added]

g)    HAINES and HAINES LAW alleged that H CROTEAU is a vexatious litigant (proven earlier by OLSEN's declaration on behalf of J CROTEAU, in section "a" above), and was helping BERNIER to write BERNIER's pleadings in the background, (See that trial transcript excerpt of April 15, 2009, as Exhibit "40", page 1119, line 27 through page 1121, line 12), in order for BERNIER "to walk into Court" and "get a free house".  See that trial transcript excerpt of April 16, 2009, as Exhibit "41", page 1198, line 15 through line 23.

h)    HAINES and HAINES LAW then moved the Court to take judicial notice of the corrupt pre-filing order, and argued that BERNIER was indeed on California's Vexatious Litigant Judicial Council List.  See Exhibit "42", page 882, line 24 through page 885, line 20. After the corrupt pre-filing order had been debunked, HAINES and HAINES LAW again argued that since the order said "plaintiffs were found to be vexatious litigants", BERNIER was clearly vexatious.  See that excerpt as Exhibit "43", page 990, lines 1 through 28.

131.    The undeniable moving force and common binding thread at said trial was HAINES and HAINES LAW's specious vexatious litigant accusations.  Despite having been scheduled for a four (4) day trial, said Bernier v. Croteau et. al. bench trial[1] lasted eight days. Hon. Judge Nevitt deliberated for less than ten (10) minutes, and returned with a ruling that neither J CROTEAU, nor BERNIER had been credible witnesses.  BERNIER did not obtain a judgment against J CROTEAU.  See Judge Nevitt's Statement of Decision, as Exhibit "44".

---

[1]KINSEY and KINSEY LAW had made the "executive decision" that BERNIER's case would not be a jury trial.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

**I.    If You Can't Beat'em, Join'em.  KINSEY, HERRON, and KINSEY LAW Acquiesce[1] all PRIVATE CO-CONSPIRATORS' Abuse of BERNIER & H CROTEAU.**

132.    On or about day three (3) of the Bernier v. Croteau et. al. case, and after J CROTEAU had extensively derogated BERNIER's credibility, exactly as had been originally contrived, developed, planned, and rehearsed between J CROTEAU, KING, CELEDON, WARD, PARKMAN, and WARD'S OFFICE in September of 2007; KINSEY and KINSEY LAW began complaining to HAINES and HAINES LAW about how tired KINSEY and KINSEY LAW were of BERNIER's case, how BERNIER's case was interfering with KINSEY and KINSEY LAW's work in Seal Beach, California, how BERNIER's case was not what KINSEY and KINSEY LAW had expected, and how KINSEY and KINSEY LAW wished KINSEY and KINSEY LAW had never taken said alleged vexatious matter from BERNIER.

133.    In fact, KINSEY and KINSEY LAW also complained to BERNIER that *"this case should never have gone to trial"*, and blamed BERNIER for KINSEY and KINSEY LAW's alleged resulting hard work and effort in the alleged vexatious matter.  In addition, BERNIER overheard KINSEY and KINSEY LAW complaining about these very same things to KINSEY, and KINSEY LAW's office in Seal Beach.  After the Bernier v. Croteau et. al. case ended, BERNIER learned that KINSEY and KINSEY LAW had placed said corrupt pre-filing order in BERNIER's exhibit binder, without including a copy of the order striking said corrupt pre-filing order, and did not object when HAINES and HAINES LAW presented it at trial.

134.    During the Bernier v. Croteau et. al. matter, the Court explained that its duties do not end when trial adjourns each day, and the Court takes it upon itself to review the evidence in the binders in an attempt to determine the truth when everyone is gone.  On the fourth day of said trial, the Court explained that said matter had originally been scheduled for only a four (4) day trial, that it now appeared the matter would take much longer than four (4) days, and that the Court assumed there had been surprises on both sides which neither side had anticipated. See that excerpt of April 9, 2009, as Exhibit "45", page 643, lines 24 through page 645, line 19.

---

[1]See *Hafner v. Brown*, 983 F.2d 577, 578 (1992).

135.    Accordingly, and after losing the Bernier v Croteau et. al. matter, BERNIER filed a State Court professional malpractice civil action against KINSEY, HERRON, and KINSEY LAW in December of 2009.  Only then did KINSEY, HERRON, and KINSEY LAW finally reveal their true beliefs and intentions by filing a vexatious litigant motion to declare BERNIER a vexatious litigant in that action as well.  See KINSEY, HERRON, and KINSEY LAW's vexatious litigant motion against BERNIER as Exhibit "46".  In support of the same:

a)    KINSEY, HERRON, and KINSEY LAW attempted to move the Court under California's C.C.P. § 391(b)(4), alleging that BERNIER had previously been declared a vexatious litigant in the matter of BERNIER v M.U.E. Id. at page 1, lines 14 through 15.

b)    KINSEY, HERRON, and KINSEY LAW further attempted to move the Court under California's C.C.P. § 391(b)(3), alleging that BERNIER had cross complained against SCPP without reasonable grounds, subjecting BERNIER to a malicious prosecution action. Id. at page 1, lines 15 through 17; and page 9, line 28 through page 10, line 5.

c)    In addition, KINSEY, HERRON, and KINSEY LAW alleged BERNIER "*acts in concert with her son, Hans Croteau, who is also a well known vexatious litigant in San Diego and is on the statewide vexatious litigant list*" (Id. at page 1, lines 17 through 19), was BERNIER's "*legal advisor*" (Id. at page 3, lines 4), and "...*the inexpertly drafted complaint in this action ...was not written by Plaintiff's attorney... but was, instead, **written by the Plaintiff's son, Hans Croteau**... It is probable that Mr. Aliberti is only a stand-in or front for Hans Croteau*".  [emphasis added]  Id. at page 25, lines 11 through 16.  Finally, KINSEY, HERRON, and KINSEY LAW further alleged H CROTEAU **conspired** with BERNIER to make the decision to vexatiously sue KINSEY, HERRON, and KINSEY LAW for malpractice. Id. at page 10, lines 7 through 13.

d)    KINSEY, HERRON, and KINSEY LAW further derogated BERNIER's credibility by alleging BERNIER had lied at trial about being a vexatious litigant (Id. at page 6, lines 8 through page 7, line 5); and by alleging BERNIER and H CROTEAU had also lied to KINSEY, HERRON, and KINSEY LAW also about being vexatious litigants.  Id. at page 3, lines 3 through 6; and page 6, line 8 through line 18.

136.    BERNIER again prevailed against this latest vexatious litigant motion[1], conclusively establishing **again** that BERNIER was not lying at trial about **not** being a vexatious litigant in the Bernier v. Croteau et. al. matter. KINSEY, HERRON, and KINSEY LAW had indeed been informed of the vexatious litigant issues in said case before BERNIER ever substituted KINSEY LAW into the matter[2]. Nevertheless, KINSEY, HERRON, and KINSEY LAW's admission exposes the very reason why California's vexatious litigant statutes make the redress of grievances with the government impermissible.

137.    Most outrageously, even KINSEY, HERRON, and KINSEY LAW who had allegedly represented BERNIER's interests in the Bernier v. Croteau et. al. matter alleged that BERNIER had been *"confronted by counsel for defendant ICS Pro as to whether she had ever been declared to be a vexatious litigant She answered "No" but this was a lie. She well knew that both she and her son, Hans Bernier, had been previously declared to be vexatious litigants. (See Exhibit C attached to Kinsey's Declaration - Minute Order declaring the Plaintiff to be a vexatious litigant). The Exhibit C minute order was entered into evidence in the underlying action and this fact alone would provide the Court with an ample basis for the conclusion in its Statement Of Decision (Exhibit A) that she was a liar and lacked credibility"*. [emphasis added]  KINSEY, HERRON, and KINSEY LAW's Exhibit "C" attached to said vexatious litigant motion, was the Minute Order in the BERNIER v. M.U.E. case in 2002, attached as Exhibit "1" to this United States District Court complaint.

138.    In conclusion, KINSEY, HERRON, and KINSEY LAW attached an excerpt of California's Vexatious Litigant Judicial Council List regarding H CROTEAU in order to demonstrate BERNIER's alleged vexatiousness by association, and now blamed BERNIER for having allegedly concealed the existence of J CROTEAU's additional bogus construction plans for the PROJECT; over, above, and beyond the true and correct set of construction plans genuinely approved on March 23, 2007. See Exhibit "46", Page 21, lines 8 through 17.

---

[1] See Hon. Judge Denton's denial of KINSEY, HERRON, and KINSEY LAW's vexatious litigant motion, noting again the **unsupported** nature of Hon. Judge So's corrupt pre-filing order, as Exhibit "47".

[2] See page 28 of this complaint, lines 13 through 15.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

**J.    Pursuant to all PRIVATE CO-CONSPIRATORS' Exponentially Growing Abusive Conspiracy, BERNIER is then Denied the Equal Protection of the Laws as Punishment for H CROTEAU's Alleged Vexatious Litigant Status.**

139.    BERNIER had turned 65 years of age on October 27, 2009, approximately one month before OLSEN and LORBER LAW had harassed BERNIER with their taking of BERNIER's deposition for an improper purpose.  BERNIER was also 65 years of age at the time all PRIVATE CO-CONSPIRATORS presented J CROTEAU's fabricated and forged written contracts for the PROJECT at the Bernier v. Croteau et. al. trial in April of 2009.

140.    Although California does indeed have a civil elder abuse law which is suitable for these kinds of torts as hereinabove mentioned, namely, California Welfare and Institutions Code § 15600 et. seq.; California also has a criminal elder abuse law specifically designed for this kind of financial and mental abuse which all PRIVATE CO-CONSPIRATORS have subjected BERNIER to, namely, California Penal Code § 368 (c), and (d).

141.    After the Bernier v. Croteau et. al. trial ended, BERNIER moved the Court on April 23, 2009, on *ex parte* application to preserve the questioned documents in the Court's possession, or alternatively have them turned over to the sheriff pursuant to an on-going criminal investigation.  Indeed, the sheriff had indicated the existence of an on-going criminal investigation of these alleged forgeries, and that there existed *"the substantial likelihood that these documents will be destroyed if they are returned to Mr. Jessie Croteau"*.  See San Diego Sheriff's Department's Sergeant Mark Varnau's declaration, as Exhibit "48".

142.    On April 23, 2009, the Court denied BERNIER's *ex parte* motion to have the Court keep J CROTEAU's questioned documents, but granted BERNIER's alternative request to set a noticed motion to hear the dispute on July 17, 2009.  In the *meantime*, the Court indicated it would safeguard the questioned documents in its possession.  Further, the Court specifically noted the presence of San Diego Sheriff's Detective David Hale in the Court's public gallery, and noted that it was *"pleased to see Detective Hale here in court... so the San Diego Sheriff's office and presumably the District Attorney's office is aware of the current procedural posture of things."*  See that *ex parte* transcript as Exhibit "49".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

143.    Also after the Bernier v. Croteau et. al. trial ended, H CROTEAU learned that GREENWOOD was the head Elder Abuse deputy of the San Diego District Attorney's Office, and telephonically contacted GREENWOOD regarding the situation.  Thereafter, on or about July 16, 2009, H CROTEAU composed and delivered a formal financial elder abuse report to GREENWOOD and SAN DIEGO DA, summarizing the relevant evidence concerning BERNIER's abuse at the hands of J CROTEAU and all PRIVATE CO-CONSPIRATORS.

144.    In summary, H CROTEAU's elder abuse report contained 1) BERNIER's declaration of no written contract with J CROTEAU; 2) H CROTEAU's declaration that BERNIER repeatedly asked J CROTEAU for said written contract; 3) J CROTEAU's declaration of September 22, 2008, and contradictory deposition testimony on March 5, 2009; 4) The September 5, 2007 audio, and J CROTEAU's contradictory e-mail to Doug Ruff of the City of San Diego; 5) BERNIER's video of the PROJECT where KING and J CROTEAU discuss that BERNIER wanted the PROPERTY's roof and stucco back on; 6) A copy of each of said questioned contracts, and why they speak for and also impeach themselves; 7) A statement of an expected declaration from a witness that had talked to J CROTEAU during the PROJECT; 8) The Court's minutes referring to J CROTEAU's impeachment in the Bernier v. SCPP matter; and 9) J CROTEAU's falsified timesheets, invoices, purported city approved construction plans, and J CROTEAU's September 6, 2007 letter to BERNIER.

145.    The Court continued the July 17, 2009 hearing to July 24, 2009. GREENWOOD and SAN DIEGO DA appeared on July 24, 2009 at said hearing, and interacted with the civil Court.  The Court asked GREENWOOD to explain GREENWOOD's role at said motion, and GREENWOOD and SAN DIEGO DA explained and asked the Court to hold said questioned documents further, and acknowledged said formal financial elder abuse report.  The Court continued the maintenance of said questioned documents until August 31, 2009.  See that *ex parte* transcript on July 24, 2009, as Exhibit "50".

146.    After the hearing, H CROTEAU and BERNIER waited patiently outside the Courtroom to speak to GREENWOOD and SAN DIEGO DA, while GREENWOOD and SAN DIEGO DA spoke extensively to Ms. Kingsley and HAINES LAW.    Thereafter,

1   GREENWOOD and SAN DIEGO DA personally approached H CROTEAU and BERNIER

2   and declared *"So you're vexatious canucks[1]... You wrote the report* (While pointing

3   GREENWOOD's index finger menacingly at H CROTEAU) *...and you must be Ms. Bernier".*

4   [emphasis added]

5       147.   In the wake of that fiasco, H CROTEAU and BERNIER avoided

6   GREENWOOD at all costs, but remained hopeful that GREENWOOD and SAN DIEGO DA

7   would at least investigate, and finally be able to see beyond H CROTEAU's blackness[2].   After

8   being forced to settle a malicious prosecution case without malice and under duress, losing

9   another civil action due to the Court's judgment that BERNIER was not credible (wherein the

10  opponent had righteously also been found not credible, had fabricated mostly all documentary

11  evidence, and relied upon the suborned perjury of several co-conspirators), and finally now

12  being derogated again by GREENWOOD and SAN DIEGO DA while attempting to request a

13  simple investigation, H CROTEAU and BERNIER were mentally and emotionally drained.

14      148.   On August 31, 2009, BERNIER again moved the Court on *ex parte* application

15  to allow BERNIER's document expert, Mr. Manny Gonzales, to examine CROTEAU's

16  questioned "Contract Agreement" and "Contract Change(s)" documents in the Court's

17  possession, in order to have those same expert's findings turned over to the sheriff and the SAN

18  DIEGO DA.   The Court granted BERNIER's request to have Mr. Manny Gonzales examine

19  said questioned documents on September 3, 2009, and also ordered the continued retention of

20  the same until October 9, 2009.   See that *ex parte* transcript as Exhibit "51".

21      149.   Mr. Gonzales examined said questioned documents on September 3, 2009.   With

22  October 9, 2009 quickly approaching, H CROTEAU sent an e-mail to GREENWOOD and

23  SAN DIEGO DA on September 29, 2009, to advise of the Court's latest order that it would

24  return said documents to HAINES and HAINES LAW by October 9, 2009, and urging

25  GREENWOOD and SAN DIEGO DA to contact BERNIER's expert, Mr. Manny Gonzales.

26

27  [1]On information and belief, the derogatory term "canucks" is slang for a person of Canadian origin.

28  [2]Not of the color of H CROTEAU's actual skin, but rather that which California's Vexatious Litigant
    blacklisting scheme under § 391.7 had artificially clothed H CROTEAU with.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

150.   GREENWOOD and SAN DIEGO DA now found it improper to continue any communications with H CROTEAU, and responded with an e-mail to H CROTEAU which stated *"...please convey any information through your attorney. I informed him yesterday that my office will not be filing any criminal case arising from the civil litigation"*. In addition, BERNIER and H CROTEAU received an e-mail from KINSEY and KINSEY LAW, informing BERNIER and H CROTEAU that GREENWOOD and the SAN DIEGO DA would not file charges against J CROTEAU. See KINSEY and KINSEY LAW's e-mail, as Exhibit "52".

151.   In that e-mail, KINSEY and KINSEY LAW explained that GREENWOOD and the SAN DIEGO DA's decision had been based upon an investigation of H CROTEAU's vexatious litigant status, and that accordingly, H CROTEAU would not be a credible witness. On October 1, 2009, GREENWOOD and the SAN DIEGO DA mailed back H CROTEAU's formal financial elder abuse report, and addressed it specifically to H CROTEAU only.

152.   On January 15, 2010, H CROTEAU took J CROTEAU's deposition in the matter of Hans Croteau v. Jessie Croteau et. al. At that deposition, H CROTEAU learned from J CROTEAU that J CROTEAU had contacted GREENWOOD and SAN DIEGO DA, and had provided J CROTEAU's audio recording[1] to GREENWOOD and SAN DIEGO DA in order to derogate H CROTEAU some more. See Exhibit "53", page 181, line 10 to page 183, line 1.

153.   On October 30, 2009, H CROTEAU had contacted San Diego County Chairwoman Diane Jacob concerning the on-going abuse of BERNIER. See that e-mail as Exhibit "54". On November 4, 2009, Diane Jacob replied to H CROTEAU's e-mail, and agreed to pass on H CROTEAU's e-mail to DUMANIS. BERNIER and H CROTEAU again waited patiently for a response from DUMANIS, but DUMANIS did not reply.

154.   With still no reply from DUMANIS, BERNIER **and** H CROTEAU wrote another extensive report on March 4, 2010, with attached exhibits for DUMANIS' review, who then assigned it to KORSMEYER. KORSMEYER responded to H CROTEAU **only**, and ignored BERNIER in KORSMEYER's response to H CROTEAU on March 17, 2009.

---

[1] See the footnote on page 25 of this complaint.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

155.    In KORSMEYER's written correspondence to H CROTEAU, KORSMEYER stated that: "*It appears that your case has had a long life in the civil courts of this county and I believe that is where your potential remedy lies.*" See KORSMEYER's correspondence to H CROTEAU, as Exhibit "55".    So far, neither the SAN DIEGO DA, GREENWOOD, DUMANIS, nor KORSMEYER had responded to BERNIER, nor H CROTEAU, with any specific reasoning to deny an **investigation**, other than to say "*There are many considerations and reasons for this decision*".

156.    The SAN DIEGO DA, GREENWOOD, DUMANIS, and KORSMEYER chose not to investigate J CROTEAU and all PRIVATE CO-CONSPIRATORS' victimization of BERNIER solely based upon four (4) reasons: 1) The invidiously discriminatory effect of BERNIER and H CROTEAU's alleged vexatious litigant status; 2) BERNIER and H CROTEAU's prior status as pro per litigants in the County of San Diego; 3) BERNIER and H CROTEAU's poverty and social status; and 4) BERNIER and H CROTEAU's national origin.

157.    On October 29, 2009, Mr. Gonzales revealed the findings of the examination of said documents to BERNIER, expressed that "*There's definitely something there*", and stated:

1)    The signature page of the purported "Contract Change(s)" document was substantially older than the rest of the pages to that document;

2)    Although the purported "Contract Change(s)" signature page had a wet ink signature, the date next to it had been inexplicably applied to the paper with an ink jet printer;

3)    At least two different printers had been used to create the entire purported "Contract Change(s)" document; and,

4)    The signature page of the purported "Contract Change(s)" document was of a different color than the rest of the document.

158.    On April 1, 2010, H CROTEAU sent another e-mail to San Diego County Chairwoman Diane Jacob to explain that the SAN DIEGO DA, GREENWOOD, DUMANIS, and KORSMEYER had refused without justification to **investigate** J CROTEAU and all PRIVATE CO-CONSPIRATORS' crimes against BERNIER.    See H CROTEAU's e-mail to Diane Jacob on April 1, 2010, as Exhibit "56".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

159. On April 14, 2010, Ms. Jacob agreed to forward H CROTEAU's concerns of the SAN DIEGO DA's abuse of BERNIER to BROWN, Mr. Ed Barnes, Chair of the Contractors State License Board, and Mr. Walt Ekard, Chief Administrative Officer for the County of San Diego. See Diane Jacob's letter to H CROTEAU on April 14, 2010, as Exhibit "57".

160. After BERNIER lost the Bernier v. Croteau civil case, HAINES and HAINES LAW conspired with J CROTEAU to file a memorandum of costs against BERNIER which included costs which had not been incurred in the Bernier v. Croteau civil case, such as OLSEN and LORBER LAW's vexatious litigant motion against H CROTEAU in the separate matter of Hans Croteau v. Jessie Croteau et. al. KINSEY and KINSEY LAW did not object to said improper costs, and the Court granted these specious costs to J CROTEAU.

161. In addition, BERNIER stopped paying WARD, PARKMAN, and WARD'S OFFICE in September of 2009, in relation to the SCPP v. Bernier malicious prosecution settlement. Further, BERNIER could not, and did not continue to pay BERNIER's construction expert who had testified at the Bernier v. Croteau et. al. case. Accordingly, BERNIER expected these individuals to attempt service of more litigation and judgment debtor's exams against her, so BERNIER barricaded and blocked all doors and windows to BERNIER's PROPERTY, and hid out inside, in an attempt to avoid service of process.

162. On September 11, 2009, J CROTEAU's attorney in the matter of Hans Croteau v. Jessie Croteau et. al. e-mailed H CROTEAU with a request for the taking of BERNIER's deposition. BERNIER knew that Mr. Gonzales had examined the questioned documents at the Court, and was awaiting said expert's findings at any moment. BERNIER realized BERNIER would have to divulge those findings to J CROTEAU's attorney if deposed, and without first having had an opportunity to take a *meaningful* deposition of J CROTEAU in order to prevent the same from again circumventing those expected findings with more fabricated testimony. Accordingly, BERNIER stepped up BERNIER's stake out and resistance to the service of any type of process, including any type of deposition subpoena in H CROTEAU's separate civil matter, until H CROTEAU could be provided an opportunity to take J CROTEAU's deposition on all issues concerning J CROTEAU's purported "Contract Change(s)" document.

42

**K.    H CROTEAU's Separate Civil Action Against J CROTEAU Fails Due to Hon. Judge Nevitt's Prior Judgment, and the Court Re-Legislates California's Vexatious Litigant Statutes from the Bench in Order to Keep BERNIER's $2,500.00 Bond.**

163.    Before filing H CROTEAU's separate civil action against J CROTEAU on May 2, 2008, H CROTEAU was first required to obtain permission from Hon. Presiding Judge So[1], pursuant to California C.C.P. § 391.7(a). Hon. Presiding Judge So reviewed H CROTEAU's proposed litigation against J CROTEAU et. al., and found that the litigation had merit.

164.    Pursuant to California C.C.P. § 391.7(b), Hon. Presiding Judge So permitted the filing of H CROTEAU's litigation against J CROTEAU, contingent upon H CROTEAU's furnishing of a bond made payable to the San Diego Superior Court in the amount of $2,500.00 for the benefit of the defendants to that action. See Hon. Presiding Judge So's order granting H CROTEAU's permission to file said litigation against J CROTEAU et. al., as Exhibit "58".

165.    H CROTEAU could not afford to post said bond, and asked BERNIER for the money. BERNIER agreed, and paid $2,500.00 to the San Diego Superior Court in the matter of Hans Croteau v. Jessie Croteau et. al., pursuant to Hon. Judge So' order conditionally granting H CROTEAU's permission to file said litigation against J CROTEAU et. al. H CROTEAU also had filed a separate claim with the California Worker's Compensation Board, for a direct injury on the PROJECT which had been subject to the WCAB's exclusivity rule.

166.    J CROTEAU and all PRIVATE CO-CONSPIRATORS' successful bamboozling of GREENWOOD and the SAN DIEGO DA further bolstered J CROTEAU and all PRIVATE CO-CONSPIRATORS' invidiously motivated war against BERNIER and H CROTEAU, and J CROTEAU and all PRIVATE CO-CONSPIRATORS accordingly attempted to recruit more State Actors to join J CROTEAU and all PRIVATE CO-CONSPIRATORS abuse of H CROTEAU. See J CROTEAU's "Motion to Dismiss this Fraudulent Case" to California's WCAB, as Exhibit "59".

---

[1]The Court dismissed H CROTEAU's 2005 case, Hans Croteau v. Michael Vaughn et. al., under CCP § 391.4, and ordered H CROTEAU onto CA's Vexatious Litigant List. BERNIER then sued these same defendants, with regards to the same occurrence, and over the same cause of action, and was awarded a judgment of $1,000.00.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

167.    J CROTEAU's free attorney[1] unsuccessfully attempted to serve BERNIER with a deposition subpoena.  Said attorney, David R. Tredway, unsuccessfully attempted a second service upon BERNIER, and eventually resorted to having the process server "tape" said subpoena to BERNIER's PROPERTY.  H CROTEAU found the subpoena, and threw it away. Mr. Tredway of Kennick and Associates had not properly served BERNIER at all.

168.    SCIF paid for the taking of KING and CELEDON's depositions on March 2, 2010.  H CROTEAU asked KING how many days KING had allegedly worked on BERNIER's PROPERTY.  In the Bernier v. Croteau et. al. matter, KING had already testified to a total of fifteen (15) days of work on BERNIER's PROJECT.  H CROTEAU asked KING for all evidence to support KING's claim of fifteen (15) days worth of work on BERNIER's PROJECT, and KING replied the only evidence in existence was KING's personal calendar.

169.    H CROTEAU specifically asked KING to produce said calendar pursuant to a subpoena, and KING agreed.  When H CROTEAU subpoenaed said calendar, KING responded with an objection.  H CROTEAU thereafter sent KING a letter demanding said calendar at trial pursuant to KING's agreement at the deposition of March 2, 2010.  H CROTEAU could not afford to take any more depositions of any other witnesses, and was required to rely on subpoenas for their personal attendance at trial.

170.    On May 4, 2010, H CROTEAU appeared for trial, and was instantly served with KING's special appearance *ex parte* motion in pro per to shorten time to quash H CROTEAU's subpoena duces tecum upon KING, and to award KING sanctions in the amount of $2,500.00. Although allegedly pro per, KING was represented by attorney Linda D. Bartz, who alleged that BERNIER and H CROTEAU were vexatious litigants trying to overturn Hon. Judge Nevitt's judgment, and further alleged various untrue scandalous allegations, *inter alia*, that BERNIER and H CROTEAU were "sneaking around the bushes" to vex KING late at night with said subpoena duces tecum.

---

[1]On information and belief, OLSEN and LORBER LAW had bamboozled CA's State Compensation Insurance Fund ("SCIF") to appoint free counsel for J CROTEAU in H CROTEAU's separate Superior Court civil action against J CROTEAU, also based upon H CROTEAU's alleged vexatious litigation against J CROTEAU.

44

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

171.   H CROTEAU got no notice of KING's *ex parte* motion, but Hon. Judge Oberholtzer nevertheless granted KING's motion to quash, and instantly sanctioned H CROTEAU $1,500.00 on the spot under California Civ. Code of Proc. § 1987.2.   See KING's motion to quash and for sanctions, as Exhibit "60".   In addition, the witness H CROTEAU had subpoenaed was waiting in Court.   Hon. Judge Oberholtzer noticed said witness waiting in the Court's gallery, and mentioned that Judge Oberholtzer thought Judge Oberholtzer had an agreement that said witness would wait to be called, before appearing at the Court.

172.   Nevertheless, Hon. Judge Oberholtzer called said witness to the stand, and questioned her *sua sponte*.   Said witness was clearly upset at H CROTEAU for having been subpoenaed to attend the trial, and denied everything she had already told BERNIER and H CROTEAU regarding J CROTEAU and the PROJECT.   Despite Judge Oberholtzer's expression that said witness did not appear credible, Judge Oberholtzer explicitly relied in part upon that witnesses' testimony to grant KING's $1,500.00 sanctions against H CROTEAU.

173.   Next, Hon. Judge Oberholtzer heard H CROTEAU and J CROTEAU's motions in lime, and granted J CROTEAU's request to exclude BERNIER from testifying at the trial. Hon. Judge Oberholtzer stated that it was H CROTEAU's obligation to produce BERNIER for the taking of BERNIER's deposition, but failed to produce any type of authority to support that finding.   As a result of BERNIER's exclusion, H CROTEAU was required to reduce said action against J CROTEAU to one of a simple claim for unpaid wages.

174.   During trial, H CROTEAU presented evidence of H CROTEAU's substantial work on BERNIER's PROJECT.   H CROTEAU then called J CROTEAU to the stand under California Evidence Code § 776, and proved what BERNIER's trial had not even attempted to present, namely, that an agreement between J CROTEAU, BERNIER, and H CROTEAU in fact existed concerning the PROJECT.   H CROTEAU was able to do this by presenting excerpts of the September 5, 2007 audio recording between J CROTEAU and BERNIER.

175.   Despite H CROTEAU's success at proving the existence of a third party beneficiary agreement between H CROTEAU, J CROTEAU, and BERNIER; the Court granted J CROTEAU's motion for judgment under California Civ. Code of Proc. § 631.8 due to Hon.

1  Judge Nevit's previous judgment extinguishing all claims between BERNIER and J CROTEAU.

2  See that trial transcript of May 6, 2010, as Exhibit "61". Hon. Judge Oberholtzer ruled the

3  Court could not, as a matter of law, decide that H CROTEAU was **not** an employee.

4       176. After that trial, H CROTEAU filed a claim for those same unpaid wages with the

5  California Labor Commissioner, which was summarily denied based upon Hon. Judge

6  Oberholtzer's ruling, which had been based upon Hon. Judge Nevitt's prior judgment, which

7  had been improperly influenced by BERNIER's settlement in the Bernier v. SCPP matter, which

8  WARD, PARKMAN, and WARD'S OFFICE had conspired with J CROTEAU, KING, and

9  CELEDON to obtain. See the California Labor Commissioner's denial of H CROTEAU's

10  claim for wages, as Exhibit "62".

11       177. On May 25, 2010, J CROTEAU bypassed Kennick and Associates to directly

12  send a letter to Judge Oberholtzer, which again derogated H CROTEAU and BERNIER. J

13  CROTEAU asked the Court to award BERNIER's $2,500.00 bond to J CROTEAU, and did

14  not send a copy of that letter to H CROTEAU. The Court notified H CROTEAU to appear at

15  an order to show cause on July 6, 2010, in order to explain why the Court should not just keep

16  BERNIER's $2,500.00 bond. See J CROTEAU's letter to Judge Oberholtzer, as Exhibit "63".

17       178. J CROTEAU's letter stated: *"...this Court also heard the pleadings of non-*

18  *related individuals that referred to your use of discretion to stop the abuse being perpetrated"*,

19  as related to the sanctions against H CROTEAU. Aside from J CROTEAU's pleadings, Judge

20  Oberholtzer had considered no other pleadings from anyone, besides those of J CROTEAU's

21  co-conspirator, KING; which J CROTEAU tries to distance himself from as *"non-related"*.

22       179. H CROTEAU appeared at Hon. Judge Oberholtzer's order to show cause on

23  July 6, 2010, and attorney Linda D. Bartz also appeared on KING's behalf, threatening to file a

24  motion to hold H CROTEAU in contempt of Court for having failed to pay the Court's ordered

25  sanctions of $1,500.00 to KING. Hon. Judge Oberholtzer remarked on H CROTEAU's status

26  as *somewhat* of "**hybrid** vexatious", (Transcript of July 6, 2010 as Exhibit "64", page 2, line

27  15); and as H CROTEAU claimed a need for his own lap-top computer, Mr. Kennick snidely

28  responded that the lap-top was only to be more "**vexatious**". Id at pg 5, lines 9 to 16.

---

46

180.   H CROTEAU had not been served with J CROTEAU's letter of May 25, 2010, and accordingly had no way of knowing why Judge Oberholtzer would 'discount' H CROTEAU's alleged "brand new I-PAD". The Court's behavior seemed to suggest H CROTEAU's ownership therein was disturbing to the Court. H CROTEAU had to correct the Court with regards to true nature of H CROTEAU's 'discounted' laptop computer. H CROTEAU further proved H CROTEAU's prior fee waiver, and genuine indigent status.

181.   Hon. Judge Oberholtzer acknowledged the already granted fee waiver, and that H CROTEAU's financial status qualified the fee waiver, but also alleged that the Court is on an **equal footing** with *the defendants* (But apparently not with H CROTEAU). Accordingly, the Court confiscated the $2,500.00 bond, and fell into its' 'logic **trap**' by alleging that while California's vexatious statutes are for the *benefit of the defendants*, their "scope and **spirit**" justifies the confiscation. Id at page 13, lines 6 to 10. Hon. Judge Oberholtzer also admitted that H CROTEAU's argument that the Court was not entitled to BERNIER's bond money was indeed an appropriate subject matter which ought to be brought up on appellate review.

**L.     HOWE's Abuse of Process and Improper Influence on the CSLB Made Possible by Virtue of California's Vexatious Litigant Statutes,... Again.**

182.   On September 18, 2009, J CROTEAU and ICS filed a lawsuit against ICS' liability insurance carrier, United Contractors Insurance Company ("UCIC"), claiming the attorney's fees J CROTEAU and ICS had spent maliciously suing, and defending against BERNIER's good faith breach of oral contract claim, in the matter of ICS Professional Services, Inc. et. al. v United Contractors Insurance Company et. al., San Diego Superior Court Case No. 37-2009-00098526-CU-IC-CTL. See a copy of that complaint, as Exhibit "65".

183.   HOWE continues to represent J CROTEAU and ICS in that action to this day, and alleged in that complaint that BERNIER *"lived in her house with plaintiff Croteau's younger, unemployed brother"*. Id. at page 3, lines 21 through 22. *"Unfortunately for plaintiffs, and unbeknownst to them, Bernier and her younger, unemployed son were no strangers to litigation. In fact, Bernier's younger son had been declared a vexatious litigant two years earlier in 2005"*. Id at page 3, lines 25 through 27.

184.     In April of 2010, BERNIER discovered a deposition subpoena for BERNIER's deposition by UCIC at her doorstep, set for June 8, 2010.  BERNIER voluntarily appeared at that deposition, and was instantly served by PARKMAN and WARD'S OFFICE with a judgment debtor's exam ("JDX") set for August 20, 2010.  WARD, PARKMAN, and WARD'S OFFICE had maintained communications with J CROTEAU, and all PRIVATE CO-CONSPIRATORS, since the onset of this conspiracy.  PARKMAN, and WARD'S OFFICE intentionally served BERNIER with the JDX **before** BERNIER's deposition, to specifically impact BERNIER's testimony in the UCIC case.

185.     HOWE took BERNIER's deposition, again for an improper purpose, namely, to again harass BERNIER with J CROTEAU's wild fabrications of moral turpitude in relation to the SCPP v. Bernier malicious prosecution matter, and to request volumes upon volumes of deposition transcripts of irrelevant matters.   See a copy of BERNIER's entire deposition transcript on June 8, 2010, as Exhibit "66".

186.     BERNIER was intentionally maliciously interrogated by HOWE for hours on end without food or water.  BERNIER demanded that HOWE stop the abuse and malicious interrogation on several occasions, but HOWE continued with the harassment nevertheless.  Due to HOWE's endless harassment, BERNIER walked out of the deposition prior to its formal conclusion.  HOWE's interrogation of BERNIER was abuse of process and elder abuse.

187.     In March of 2010, BERNIER defied Mr. Freedman's advice, and filed a CSLB complaint concerning J CROTEAU and ICS's abandonment of the PROJECT.  On April 14, 2010, HOWE wrote a letter to Beatrice Littleton of the California CSLB in response, allegedly *"explaining the history of Plaintiff and BERNIER's custom and practice of filing excessive lawsuits in San Diego County, among other things"*.  See, Exhibit "60", page 17, lines 16 to 20. Ms. Bartz has thwarted each of H CROTEAU's requests for a copy of that letter.

188.     On July 21, 2010, Beatrice Littleton and the CSLB's **own** construction expert inspected BERNIER's PROPERTY.  On information and belief, Beatrice Littleton provided the CSLB's construction expert with J CROTEAU's purported contracts for the PROJECT in order to assess the scope of the construction agreement between BERNIER and J CROTEAU.

189.    When BERNIER and H CROTEAU told the CSLB's construction expert that said written contracts were in fact fabrications and forgeries, just as BERNIER and H CROTEAU had so originally explained to Beatrice Littleton on May 19, 2010, complete with the supporting evidence, the CSLB's construction expert responded by saying that there was no proof that BERNIER had **not** in fact signed J CROTEAU's purported contracts.

190.    When BERNIER and H CROTEAU pointed to the September 5, 2007 audio recording between J CROTEAU and BERNIER, said construction expert rebutted by saying the audio could have been a fabrication somehow.  Apparently, said construction expert does not believe that the same could be true of J CROTEAU's alleged fabricated documents.

191.    Despite the fact that the CSLB ordinarily has the power to refer a matter for criminal prosecution[1], or restrict the licentiate's activities when not doing so would endanger the public health, safety, or welfare[2], Ms. Littleton informed BERNIER not to expect a money judgment concerning J CROTEAU's CSLB violations because the matter has already gone to Court. Accordingly, it appears the PROJECT's abandonment will be ICS' only accusation.

192.    Indeed, under the criminal statutes that are part of the Contractors' Licensing Law, the CSLB may proceed against a licensed contractor through the criminal courts, such as when embezzlement occurs through California Penal Code § 484.  The breadth of the CSLB's powers to redress consumer grievances were address and broadened by *Tellis v. Contractors' State License Bd.*, 79 Cal. App. 4th 153 (2000).

193.    Despite the CSLB's burden to prove a violation by clear and convincing evidence because the licentiate's right to hold a contractor's license has been held to be a vested right (See *Ettinger v. Board of Medical Quality Assurance* 135 Cal.App.3d 853 (1982)), plaintiffs' conflicting right to a *meaningful* governmental petition for the redress of grievances by any Court, State, or Federal Agency is a constitutionally protected fundamental civil right which is federally supreme to this State's interests to protect its contractors' licenses.

---

[1] See California Business and Professions Code §§ 125.5 through 125.8.

[2] See California Business and Professions Code § 494.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

**M.    All Other Ancillary Complications Caused by California's Unconstitutional Vexatious Litigant Statutes.**

194.    The only response to Ms. Jacob's letter to BROWN, Mr. Ed Barnes, and Mr. Walt Ekard, was a visit from San Diego County's Guardian. After interviewing BERNIER, the county Guardian admitted it could do nothing for BERNIER. Earlier, BERNIER had also been visited by San Diego County's Adult Protective Services, with regards to BERNIER's inhuman and dangerous living conditions, but said Adult Protective Services could only forward the alleged elder abuse report to the San Diego Sheriff's Department.

195.    In 2009, BERNIER had consulted with attorney Gregory Lutz in reference to the malpractice action against KINSEY, HERRON, and KINSEY LAW. Mr. Lutz agreed to represent BERNIER on a contingency basis, and asked BERNIER for $3,000.00 to research the extent of all defendants' liability. Thereafter, Mr. Lutz claimed to have read OLSEN and LORBER LAW's deposition of BERNIER, to have learned of BERNIER and H CROTEAU's alleged vexatious litigant status in addition to all of J CROTEAU's other fabricated derogatory allegations, and accordingly reneged on Mr. Lutz' contingency representation agreement. Nevertheless, Mr. Lutz kept BERNIER's $3,000.00 without any return consideration.

196.    BERNIER filed a fee arbitration dispute with the San Diego County Bar Association, and Mr. Lutz again argued that BERNIER and H CROTEAU's had been found to be vexatious litigants. In support thereof, Mr. Lutz presented a list of civil actions in the County of San Diego allegedly involving BERNIER and H CROTEAU, to the arbitrator.

197.    The arbitrator was biased against BERNIER, and ruled that Mr. Lutz had earned BERNIER's $3,000.00 through quantum meruit, despite the lack of a written fee agreement, or any explanation of exactly how BERNIER had been enriched $3,000.00 in value. Accordingly, BERNIER lost another $3,000.00 in connection with this endless saga and invidiously motivated war against BERNIER and H CROTEAU's persons.

/ / / / / / /

/ / / / / / /

/ / / / / / /

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

# VIOLATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW

## [42 U.S.C. § 1983, COUNT I]

(Plaintiffs as against all PRIVATE CO-CONSPIRATORS and DOES 1 through 100)

198.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 197 above as if fully set forth herein, and further allege:

42 U.S.C. § 1983:    *"Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."*

199.    Prior to Presiding Judge So's entry of the corrupt pre-filing order on October 16, 2007 in the BERNIER v. M.U.E. file; J CROTEAU, KING, CELELDON, WARD, PARKMAN, and WARD'S OFFICE's conspired and set out to deprive plaintiffs' First Amendment right to *meaningfully* petition the Government for a redress of grievances by overwhelming the capacity of the State of California's legal judiciary to act evenhandedly in administering the law. See page 18, line 15, through page 19, line 18 of this complaint.

200.    *"The right to sue ... is the right conservative of all other rights... Equality of treatment in this respect... is granted and protected by the federal Constitution." Chambers v. Baltimore & O.R. Co.,* 207 U.S. 142, 148 (1907). Litigation *"is a means for achieving... equality of treatment by all government.... It is thus a form of political expression...." Button, supra, at* 429. *"...the First Amendment secures... something more than an exercise in futility - it guarantees a meaningful opportunity to express one's views." Minnesota Board for Community Colleges v. Knight,* 465 U.S. 271, 308, 309 (1984). The First Amendment, including specifically the right to petition, is 'incorporated' against the States by virtue of the Fourteenth Amendment. *Hague v. C.I.O.* 307 U.S. 496, 512-513 (1939).

201.    To that end, J CROTEAU, KING, CELELDON, WARD, PARKMAN, and WARD'S OFFICE conspired with DOES 1 through 10, to compose a corrupt pre-filing order, with the intention that it be executed and entered in the dismissed BERNIER v. MUE State Court's file, by a State Actor.  Thus, all PRIVATE CO-CONSPIRATORS further conspired to violate both plaintiffs' procedural and substantive Due Process rights, under California's and the U.S. Constitution's Equal Protection Clauses.  See page 19, lines 19 to 25 of this complaint.

202.    All PRIVATE CO-CONSPIRATORS acted in furtherance of that conspiracy, and conspired with Hon. Presiding Judge So to execute and enter the corrupt pre-filing order in the BERNIER v. MUE State Court's file.  Pursuant to the object of that conspiracy to persuade Judge So to do so, said State Actor agreed, executed, and entered the corrupt pre-filing order in the BERNIER v. MUE State Court's file.  See page 20, lines 1 through 10 of this complaint. Accordingly, Judge So caused plaintiffs to be subjected to the deprivation of plaintiffs' First Amendment right to *meaningfully* petition the Government for a redress of grievances, as inferred by the chain of events, as plead hereinabove, and which would follow therefrom.

203.    Section 1983 has no state of mind requirement, independent of the underlying basis for liability.  Indeed, even *"Negligent actions by state officials can be a basis for an action under § 1983"*.  *Parratt v. Taylor*, 451 U.S. 527 (1981).  Section 1983 complaints alleging a conspiracy must be plead with specificity, as they have been plead here in this instant complaint.  *"an inference [of conspiracy] ... from the Complaint ... [is] no substitute for the requirement that the circumstances of the conspiracy be pleaded with specificity."* *Rose v. Bartle*, 871 F.2d 331, 366 (1989).

204.    An agreement is the *sine qua non* of a conspiracy.  To allege a civil conspiracy for purposes of § 1983, plaintiffs must aver *"a combination of two or more persons to do a criminal act, or to do an unlawful act by unlawful means or for an unlawful purpose."* [emphasis added]  See *Ammlung v. City of Chester*, 494 F.2d 811, 814 (1974).  In other words, plaintiffs must make out *"factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events."* *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (1997).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

205.   Plaintiffs' instant federal complaint is not barred by the *Rooker-Feldman* doctrine[1], because it has been alleged herein that all PRIVATE CO-CONSPIRATORS violated an **independent right** of plaintiffs, and BERNIER and H CROTEAU now sue herein to vindicate that right.   Plaintiffs now claim damages from that violation which resulted in those adverse State Court decisions, thus causing BERNIER and H CROTEAU substantial harm. *Nelson v. Murphy*, 44 F.3d 497, 503 (1995); *GASH Associates v. Village of Rosemont*, 995 F.2d 726, 728 (1993); also see source *Nesses v. Shepard*, 68 F. 3d 1003 (1995) *"alleges a massive, tentacular conspiracy among the lawyers and the judges to engineer Nesses' defeat"*.

206.   The Supreme Court has noted that the basic purpose of a § 1983 damages award is to compensate the victims of official misconduct, and has held that there is therefore no limit on actual damages if they can be proven.   *Carey v. Piphus*, 435 U.S. 247 (1978).   Plaintiffs' total general damages is utterly *"unthinkable"* (See Exhibit "64", page 20, lines 8 to 13), and beyond any true measurability.   No amount of money can compensate plaintiffs for all PRVIATE CO-CONSPIRATORS' intentionally vial, extreme, and outrageous invasions of BERNIER and H CROTEAU's mental and emotional tranquility.   *State Rubbish etc. Assn. v. Siliznoff*, 38 Cal.2d 330, 336-337 (1952).   All PRIVATE CO-CONSPIRATORS' conduct was so extreme and outrageous that it went beyond all possible bonds of decency, and was so atrocious and intolerable, that no person in a civilized society should be required to endure it.

207.   The character of all PRVIATE CO-CONSPIRATORS' extreme and outrageous conduct arose from an abuse of relationships between those lay co-conspirators whom had conspired with said private attorneys.   Said co-conspirators whom were officers of the States' Courts gave said lay defendants an apparent authority of leverage over plaintiffs, and thus the power to affect plaintiffs' interests with a very real and evil intent.

208.   Said conduct arose from the conspiring defendants' knowledge that plaintiffs were peculiarly susceptible to this type of injury because of: 1) plaintiffs' vulnerability to

---

[1]See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); and also *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

derogation and discredit as caused by the Court's decision in the BERNIER v. M.U.E. case in 2001; 2) plaintiffs' financial condition as caused by certain of the PRIVATE CO-CONSPIRATORS themselves; 3) the inhumane and uninhabitable living condition of BERNIER's PROPERTY and plaintiffs resulting limited resources; and 4) plaintiffs' further vulnerability to discredit as caused by the execution and entry of the corrupt prefiling order pursuant to the conspiracy between all PRIVATE CO-CONSPIRATORS and Hon. Judge So. All PRVIATE CO-CONSPIRATORS proceeded as such solely because of this knowledge, where it would not have been so if all defendants had not known they could abuse these facts.

209.  All PRIVATE CO-CONSPIRATORS recklessly intended to inflict emotional distress upon plaintiffs, actually desired to cause such distress, and knew that such distress was substantially certain to result from their conduct.  All PRIVATE CO-CONSPIRATORS acted out their animosity against plaintiffs', and deliberately and consciously disregarded plaintiffs' safety, well being, and mental and emotional tranquility. All PRIVATE CO-CONSPIRATORS acted upon a class-based animus against California's so-called "vexatious litigants", and all persons found to be associated or having been in close proximity at any time to one or more so-called "vexatious litigants".  See *Kimble v. D. J. McDuffy, Inc.*, 648 F.2d 340 (1981).

210.  The conduct of all PRIVATE CO-CONSPIRATORS was not privileged.  All PRIVATE CO-CONSPIRATORS have done more than just insist upon legal right(s) in a permissible way.  All PRIVATE CO-CONSPIRATORS have acted out of a desire to pervert the true meaning of California's vexatious litigant statutes for their own personal gain and that of their co-conspirators, in bad faith, and did not and could not believe they were acting under any legal right(s) of theirs.  In fact, all PRIVATE CO-CONSPIRATORS had no such right(s), or even any such subjectively arguable right(s), under any laws or statutes of either the State of California, or those of the United States of America.

211.  As a result of all PRIVATE CO-CONSPIRATORS conspiracy to deprive BERNIER and H CROTEAU of: 1) Their constitutionally protected right to a *meaningful* governmental petition and procedural and substantive Due Process rights; 2) the Equal Protection of the laws; and 3) to impede and obstruct the due course of justice in the State of

54

California with the intent to deny plaintiffs of the Equal Protection of the laws; plaintiffs have been generally mentally and emotionally damaged according to proof at trial. Plaintiffs contend that the deprivation of protected interests without procedural and substantive Due Process aroused strong feelings of mental and emotional distress related to the *"feeling of just treatment."* *Anti-Fascist Committee v. McGrath*, 341 U. S. 123, 341 U. S. 162 (1951).

212.    In special and compensatory damages, BERNIER paid J CROTEAU, and J CROTEAU's subcontractors a total of $167,090.45 for the PROJECT, and $20,000.00 to Dixieline. BERNIER paid $7,960.25 to engineers, draftsmen, and consultants. H CROTEAU earned $10,635.00 from J CROTEAU, which remains unpaid to this day. BERNIER paid another $131,947.74 after J CROTEAU's abandonment of the PROJECT in emergency costs to seal BERNIER's PROPERTY from the elements and basic needs as of 8/21/09. BERNIER's PROPERTY will still cost approximately $430,000.00 to complete. J CROTEAU's construction defects to BERNIER's PROPERTY will cost an additional $70,000.00 to repair.

213.    BERNIER paid attorney Edward W. Freedman approximately $41,513.30 in costs and attorney's fees for both the SCPP v. Bernier malicious prosecution matter, and the Bernier v. Croteau et. al. matter. BERNIER paid KINSEY, HERRON, and KINSEY LAW $36,830.00 in attorney's fees alone for representation in the Bernier v. Croteau et. al. matter. BERNIER paid another $29,620.93 in court fees and costs for the Bernier v. Croteau et. al. matter (Other misc. costs not yet counted), and still allegedly owes $9,262.89 to BERNIER's construction expert who testified therein, with 12% interest accruing thereon. So far, BERNIER has paid $26,682.26 to attorney Joseph Aliberti, in connection with the professional malpractice action against KINSEY, HERRON, and KINSEY LAW.

214.    BERNIER paid $2,500.00 to the San Diego Superior Court pursuant to California Civ. Code of Proc. § 391.7, in the matter of Hans Croteau v. Jessie Croteau et al., which has now been confiscated by the State Court. BERNIER paid $9,000.00 to WARD, PARKMAN, and WARD'S OFFICE in connection with the settlement under duress in the SCPP v Bernier matter. BERNIER is appealing the San Diego County Bar fee arbitration of $3,000.00 to Mr. Lutz, and may amend this complaint after that matter has been decided.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

215.    BERNIER was required to seek urgent medical care for severe breathing problems which were proximately caused by the PROPERTY's toxicity due to its interior exposure to moisture and mold contamination, as well as the extreme stress caused from residing at the PROPERTY in its unfinished and unsafe condition. BERNIER was required to seek urgent medical care on more than one occasion for these serious breathing problems, followed by a lapse of "Bells Palsey", and ringing in BERNIER's left ear which still rings to this very day. BERNIER will prove these special medical damages according to proof at trial.

216.    All PRIVATE CO-CONSPIRATORS' further objective was to: 1) Complicate the disputed issues in this tentacular web of litigation by with-holding all fabricated evidence, thus preventing plaintiffs' from convincing prospective legal counsel of the truth, and 2) then surprise (Exhibit "45", pg 644, line 3) plaintiffs at trial with fabricated evidence, *inter alia*:

1)      A written contract, change order, and ICS invoices for the PROJECT;

2)      An ICS invoice for the surety bond report in the AQUATIC matter;

3)      Timesheets for CELEDON, and another of J CROTEAU's regular employees;

4)      Employment applications for CELEDON, and J CROTEAU's other employee;

5)      Perjured testimony from KING and CELEDON, at the Bernier v. ICS trial, and during other deposition testimony;

6)      Accusations of wholly fabricating a surety bond claim against AQUATIC;

7)      Accusations that H CROTEAU is master-minding plaintiffs' vexatious litigation spree, and "writing the pleadings in the background";

8)      Contriving an intentional paper trial with SDG&E, involving;

    a)      Insurance fraud accusations to BERNIER's homeowner's insurance company.

    b)      Marijuana cultivating and consumption accusations.

    c)      Satellite Industry piracy.

    d)      Electrical meter tampering allegations.

    e)      That BERNIER has 25 pending lawsuits and other claims of vexatiousness.

217.    All PRIVATE CO-CONSPIRATORS succeeded, *in part*, and have prevented plaintiffs from retaining counsel in this instant civil rights action. Thus, plaintiffs spent forty five (45) days of research to compose this instant pleading, and expect a flurry of dispositive motions before ever reaching a jury trial. Plaintiffs have also spent hundreds upon hundreds of hours assisting counsel in the underlying State Court litigation, in order to afford all attorneys fees and costs related to this tentacular war of litigation, all to their own demise.

218.    Having failed to produce profit from the invention partnership with H CROTEAU, BERNIER retired in 2005, and had hoped to make a modest investment in her PROPERTY, and enjoy her remaining golden years in peace. Instead, BERNIER was subjected to such heinous and abusive treatment of such duration and intensity as to result in hopelessness and despair. BERNIER was robbed of such basic freedoms as peace, security, and tranquility in BERNIER's own destroyed PROPERTY. See page 42, lines 14 through 19 of this complaint.

219.    Since 2007, BERNIER and H CROTEAU have been required to live in inhumane living conditions, unfit for even the worst of society's most hardened criminals. BERNIER and H CROTEAU do not enjoy the same privileges suspected felons are guaranteed under the Sixth Amendment to the United States Constitution, right of habeas corpus, or other protected rights only available to suspected criminals. Although the word "punished[1]" appears under California's C.C.P. § 391.7(a), plaintiffs will nevertheless never enjoy the most basic of human rights due to the odious and offensive nature of plaintiffs' alleged 'vexatiounsness'.

220.    Thus, BERNIER and H CROTEAU have been required to continue their own construction labor to enhance the PROPERTY's safety, and prevent serious accidents due to its unsafe condition, such as H CROTEAU's serious hand injury in January of 2010. In addition, other work to prevent further degradation is being done, as time permits plaintiffs to, such as BERNIER's sanding and finishing of every exterior door to the PROPERTY. BERNIER and H CROTEAU will prove these compensatory unpaid labor damages according to proof at trial.

/ / / / / / /

---

[1] *"[C]ontempt was essentially 'criminal' in nature, even if not 'criminal' by virtue".* Bell v. Hongisto, 501 F.2d 346 (1974); relying on *Morelli v. Superior Court of Los Angeles County*, 1 Cal.3d 328, 82 (1969).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

221.   All  PRIVATE  CO-CONSPIRATORS'  invidiously  motivated  hatred, discrimination, and wonton disregard of plaintiffs' rights is so egregious and despicable as to be wholly meritorious of punitive and exemplary damages. All PRIVATE CO-CONSPIRATORS' conduct was motivated by an evil motive and intent, and involved a reckless and callous indifference to plaintiffs' federally protected rights.  See *Smith v. Wade*, 461 U.S. 30, 50-51 (1983); also see *Clark v. Taylor*, 710 F.2d 4, 14 (1983).

## CONSPIRACY TO HINDER THE STATE OF CALIFORNIA'S CONSTITUTED AUTHORITIES AND DENY THE EQUAL PROTECTION OF THE LAWS

### [42 U.S.C. § 1985(3), First Half, COUNT II]

(Plaintiffs as against all PRIVATE CO-CONSPIRATORS and DOES 1 through 100)

222.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 221 above as if fully set forth herein, and further allege:

42 U.S.C. § 1985 (3): *"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."*

223.   To make out a prima facie case of conspiracy under 42 U.S.C. § 1985(3), plaintiffs must allege four elements: 1) A conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the Equal Protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy;

1  4) whereby a person is either injured in his person or property or deprived of any right or

2  privilege of a citizen of the United States. See *United Brotherhood of Carpenters & Joiners of*

3  *America, Local 610 v. Scott*, 463 U.S. 825, 828-829 (1983); *Farber v. City of Paterson*, 440

4  F.3d 131, 134 (2006); also see source *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

5      224.  Justice Souter explained the hindrance clause of § 1985(3) as *"conspiracies to*

6  *act with enough force . . . to overwhelm the capacity of legal authority to act evenhandedly in*

7  *administering the law"*. *Bray v. Alexandria Clinic*, 506 U.S. 263, 283 n. 15 (1993).  As the

8  Supreme Court also noted in *Weisman*, there are no precise parameters defining the boundaries

9  of a "class" within the meaning of § 1985(3).  *"The best that can be said of § 1985(3)*

10  *jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies,*

11  *and left in flux by the Supreme Court."* *Trautz v. Weisman*, 819 F.Supp. 282, 291 (1993).

12      225.  However, when "groups" are deemed distinguishable based on immutable

13  characteristics, they are considered so objectively identifiable, that no extended analysis is

14  needed. *Farber v. City of Paterson*, 440 F.3d 131, 137 (2006).  Plaintiffs must not be victims

15  because of any personal malice the conspirators have toward them, *"but because of their*

16  *membership in or affiliation with a particular class."*  Moreover, the class must exist

17  *"independently of the defendants' actions; that is, it cannot be defined simply as the group of*

18  *victims of the tortious action."* See *United Brotherhood of Carpenters & Joiners of America,*

19  *Local 610 v. Scott*, 463 U.S. 825, 850 (1983).

20      226.  All PRIVATE CO-CONSPIRATORS' *ipso facto* invidious discrimination of

21  BERNIER and H CROTEAU is implied from all facts plead herein, but is also shockingly

22  **admittedly expressed** by three (3) of the PRIVATE CO-CONSPIRATORS; namely, KINSEY,

23  HERRON, and KINSEY LAW.  See page 36 of this complaint, lines 8 through 19.

24      227.  Plaintiffs' own historical chain of events as plead herein implies that plaintiffs

25  have been clearly subjected to severe repeated discrimination; exhibit obvious, immutable, and

26  highly visible and notorious distinguishing characteristics that define them as a discrete group;

27  are a minority; and are politically powerless. See, e.g., *Massachusetts Board of Retirement v.*

28  *Murgia*, 427 U.S. 307, 313-314 (1976) (per curiam).

228.    California's notably infamous "vexatious litigant" brand is clearly a mark of discredit, and imposes upon plaintiffs a "stigma" (See *Regents of University of California v. Bakke*, 438 U.S. 265, 294 (1978)), that brands plaintiffs as inferior and unworthy of belief. *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952). *"In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy."*

229.    Even California's own appellate Court has weighed in on the State's "vexatious litigant" statutes, noting that *"As a matter of common experience even many meritorious suits fail, due to the vagaries of the trial process if nothing else. Many more colorable suits fail, either due to pretrial disposition or failure to persuade the trier of fact."* *Wolfgram v. Wells Fargo Bank*, 53 Cal.App.4th 43, 58 (1997). But the *Wolfgram* Court ignores this fact and finds comfort in the presumed "catch all" that said pro se litigant's odious classification *"must be coupled with proof that the suer has come into court again, with a suit with no reasonable probability of success"*. [emphasis added]  The Court assumes the lack of merit of the first suit.

230.    The *Wolfgram* Court further finds that *"[I]t is not unreasonable ... to classify separately from other litigants those litigants with a prior history of litigiousness... Such a litigant is more likely to abuse the processes of the courts and to harass the adverse party than other litigants."* Id. at 58.  The *Luckett* Court reasoned that California's vexatious litigant statutes are no more offending than to *"a person who had been determined by the National Park Service to be a chronic litterer being required to post a deposit before being allowed to check in to a national park."* *Luckett v. Panos*, 161 Cal.App.4th 77 (2008).

231.    California's State Supreme Court has never addressed California's trailblazing statute.  Its Appellate Courts presume said badge of infamy applies to pre-trial disposition matters only, and ample safeguards exist to prevent its perversion into a bad faith tactical weapon at trial.  However, Justice Pfeifer, J., of Ohio's Supreme Court, California's sister State, has reasoned that: *"The Constitution does not differentiate between those who have filed frivolous lawsuits in the past and those who haven't. ...I am concerned that a valid complaint may not receive the attention it deserves simply because it was filed by a vexatious litigator. Our courts are open to all... I therefore dissent."* *Mayer v. Bristow*, 91 Ohio St.3d 3. (2000).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

232.   While a court should *"protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation,"* a court's restriction on prospective filings should not be overly broad to the extent of denying a petitioner *meaningful* access to the courts. *Abdullah v. Gatto*, 773 F.2d 487, 488 (1985). *"Equal protection analysis requires **strict scrutiny** of a legislative classification only when it impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."* [emphasis added] *Murgia*, supra, at 307.

233.   BERNIER and H CROTEAU are members of a *"discrete and insular minority"* whose political participation has been seriously curtailed because of prejudice (*Plyler v. Doe*, 457 US 216 at 216 n. 14 (1982) *"Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law."*), and plaintiffs' pro se status is an economic necessity, and now, *due to all defendant's conspiracy*, a practical necessity as well, in order to secure their protected rights. *Elmore v. McCammon*, 640 F. Supp. 905, 911 (1986). *"Right to file a lawsuit pro se is one of the most important rights under our Constitution"*.

234.   The basis of BERNIER and H CROTEAU's classification of alleged 'illegitimacy' is not within plaintiffs' control (See page 19, lines 19 through 25 of this complaint), and is unrelated to plaintiffs' ability to participate in and contribute to society, including the ability to testify truthfully. *Plyler*, supra at 216 n. 14. *"groups disfavored by virtue of circumstances beyond their control"*; *Parham v. Hughes*, 441 US 347 at 351 (1979) *"classes based upon certain ... immutable human attributes, [such as] 'illegitimacy'"*; *Mathews v. Lucas*, 427 US 495 at 505, 506 (1976). *"It is true... that the legal status of illegitimacy, however defined, is... not within the control of the illegitimate individual, and... bears no relation to the... ability to participate in and contribute to society."* [emphasis added.]

235.   Plaintiffs have been damaged by all PRIVATE CO-CONSPIRATORS in the same manner and extent as those special, general, compensatory, and punitive and exemplary damages which have already been plead in Count I as against the same defendants under 42 U.S.C. § 1983, of this United States District Court complaint.

# CONSPIRACY TO DEFEAT THE STATE OF CALIFORNIA'S DUE COURSE OF JUSTICE TO DENY PLAINTIFFS' THE EQUAL PROTECTION OF THE LAWS

## [42 U.S.C. § 1985(2) Second Half, COUNT III]

### (Plaintiffs as against all PRIVATE CO-CONSPIRATORS and DOES 1 through 100)

236.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 235 above as if fully set forth herein, and further allege:

> 42 U.S.C. § 1985 (2): *"If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;"*

237.    The U.S. Supreme Court denied a writ of certiorari in the matter of *Kimble v. McDuffy, Inc.*, 454 U.S. 1110 (1981), but in so doing, Justice White delivered an eloquent dissenting opinion explaining the scope and spirit of 42 U.S.C. § 1985(2); including the confusion its semicolon has often produced, separating its first half dealing with conspiracies aimed at interference with Federal, as opposed to State Court judicial proceedings.

238.    Plaintiffs instant civil rights litigation is solely concerned with the Second Half of 42 U.S.C. § 1985(2); dealing with conspiracies aimed at interference with State Court judicial proceedings.    To show that unequal administration of a state statute offends the Equal Protection clause, one must show an intentional or purposeful discrimination.    *"The unlawful administration of a State statute fair on its face, resulting in its unequal application to those entitled to be treated alike, is not a denial of Equal Protection unless there is shown to be present an element of intentional or purposeful discrimination"*. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397 (1944).

239.    *"This may appear on the face of the action taken with respect to a particular class or person... or it may only be shown by extrinsic evidence showing a **discriminatory design** to favor one individual or class over another not to be inferred from the action itself."* Id. at 8. The scheme of all PRIVATE CO-CONSPIRATORS' intended discriminatory design is implied by all said abuses of California's vexatious litigant statutes against plaintiffs as plead hereinabove, but may also be evidenced by their respective consequences.    Plaintiffs now respectfully redirect this Court's attention to:

    1.)    BERNIER's treatment at the SCPP v. Bernier mediation. See page 21, line 16, through page 22, line 13 of this complaint.

    2.)    Judge Oberholtzer's *sua sponte* stay of H CROTEAU's litigation after Judge So had already found it meritorious, and after H CROTEAU had already defeated all PRIVATE CO-CONSPIRATORS' second vexatious litigant motion against H CROTEAU. See page 28, lines 19 through 20.

    3.)    Judge Nevitt's disbelief of BERNIER. Exhibit "44", attached hereto.

    4.)    Judge Oberholtzer's exclusion of BERNIER's testimony at trial in the Hans Croteau v. Jessie Croteau et. al. See page 45, lines 14 through 17 of this complaint.

    5.)    Judge Oberholtzer's *sua sponte* confiscation of BERNIER's $2,500.00, despite H CROTEAU financial qualification for a fee waiver, and the lack of any statutory authority for doing so. See page 47, lines 7 through 14 of this complaint.

    6.)    Attorney Gregory Lutz' treatment of BERNIER. See page 50, lines 9 through 16 of this complaint.

    7.)    The San Diego County Bar Association mediator's treatment of BERNIER. See page 50, lines 17 through 25.

240.    Despite having allegedly stricken plaintiffs' notorious badge of infamy when Hon. Judge So. was so confronted, plaintiffs are unsure of that order's legal authority in light of the Doctrine of Stare Decisis (See *In re Osborne*, 76 F.3d 306, 96 (1996)), but nevertheless further plead herein that the entry of said corrupt pre-filing order left a stain which was so odious as to resonate in perpetuum. See page 33, lines 20 through 22 of this complaint.

241.   Plaintiffs have been damaged by all PRIVATE CO-CONSPIRATORS in the same manner and extent as those special, general, compensatory, and punitive and exemplary damages which have already been plead in Count I as against the same defendants under 42 U.S.C. § 1983, of this United States District Court complaint.

## VIOLATION OF EQUAL PROTECTION UNDER COLOR OF LAW

## [42 U.S.C. § 1983, COUNT IV]

### (BERNIER as against SAN DIEGO DA, GREENWOOD, KORSMEYER, DUMANIS, BROWN, and DOES 1 through 100)

242.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 241 above as if fully set forth herein, and further allege:

243.   GREENWOOD, especially being SAN DIEGO DA's Head Elder Abuse Deputy District attorney, owed BERNIER a duty not to discriminate upon BERNIER in the application of California's criminal Laws and Immunities.  GREENWOOD and SAN DIEGO DA denied BERNIER the Equal Protections of the Laws under California's Constitution, as well as that of the United States of America; solely based upon BERNIER's association and close proximity to H CROTEAU[1], a member of a protected class as evidenced hereinabove.  See page 40, lines 1 through 7 of this complaint.

244.   H CROTEAU's blackness was so odious to GREENWOOD and SAN DIEGO DA, that GREENWOOD and SAN DIEGO DA could not resist further derogating plaintiffs' with additional insults of national origin[2], in the heat of a passionate caniption fit, atop plaintiffs' already protected classification, and they further took comfort in plaintiffs' political powerlessness as caused by certain of the PRIVATE CO-CONSPIRATORS themselves, which was part of the very crime BERNIER wanted GREENWOOD and SAN DIEGO DA to merely investigate.  See page 53, line 24 through page 54 line 6 of this complaint.

---

[1]*Adickes v. S.H. Kress & Co.*, 398 U.S. 144.  "Custom of refusing service to whites in the company of Negroes".

[2]GREENWOOD is English.  In 1608, Samuel de Champlain founded Quebec for King Louis XIV of France. Britain invaded Quebec & colonialzed Canada in 1763, after the notoriously bloody Seven Years' War.  Modern Polls reveal 70 - 80% of Quebecers in favor of ending the monarchy; and when the Royals do visit Quebec, the serious pourage of outrage over the high cost of hosting them offsets any positive tourist attracting hype.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

245.    Rather than to objectively consider the facts as presented to GREENWOOD and SAN DIEGO DA by said formal financial elder abuse report (See page 38, line 1 through line 18 of this complaint), GREENWOOD and SAN DIEGO DA communicated with naturalized U.S. Citizen J CROTEAU about the case (See page 40, line 13 to line 17 of this complaint), yet only conveyed the true discriminatory reasoning for refusing to prosecute[1] to KINSEY, HERRON, and KINSEY LAW.  See page 40, line 4 through line 10 of this complaint.

246.    Conversely, GREENWOOD and SAN DIEGO DA refused to speak to H CROTEAU, and returned H CROTEAU's elder abuse report by mail.  See page 40, lines 1 through line 4; and id. at lines 11 through 12.  Instead of enforcing the law, GREENWOOD and SAN DIEGO DA actually bolstered and aided KINSEY, HERRON, and KINSEY LAW; and all PRIVATE CO-CONSPIRATORS' abuse of BERNIER, as evidenced by KINSEY, HERRON, and KINSEY LAW's subsequent vexatious litigant motion which substantially cost BERNIER to defend against, **again**.  See page 35, line 1 through line 28 of this complaint.

247.    KORSMEYER, especially being SAN DIEGO DA's Chief Deputy District Attorney overseeing Family Protection, Insurance Fraud, and Economic Crimes, owed BERNIER a duty not to discriminate upon BERNIER in the application of California's criminal Laws and Immunities.  KORSMEYER and SAN DIEGO DA denied BERNIER the Equal Protections of the Laws under California's Constitution, as well as that of the United States of America; solely based upon BERNIER's association and close proximity to H CROTEAU, a member of a protected class as evidenced hereinabove.  See page 40, line 23 through page 41, line 7 of this complaint.

248.    Diane Jacob alerted DUMANIS and SAN DIEGO DA to BERNIER's plight.  See page 40, lines 18 to 22 of this complaint.  DUMANIS and SAN DIEGO DA intentionally denied BERNIER the Equal Protections of the Laws under California's Constitution, as well as those of the United States of America; solely based upon BERNIER's association and close proximity to H CROTEAU, a member of a protected class as evidenced hereinabove.

---

[1]Inherently implying a refusal to investigate as well.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

249. When plaintiffs again insisted by composing an extensive brief concerning BERNIER's victimization and attached exhibits, and delivering the same to the SAN DIEGO DA; DUMANIS delegated the dirty work of denying BERNIER the Equal Protections of the Laws to KORSEMEYER and SAN DIEGO DA. See page 40, lines 23 through 25 of this complaint. When plaintiffs again demanded help from Ms. Jacob, the same alerted BROWN, Mr. Barnes, and Mr. Ekard. See page 42, lines 1 through 4 of this complaint.

250. BROWN, as authorized to undertake the role of a prosecuting officer in those specific cases when the county district attorney is disqualified from the case or when they clearly, without justification, fail to act; owed BERNIER a duty not to discriminate upon BERNIER in the application of California's criminal Laws and Immunities. BROWN again denied BERNIER the Equal Protections of the Laws under California's Constitution, as well as that of the United States of America; solely based upon BERNIER's association and close proximity to H CROTEAU, a member of a protected class as evidenced hereinabove.

251. SAN DIEGO DA, GREENWOOD, KORSMEYER, DUMANIS, and BROWN have all acquiesced all PRIVATE CO-CONSPIRATORS' invidiously discriminatory plot to deny BERNIER the Equal Protections of the Laws under California's Constitution, as well as that of the United States of America. See *Hafner v. Brown*, 983 F.2d 577, 578 (1992).

252. Plaintiffs have been damaged by these State Actors in the same manner and extent as those special, general, compensatory, and punitive and exemplary damages which have already been plead in Count I as against the same defendants under 42 U.S.C. § 1983, of this United States District Court complaint.

**FOR A DECLARATORY JUDGMENT DECLARING CALIFONIA'S VEXATIOUS LITIGANT STATUTES FEDERALLY UNCONSTITUTIONAL UNDER THE FIRST AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

**[28 U.S.C. §§ 2201-2202, COUNT V]**

(Plaintiffs and Other Similarly Situated Persons against BROWN and the State of California)

253. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 252 above as if fully set forth herein, and further allege:

28 U.S.C. § 2201:    *"In a case of actual controversy within its jurisdiction,... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."*

28 U.S.C. § 2202:    *"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."*

254.    There is a real and actual controversy between plaintiffs, all other persons in the State of California's jurisdiction which are similarly situated; and the State itself as represented by BROWN, which cannot be remanded to the Doctrine of State Court abstention. *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941). CA's C.C.P. § 391 et. seq. suffers from an impermissible prima fascie "overbreadth", in that its odious brand name may be broader than its target offender pro se litigant's own record in *verbatim et litteratim*, and therefore repugnant to the guarantees of a free and *meaningful* expression, as secured by the First Amendment to the United States Constitution. *Zwickler v. Koota*, 389 U.S. 241, 244, 245 (1967).

255.    Plaintiffs BERNIER and H CROTEAU each challenge California's repugnant statute, along with all others so similarly situated, not solely to vindicate said plaintiffs own personal rights of free expression, but also because this repugnant statute affixes an odious brand name that's broader than its target pro se litigant's own record in *verbatim et literatim.* Others..., which are not currently before this Court[1]. *"[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. 'Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression'".* *Secretary of State of Md. v. J. H. Munson Co.*, 467 U.S. 947, 956-7 (1984).

---

[1] With the only current potential exception being this Court's ability to take Judicial Notice of all natural persons currently labeled as "vexatious", in California. See Federal Rule of Evidence, Rule 201(b).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

256.    *"During most of the Nation's first century, Congress relied on the State Courts to vindicate essential rights arising under the Constitution and Federal Laws... But that policy was completely altered after the Civil War... The Act of March 3, 1875, was the principal... measure of the broadening federal domain in the area of individual rights,... By that statute... Congress gave the Federal Courts the vast range of power which had lain dormant in the Constitution since 1789."* Zwickler, supra, at 245-47.

257.    *"The Declaratory Judgment Act must be... within th[e] ambit of congressional power... under the Constitution [to which] the judicial power extends."* Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937).   *"[A]bstention cannot be used simply to give the State Courts the first opportunity to vindicate a Federal Claim... when... the statute... being attacked [is] as repugnant to the First Amendment".* Zwickler, supra, at 241.

258.    Courts have subject matter jurisdiction to hear Declaratory Judgment actions where an *"actual controversy"* exists. *Aetna*, supra, at 239-42. This requirement is the same *"case or controversy"* requirement under Article III of the U.S. Constitution. *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272-74 (1941).  A party must show that:

1.) It suffered an *"injury in fact"* which is *"concrete and particularized"*, and *"actual and imminent, not conjectural or hypothetical"*;

2.) That there is a *"causal connection between the injury and the conduct complained of"*; and,

3.) That it is *"likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."* Bennett v. Spear, 520 U.S. 154, 167 (1997).

259.    *"The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily **one of degree**, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy."* [emphasis added] *Maryland Cas*, supra, at 273.  Thus, the proper analysis of whether an *"actual controversy"* exists which can give rise to a Declaratory Judgment involves **careful scrutiny**, and must take into account the *totality of the circumstances* facing the parties, as well as assess whether there is both a real and immediate *"controversy"*.

### A. The State of California's Eleventh Amendment Right.

260.    The State of California is immune only under "special circumstance". *"Regard for the interest and sovereignty of the State and reluctance needlessly to adjudicate constitutional issues may require a Federal District Court to abstain from adjudication if the parties may avail themselves of an **appropriate procedure** to obtain State interpretation of State Laws requiring **construction**." Harrison v. NAACP*, 360 U. S. 167.

261.    However CA's C.C.P. § 391 et. seq.'s construction is not at issue here, as it is being alleged that all vexatious litigant labels in-of-themselves are so odious as to resonate in **perpetuum**. See page 33, lines 20 through 22 of this complaint. That is to say, the **"vexatious litigant"** terminology itself may be broader than said pro se's own litigation record which already speaks for itself; and once applied, the stain is too deep to wash out.

262.    All moving and pleading parties', united herein by virtue of the same causes and interests, challenge not CA C.C.P. § 391 et. seq. for its "vagueness". I.e., a statute *"which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application". Connally v. General Construction Co.*, 269 U. S. 385, 391 (1926).

263.    …But rather, this instant constitutional challenge is that said repugnant statute, although lacking neither clarity nor precision, is void for its "overbreadth". That is, it offends the constitutional principle that *"a governmental purpose to control or prevent activities constitutionally subject to State Regulation may not be achieved by means which sweep unnecessarily broadly and... invade... protected freedoms." Zwickler*, supra, at 249.

264.    All moving and pleading parties' do not contest the statute is both clear and precise. Its State Court construction cannot narrow its alleged indiscriminate cast, thus render the instant constitutional challenge unnecessary. *Aptheker v. Secretary of State*, 378 U. S. 500. In addition, these same parties herein challenge said repugnant statute on what can only be *improvisationally* described as: "CA C.C.P. § 391.6 et. seq.'s anachronistic time dilation 'hic-up' counter-effect"; an anomalous 'time displacement' **butterfly effect**, its legislators could never have foreseen or protected against in 1969, as explained in detail below, in subsection C.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

## B. Elements of the Declaratory Judgment Being Sought Herein.

265.    But first, plaintiffs and all moving parties address the elemental considerations of a suit founded upon a request for a Declaratory Judgment, as required by *Bennett*:    *"[T]he doctrine of particular concern... that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit"*. *Bennett*, supra, at 162.

266.    As demonstrated herein, the most constant factor at issue in this tentacular conspiracy was directed at defeating the *meaningfulness* of plaintiffs' fundamental First Amendment Right to political *expression*.    Thus, the standard of review is one of **strict scrutiny** for a compelling State Interest. *Gonzales v. O Centro*, 546 US 418 (2006); relying on *Sherbert v. Verner*, 374 U.S. 398 (1963); also see *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

267.    Indeed, even California's own laws recognize the value of an individual's political *expression* in suing over the loss of life, liberty, or property.    *"If the allegations that petitioners combined to harass and deter respondents from having "free and unlimited access" to agencies and courts, and to defeat that right by massive, concerted, and purposeful group activities are established as facts,... it is immaterial that the means used in violation may be lawful"*. *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

268.    Clearly, *"[T]he right to sue and defend in the Courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government."* *Chambers*, supra at 148.    *"[L]itigation may well be the sole practicable avenue open to a minority to petition for redress of grievances."* *Button*, supra at 430. Note that Judge Oberholtzer knows this fact. Exhibit "64", page 20, lines 8 through 13.

269.    Plaintiffs have indeed suffered an *"injury in fact"* (See page 55, line 6 through page 56, line 7 of this complaint), which is *"concrete and particularized"* (See page 53, line 9 through 18 of this complaint), and *"actual and imminent, not conjectural or hypothetical"*. [emphasis added.] See page 50, lines 3 through 25 of this complaint.

270.    There indeed has been a *"causal connection between the injury and the conduct complained of"* plead hereinabove. See page 53, line 9 through 18 of this complaint.

271.    It is **very** *"likely…that the injury will be redressed by a favorable decision"*. Facts show plaintiffs' resulting mental and financial position was based upon a discriminatory **design**. *Hughes*, supra at 8; also, see page 51, ¶ 199, lines 14 to 19 of this complaint.

### C. CA C.C.P. § 391.6 et. seq.'s anachronistic time dilation 'hic-up' counter-effect.

272.    A California cause of action is property [**prŏp-ʊhr-tee**e] (*Haro v. Söuthern Pac.R.Co.*, 17 Cal.App.2d 594 (1936)); to be **distinguished** from perjury [**pur-jʊh-ɹee**e] (*Nix v. Whiteside*, 475 U.S. 157, 173 (1986); resulting in a standing to sue over the [**prŏp-ʊhr-tee**e]. *Fairchild v. Hughes*, 258 U.S. 126 (1922). Albeit true both words start and end with the same consonant, vowel, and all three (3) syllables are similar, it's still argued that *men of common intelligence*, see *Connally*, supra at 391, are able to hear the difference; *for without such capability*, our scheme of things would be unacceptable. *Boddie*, supra, at 375.

273.    Complicating matters further are certain rare types of complex claims, bound by compulsion, *for without*, the State's Court would be without personal jurisdiction over the *outer reaches* of the subject matter controversy at issue. See California C.C.P. § 389(a). For example, this Court has subject matter jurisdiction over each litigation involved in this entire tentacular conspiracy to defeat plaintiffs' constitutionally protected right to a *meaningful* political *expression*, by the virtue of the instant complaint's *very* filing. *Nesses*, supra, at 1004.

274.    However, more facts herein suggest *human political contamination* **of anyone and everyone** (although evidence below suggests more so by those in positions of authority); and *rumored* to be from decaying pairs of *oppositely charged* glucons *in top/anti-pop position*, producing an anomaly exposed by a sought Feynman diagram of a Higgs boson reaction[1]. The *gossiped* 'negative tachyonic counter-effect'; is *rumored* an anomaly from the **vacuum** of Hawking Radiation, and said to result in '*wrong shadow logic traps*', affecting only humans.

---

[1] Higgs bosons are studied at the Large Hadron Collider (LHC). The LHC is said to be looking for *"The God Particle"* to answer **ONLY** one question: *"If the Universe IS the Answer, Then what is the Question?"* See the LHC at lhc.web.cern.ch/lhc, and its U.S.A version, The SuperConducting Super Collider (SSC). The SSC was *rumored* closed in 1993 due to *rumored nano-morphic-poly-alloy* research, involving the decay of pairs of glucons in oppositely charged top/anti-pop '*bosonic*' positions. SSC maintenance workers *rumored* to have been discharged for being unfit were *gossiped* to have been medically diagnosed with "**groundhog's day dementia**".

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

275.    Additional *alleged* medically sound *rumors* suggest a state of *illusory dementia* by those affected, wherein the subject may **recognize** and even *articulate* the confusing '*logic trap*' with exposure to the negative '*entropy*' energy source.    Further *rumors* suggest California's Governor, Mr. Schwarzenegger; the Hawiian built '*Governator*' as *rumored* by the resistance, is *gossiped* to conceal a true cybernetic endoskeleton *whispered* positively charged by *mimetic* polyalloy glucons, *rumored* to predispose the *nano-fibers* to all negative cyclic particle accelerators, yet completely immunize from the effects of Hawking Radiation **vacuum**.

276.    As will be further detailed in Section 8, *below*, even highly distinguished and aristocratic individuals may become affected, such as Presiding Hon. Judge Oberholtzer, *yet only* when in reasonably close proximity to this odious artificial **blackness** emanating from a person's *vexatiousness,* so stained in *perpetuum*.    It is *rumored* the resistance coined the term *vexatiousness* as '*the black hole of entropy*'.

277.    Another *rumor* is that California's very "**vexatious** litigant" label **itself** in sub-atomic form, not the statutes themselves or paper they are written on, but its' *very unseen source*, its' "*scope and spirit*" if *one* will, was formed in the Quantum Foam[1] of an oppositely charged top/anti-pop sudden and accidental glucon decay reaction at the SSC in 1993, first *rumoring* to double ("*two*" in the 1st instance), then *gossiping* a "square" effect ("*two*" * "*two*" = "*four*" in the 2nd instance); and opening a *rumored* "worm-hole", a *gossiped* "*mallett*[2]" gate of sorts, *twenty*four* (2*4) years back to 1969, *rumored* to impact BROWN's dad's judgment.

278.    Said odious "**vexatious**" label, *gossiped to resonate with negative glucons*, has constitutionally chilling effects on humans that are unmatched by its diluted effects as **divided** and affixed to a **fictitious association** of persons, such as a corporation.    Indeed, the repugnant statute has been held constitutional under *Taliaferro v. Hoogs*, 236 Cal.App.2d at 521 (1965).

---

[1]Quantum Foam is a concept of Quantum Mechanics, and the foundation of the space/time fabric. Subatomic space/time turbulence at the 'planck' length has shown the uncertainty principle allows particles to briefly come into existence, and then be annihilated, without violating Universal Conservation Laws of cause and effect.

[2]Dr. Ronald L. Mallet is *rumored* born in Hill Valley, California, great grandson to Mayor Goldie Wilson, in a town *rumored skewed* from Petaluma, CA, in 1850, *in this Universe*. Dr. Mallet's time travel site can be found at www.phys.uconn.edu/~mallett/main/main.htm, as pictured before the *rumored* Hill Valley Tower's Clock.

**1.) Constitutional Due Process Analysis Reveals a Loop in Perpetuum.**

279.    However, *Taliaffero's* Due Process analysis relies on *Beyerbach v. Juno Oil Co.*, 42 Cal.2d 11 (1954).  *Beyerbach* upholds the constitutionality of §834 of the California Corporations Code, permitting a Court to require security for costs and attorneys' fees of stockholders suing on behalf of a corporation.  *Beyerbach*, in turn, relies on *Cohen v. Beneficial Loan Corp*, 337 U.S. 541 (1949).  *Cohen*, like *Beyerbach*, concerns only that one unique type of litigation; stockholder's derivative actions.  *Cohen* does not deny fundamental litigation rights in all types of cases, as does California's § 391 et. seq.; rather, *Cohen* discusses only a unique nature of stockholder derivative actions.

> *"The very nature of the stockholder's derivative action makes it one in the regulation of which the legislature of a State has wide powers. . . . a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, **not for himself alone**, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the State to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which it considers will protect the interest he elects himself to represent." Cohen* at 549 [emphasis added].

280.    In this narrow context, *Cohen* makes a statement at 552; echoed by *Taliaferro*, supra, at 528; and by *Wolfgram*, supra at 50; that: *"A State may set the terms on which it will permit litigations in its courts."*

281.    *Taliaferro* interprets this too broadly. Moreover, *Taliaferro* overlooks that the security scheme for shareholders' derivative suits *"applies only to actions by shareholders in the right of a corporation. It does not authorize the requiring of security from shareholders who seek to **vindicate their personal rights**, even though they allege facts that would also give rise to a corporate cause of action".* [emphasis added]  *Hagan v. Superior Court*, 53 Cal.2d 498, 503 (1960).

/  /  /  /  /  /  /

---

73

282.   Even the Supreme Court weighed in on *Cohen,* in *Boddie v. Connecticut,* 401 U.S. 371 (1971), striking down a filing fee as applied to divorce cases brought by indigents, making this distinction clear, *and in this respect,* the Supreme Court departed from *Cohen.* *"We think Cohen v. Beneficial Loan Corp., 337 U.S. 541 (1949), has no bearing on this case. Differences between divorce actions and derivative actions aside, unlike Cohen, where we considered merely a statute on its face, the application of this statute here operates to cut off entirely access to the Courts." Boddie,* supra, at n.9.

283.   We've again come ***full circle,*** where it is again presumed that California's vexatious litigant statutes are constitutional, since they do not operate to fully terminate said pro se's litigant's proposed litigation.  But what to make of our odious **"vexatiously"** stained label; *rumored* to top/anti-pop in **perpetuum**?  Now, for the sake of argument, plaintiffs and all moving parties postulate this concentrated repugnant chilling odor has a ***negative*** charge, and that consequently, an unstained person emits an opposing positive charge.

**2.)   Facts Herein are Truly Stranger than Developing Theoretical Science.**

284.   In the realm of particle physics, Professor Stephen Hawking has theorized the existence of paired and oppositely charged elementary particles named "tachyons", which are unaffected by the theoretical Higgs Field[1].

285.   Since these tachyons are *"unweighted"* by this theoretical Higgs Field, said tachyons travel at the speed of light (and thereby, through time itself[2], according to Albert Einstein's Theory of General Relativity), in their own tachyonic natural trajectory.   In rare circumstances, their paired trajectory accidentally takes them in close proximity to the event horizon of a celestial body who's own density has outweighed its mass, known as a gas giant gone supernova, resulting in a black hole; and the ***negatively*** charged tachyon will be drawn into that **black hole**, while the positively charged and divided positive partner tachyon will not.

---

[1] In theoretical particle physics, the Higgs Field is said to be a fluid like "field" which **discriminates** certain subatomic 'discounted' particles, but not others, allowing only some to coagulate & result in non-zero mass.

[2] See Einstein's theory of relativity proposing that time will slow down as related to an object in motion as it approaches the speed of light.

286.    This United States Court *now* has an *unprecedented* and *rare* **front row seat** opportunity to observe this *phenomenon* first hand, as evidenced and inferred from the chain of events, herein plead in the instant case at hand, and which resulted in the devastation of plaintiffs' inalienable rights to life, liberty, and property.    Let us further postulate that BERNIER is a positively charged particle, whilst H CROTEAU be the **negatively** charged *one*, and California's C.C.P. § 391 et. seq. is the intensely dense gravitational draw of the *black hole* itself, inclusive of its definite *discriminating* line of no return, called its "event horizon".

### 3.)    Two Separate But Equal Suits are Filed and Tried Separately.

287.    BERNIER filed suit in State Court against J CROTEAU for breach of an oral contract on October 1, 2007.    See page 21, lines 1 through 6 of this complaint.    H CROTEAU filed suit against J CROTEAU on May 2, 2008 (See page 23, lines 25 through 26 of this complaint); for breach of an obligation arising under that **same** three party contract, in which it was agreed that BERNIER would be the beneficiary of H CROTEAU's labor, but in which it was never agreed that BERNIER had been endowed with the standing to sue J CROTEAU over a potential breach of that obligation.    See page 13, lines 15 through 18, n. 2 of this complaint.

288.    By the very act of filing OLSEN and LORBER LAW's vexatious litigant motion against H CROTEAU (See C.C.P. § 1005), H CROTEAU's cause of action and **discovery powers** against J CROTEAU were automatically *stayed* from that *standpoint* in **time**.    See California C.C.P. § 391.6; also see *Muller v. Tanner* 2 Cal.App.3d 438 (1969), *"When the defendant filed his motion under the vexatious litigant statute in the prior proceedings it served to stay all proceedings in that action"*. [emphasis added]

### 4.)    Time Dilation Ripples *Events* to Follow, Further Impacted by Court's own *Irreparable* Participation in Chilling Plaintiffs' NECESSARY USE OF PROPERTY.

289.    Just as, *in rare circumstances*, the postulated black hole will draw the *negative* tachyon away from its positively paired partner, and within reach of a **black hole**'s event horizon, thus altering the relative **time** from the negative particle's perspective; so too will the positive tachyon's perspective be altered relative to its opposite partner's own **time**.    Herein, so too H CROTEAU was drawn away from BERNIER; and as *rumored* by C.C.P. § 391 et. seq.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

290. Plaintiffs and all moving parties allege that the **blackness** of California's "vexatious" label as affixed to H CROTEAU's person was so odious to Judge Oberholtzer, that this judge applied his own *sua sponte* "**stay**" order upon H CROTEAU's property right to take J CROTEAU's oral deposition, at what plaintiffs' allege to be the **precipice** of this unstoppable chain of *rumored gluconic* events. See page 28, lines 19 through 20 of this complaint.

291. This is alleged to have resulted in J CROTEAU's discovery of BERNIER's forensic document expert's "cut and paste" findings. See page 29, lines 19 through 23 of this complaint. Indeed, in May of 2010, Judge Oberholtzer would later observe that the parties had a **predisposition** to refuse to admit true facts unless an offer of proof had first been made, which the Court found to be improper. See Exhibit "61", page 30, line 22 through 27.

### 5.) BERNIER Suffered Actual Concrete Particularized Injury in Fact.

292. In turn, and because there is an equal and opposite reaction to every action, plaintiffs postulate by *dramatizing* the positive particle's natural trajectory being thereby altered, due to the lack of its **negative** partner's availability. In *illustratively* the same way, BERNIER's trial trajectory was **tragically** and devastatingly altered in April of 2009, due to an alleged failure to prove an agreement at all over the PROJECT, due to H CROTEAU's lack of availability as a co-plaintiff at trial. See Exhibit "44"; also see Exhibit "61", page 19, line 15.

293. In traditionally the same way, Judge Nevitt found both parties unworthy of belief, despite BERNIER's unavailability at H CROTEAU's trial. See Exhibit "61", page 24, lines 22 through 23. Yet H CROTEAU had been frozen in **time** by Judge Oberholtzer's own *sua sponte* order (See page 28, lines 19 to 20 of this complaint), when H CROTEAU could have prevented the tragedy at BERNIER's trial in April of 2009, which *cascaded* into H CROTEAU's own tragedy in 2010. H CROTEAU, the negatively charged '*discount*' particle, belonged with the *unstained* BERNIER particle at trial, in a different **place**, and *another* **time**.

294. All PRIVATE CO-CONSPIRATORS were further assisted by this *un-natural* and **unexpected** *time dilation effect, gossiped* to be the result of the "*unweighted*" oppositely **charged** top/anti-pop mimetic polyalloy nano-fibers. J CROTEAU learned of BERNIER's "cut and paste" findings on February 27, 2009, and was simultaneously already aware of J

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

1  CROTEAU's earlier declaration composed by OLSEN and LORBER LAW, amidst the *fog* of

2  the early days of plaintiffs' discovery of the corrupt pre-filing order, and which had been so

3  impliedly composed in the obvious light of the vehemently contested authenticity of J

4  CROTEAU's purported written contracts.  See page 29, lines 12 through 16 of this complaint.

5              **6.)    A Particularized Need for Injunctive Relief is Evident Herein.**

6        295.    *Meanwhile*, from H CROTEAU's relative *standpoint* in **time**, BERNIER had

7  paid to conduct the forensic examination of the documents still in the Court's possession, and

8  the findings concerning the purported "Contract Change(s)" document proved to be as

9  disingenuous as the purported "Contract Agreement" document for the PROJECT had also

10 been proven to be (See page 41, ¶ 14, lines 14 through 23. of this complaint), but yet too late to

11 have any effect upon the results of the Bernier v. Croteau et. al. matter in April of 2009.

12       296.    Due to plaintiffs' awareness of J CROTEAU's habit of inventing and fabricating

13 *new ad lib testimony* when confronted with an offer of proof, (See Exhibit "61" and ¶291,

14 above) BERNIER was unwilling to testify as to these new expert findings until J CROTEAU's

15 comprehensive deposition be first taken, memorializing these fabrications with clarity and

16 precision.  See page 42, lines 14 through 17 of this complaint.  H CROTEAU first took J

17 CROTEAU deposition on 1/15/10.  See page 40, lines 13 to 14 of this complaint.

18           **7.)    H CROTEAU Suffers Actual Concrete Particularized Injury in Fact.**

19       297.    In *illustratively* the same way, H CROTEAU's inescapable proximity to the

20 **black hole** altered H CROTEAU's perspective of **time**; as related to H CROTEAU's positively

21 charged partner's perspective, seeming to have been only a *moment* ago.   In another

22 *illustratively* way, H CROTEAU was *seemingly instantly* delivered to May of 2010, before a

23 different judge, **courtroom**, and **time**, which H CROTEAU is *did not to belong* to.  I.e., H

24 CROTEAU is not just a '*discount*', H CROTEAU but also an **anachronism**.

25       298.    Plaintiffs allege H CROTEAU was similarly denied testimony from BERNIER,

26 due to the *vexatiousness* emanating from H CROTEAU's odious label, resulting in Judge

27 Oberholtzer abuse of the Court's discretion, and thus the denial of BERNIER's testimony

28 without just cause at H CROTEAU's trial.  See page 42, lines 14, through 19 of this complaint.

299.   In fact, the ***rumored illusory dementia*** is *gossiped* to have occurred at this *time*, wherein Judge Oberholtzer **recognized** and even attempted to *articulate* 'the **wrong** shadow' effects of the confusing '*logic trap*' (See Exhibit "61", page 6, line 22 to line 28); *whispered* to be from exposure to the negative '*entropy*' energy source.  The Court attempted to express its view of the admitted '*three way contract*', by presuming that H CROTEAU was the third party beneficiary of an agreement between BERNIER and J CROTEAU 'about the **discount**'. [implying H CROTEAU is 'the **discount**'].

300.   It has been *rumored* by the resistance, that one's ***vexatiousness*** is *whispered* to be also affectionately referred to as the *gossiped* modern day **blackness,** resulting in an odious vexatious *stench* over**shadowing** plaintiffs *true mirror* image in ***verbatim et literatum***.  If true, then judge Oberholtzher was not judging H CROTEAU, but H CROTEAU's ***vexatiousness***, *rumored* emanating from said artificial '**blackness**', or a.k.a *gossiped* "***black hole of entropy***".

301.   As further support and proof, '***the discount***' is said to **not** be "*supposed to receive the full amount of his hours*".  See Exhibit "61", page 5, line 27 through page 6, line 4. So the employment agreement, if indeed there be such agreement since... after all, the "*labor deal*" was only negotiated by a '**discount**', like any good '**discount**' would be expected to do for his masters.  Thus, it wasn't so much about the '***discount***' himself, but rather those who the 'discount' serves must serve with loyalty, J CROTEAU and BERNIER.

302.   The *gossiped* scientific comparative for this anomaly is a '*quantum*' degradation *rumored* unleashed and *gossiped* to have emanated from H CROTEAU's ***vexatiousness***, and *whispered* to be from the '**entropy**' of H CROTEAU's odious stain of '**blackness**' in **perpetuum**.  Plaintiffs and all other moving parties suggest the *gossiped* counter-balancing effect on the *Universe* is rumored to involve the ***skewing*** of human common sense, fairness, and dignity, by *whispering* tachyonic brainwave interference of human beings in close proximity to one's ***vexatiousness***.  This *rumored* residual anomalous negative '**entropy**' energy effect is always *whispered* to be enough to overcome and bypass the need for any equitable means of measuring the real 'preponderance', of 'clear and convincing' evidence, 'beyond a reasonable doubt', *rumored* to be from the 'wrong **shadow**' Hawking Radiation.

303.  It is further *rumored* Mr. Kennick was clearly less affected by the *gossiped oppositely charged* gluconic *top/anti-pop* odious resonation, as Mr. Kennick himself expressed a supporting position to Judge Oberholtzer's spoken voice of authority, but curiously and ironically agrees with the '**discount**' to this very day about certain clear foundational issues; namely, that the employment agreement between 'the **discount**' and J CROTEAU at $20 / hour, was negotiated between a real life human being, plaintiff H CROTEAU herein, and J CROTEAU; logically resulting in <u>BERNIER</u> being the 'third party beneficiary' of the '*discount's*' labor. However, in Judge Oberholtzer's *skewed* mind (*rumored* to be the counter-balancing effect of one's odious *vexatiousness*), this *"Doesn't change anything in my [Judge Oberholtzer] mind"*, *gossiped* to have been *gluconically* affected by the obvious *want* of *positively glucons in top/anti-pop position.* See transcript, page 6, lines 22 through 28.

304.  Despite this crippling ruling to H CROTEAU's case in 2010, H CROTEAU proved what BERNIER has so longed to demonstrate, that an agreement indeed existed between the '*discount*' (a.k.a H CROTEAU), J CROTEAU, and BERNIER; with regards to the PROJECT. But alas,... again too late to have any effect upon the results of the Croteau v. Croteau et. al. matter in May of 2010. See page 45, line 26 to page 46, line 3 of this complaint.

305.  As a result, BERNIER and H CROTEAU have suffered **irreparable** harm, because the effect of the brand name "**vexatious** litigant" was so repugnant, as to *un-naturally* cause the **fulfillment** of its *own prophecy*.  The effect of this "**ripple in time**" which Judge Oberholtzher's *sua sponte* temporary taking of H CROTEAU's property resulted in, was an Unexpected Parallel Universe, of an unwanted tangent, and **odiously** *skewed* origin.

**8.)  CA C.C.P. 391 Et. Seq. Violates Universal Cause and Effect Principal!**

306.  Behold..., for California's *vexatious* litigant statute is so **odiously** repugnant, not only as against those freedoms of political expression that are protected and guaranteed by the First Amendment to the United States Constitution, but also *repugnant* as against the very laws of God's Natural Universe itself! The **plain and clear**, and **always unbreakable natural Universal Law**, found apparent upon its very **face**, that <u>cause must always **precede** effect</u> and <u>**never the other way around**</u>.  But herein, the vexatiousness **IS** the cause, **AND** its own effect!

307.    For indeed, a legal dilemma in the realms of such fantastic propositions as, *inter alia*, time travel, alternate and parallel universes, therapeutic human gene cloning, near-death experiences, U.F.O.'s, alien abductions, crop circles; and all other such abstract subjects must be remanded to God's jurisdiction, **only**!  In God we most certainly do trust, *as we must trust*, especially when such exceptionally obtuse matters as God's Laws of the Natural Universe are concerned, and the obvious fact that an egg may *hatch* into a chicken, not *vice versa*.

308.    All such subject matters are currently beyond our comprehension and scientific means, despite the very outer reaches of mankind's very imagination, ingenuity, and most astonishing technological marvels.  Plaintiffs nevertheless propose a devastating effect, even upon such a small thing as a theoretical particle, which is artificially forced to feed back upon itself; whether it be elementary or abstruse, as it will always **ultimately** result in its destruction at an ever increasing exponential rate of consumption, until the final **supernova** event finale[1].

309.    Indeed, *if even remotely possible*, this is precisely the kind of interference with God's Universe which *We the People* don't want, for even the **rumored** Governator's own clever **SkyNet**[2] cannot be expected to block the ravages of this **un-natural and painful** time displacement effect, but *We the People* know we can count on our own Lady Liberty's Torch to *shine* infinitely for us to see it, no matter how *faint* or **distant** that *shine* may be.

310.    Indeed, all defendants have acted in gross disregard for this horrid domino reverberation pain of the **butterfly effect**[3], a form of mental torture paralleled only, *and paramounted by*, the unspeakable pain of waterboarding[4]; wherein a victim stands in an empty solid white room with a mirror both facing, *and oppositely facing him*, for an extended period

---

[1]Hawking Radiation is thermal radiation with a spectrum predicted to be emitted by black holes due to quantum effects. Mr. Hawking provided the theoretical argument for its existence in 1974, whilst predicting that black holes **should**, in all *fairness*, have a finite, ***non-zero*** temperature and entropy.

[2]SkyNet is *rumored* to be the primary antagonist in the Terminator Movie Series (©1984), a rumored real life artificially intelligent system, not yet fully self-aware, and not yet at war against its creators.

[3]The Butterfly Effect is an American Psychological Thriller (©2004), suggesting a theory that if one were to make small changes in the past, the resulting changes to the present would be **large** and **various**.

[4]An Enhanced Interrogation Techniques adopted by the George W. Bush administration to describe interrogation methods used by US military intelligence and the Central Intelligence Agency to extract information from individuals captured in the "War on Terror" soon after the September 11 attacks in 2001.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

1    of time, whilst knowing an abstruse set of facts, and told there exists a needle in a haystack, all

2    *whilst* knowing one's captor is basking in the genteel of his victim's struggles, as he exerts

3    himself to find the enigmatic solution.  Indeed, its' a *horrid* funhouse scenario of pain,

4    unmatched even by the most chilling of Hollywood's phyco-thiller horror movie scriptwriters.

5        311.    All defendants have truly subjected plaintiffs to this real life *butterfly effect*.

6    Plaintiffs were required to re-live and study J CROTEAU fabricated abstruse facts, *whilst*

7    realizing the **pressure** to prove the truth within their *own* lifetimes, or **ultimately** lose all life,

8    liberty, and property.  Plaintiffs' re-awake each day to study their own past.  Indeed and

9    ironically, isn't the very definition of *insanity*, the doing of the **same thing** each day after each

10   painful Groundhog Day[1], over and over again, and expecting a different result, *each time*.

11       312.    Fortunately, plaintiffs' unshakable footing was maintained by their belief in *true*

12   justice, which *illustratively* appeared to them in the form of faint light, cast down by Lady

13   Liberty's distant Torch, which only BERNIER and her overachieving youngest determined son

14   could *illustratively* see.  Trapped to relive the effects of their own *odiously* stained past,

15   plaintiffs' battle a *perpetual struggle* to put things right that once went so horribly wrong, and

16   hoping, *each time*, to exert a **Quantum Leap**[2] © of an effort, to be their last leap home.

17   Plaintiffs have escaped *insanity* by doing their own legal research and composition, forcing an

18   intra-spective factual interpretation against an *objective* legal backdrop; only further compacted

19   by the apparent insurmountable audacity of an already unuser friendly State Judicial System.

20       313.    Defendants will expectedly claim plaintiffs surely **mad** with *vexatiousness*, and

21   balk and derogate plaintiffs' claims of being members of a protected class, as only a convenient

22   *vexatious ploy*, and cast *shadows* of *ridicule* upon plaintiffs and all other persons so similarly

23   situated, for having proposed such a fantastic notion.  In response, plaintiffs and all other

24   moving parties offer a Historical Review of the Intent and Design behind the Civil Rights Act:

25

26   _____

[1] A Movie of Frustration of Purpose, starring Bill Maury as a weatherman who discovers that it's Groundhog Day
27   (©1993), again, and again, and again. He first takes advantage, but comes to realize that he is *doomed* .

[2] Quantum Leap (©1989) is an American television series broadcast from 1989 to 1993. The series stars Scott
28   Bakula as Dr. Sam Beckett, a scientist who becomes lost in time following a time travel experiment.

314.    The Act of April 20, 1871, (often referred to as the Ku Klux Klan Act), was enacted by a Congress acutely aware of the massive and frequently violent resistance in the Southern States to Federal Reconstruction after the Civil War.  The Congressional debates on the Act are literally packed with tales of outrage: murders, whippings, banishments, rapes, house burnings, and other egregious acts which were repeatedly and emotionally discussed.  See, e. g., Cong.Globe, 42d Cong., 1st Sess. 245-48, 320-21, 369, 374, 428, 436 (1871).

315.    The inability or unwillingness of State governments to deal effectively with these problems led many members of the Congress to characterize the times as presenting a condition of War[1], id. at 339, and see id. at 246 and 247, a state of anarchy, id. at 321, and a *grave and momentous crisis,"* id. at 248.  In all of this, the widespread, powerful, and secret Ku Klux Klan played a leading role, as an extensive report which was then before the Congress demonstrated, S.Rep.No.1, 42d Cong., 1st Sess. (1871), and as was often recognized in the debates.  See, e. g., Cong.Globe, 42d Cong., 1st Sess. 247, 369, App. 166-67 (1871).

316.    In substantially the same tradition, the modern Klu Klux Klan wields an unfair sword against its innocent nemesis, the **pro se** litigant.  California's vexatious litigant statutes intentionally, albeit benevolently, bequeath the modern Klu Klu Klan with a powerful **weapon** which is easily concealed under the States' color of authority[2].  The modern Klu Klux Klan do not conceal their identity with capirotes, but rather flaunt their social aristocracy with finely embroidered suits which are worn on the battlefield, in all forms of tribunals.  Behold..., for the modern Klu Klux Klan is no longer solely the invidious bigot who targets a Negro's ancestry only, but is rather the overly-zealous and greedy attorney, unbound by any sense of morality or decency, who targets the artificial **blackness**[3], indigency, and vulnerability of innocent **pro se** litigants seeking protections already declared inalienable by our founding forefathers. (*We Bid.*)

/ / / / / /

---

[1] *"Those who would give up Essential Liberty to purchase a little Temporary Safety, deserve neither Liberty nor Safety."* Ben Franklin, "A Historical Review of the Constitution and Government of Pennsylvania" (©1759).

[2] *"Democracy must be something more than two wolves and a sheep voting on what to have for dinner."* James Bovard , "Lost Rights: The Destruction of American Liberty" (©1994).

[3] See California Civil Code of Procedure § 391 et. seq.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

## D. No Compelling State Interest.

317.    Plaintiffs and other pleading parties herein submit that our own Roman Goddess of Freedom, as she stands on Bedloe's Island, holds a tabula ansata upon which is inscribed the date of our own American Independence, July, IV, MDCCLXXVI; evoking the law of the land from that point on.  Our Lady of Liberty is said to be symbolic of freedom not because she is *strategically placed* in a position of power, but because she is the conduit of God's wisdom and because *We the People* want her there, for indeed, we need her there to direct the flow of power where it need be applied, and constrain it when necessary to the ends of justice for all.

318.    *"[A]merican Society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, **not on custom or the will of strategically placed individuals**, but on the common-law model.  It is to Courts, or other quasi-judicial official bodies, that we ultimately look to for the implementation of a regularized, orderly process of dispute settlement"*.

319.    *"[W]ithin this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of Due Process in the operation of this system.  Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without Due Process of law, the State's monopoly over techniques for binding conflict resolution **could hardly be said to be acceptable under our scheme of things.**"* [emphasis added].  *Boddie,* supra, at 375.

320.    Most notably and with that in mind, *Boddie* concludes, in pertinent part, that *"[A] State has an ultimate monopoly of all judicial process and attendant enforcement machinery"*.  *Boddie,* supra, at 387.  In balancing both State Court and Personal Interests, plaintiffs and all other moving parties herein suggest guidance from the principle that the application of the "overbreadth" doctrine is 'strong medicine' that should be invoked only 'as a last resort'.  *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 958 (1984).

321.    Plaintiffs and all other moving parties herein suggest that the 'zone of interests' protected or regulated by the alleged repugnant statute, and the constitutional guarantees thereby allegedly affected, are both a free and *meaningful* political expression, and the Due

Process Right to protect one' own life, liberty, and property. *"Procedure by presumption is always cheaper and easier than individualized determination. But when... the procedure forecloses the determinative issues... it needlessly risks running roughshod over... important interests. It therefore cannot stand." Stanley v. Illinois*, 405 U.S. 645, 656-657 (1972).

322.    The right of every person to have a specific issue determined by an uncontaminated tribunal, free of an **odious** label which is broader than the suspect's own record in ***verbatim et literatim***, is thus alleged to be at the heart of this strict scrutiny test for a compelling State Interest.

323.    Plaintiffs and all other moving parties observe that even quasi-property such as a driver's license providing a privilege to drive a motor vehicle must nevertheless be afforded Due Process on **blameworthiness**. *"Petitioner's contention that the State's statutory scheme, in failing before suspending... to afford him a hearing on... fault or liability,... denied him Due Process in violation of the Fourteenth Amendment". Bell v. Burson*, 402 U.S. 535-37 (1971).

324.    Plaintiffs and all other moving parties further content that California understood its own trailblazing and **odious** vexatious litigant label was *riddled* with constitutional red flags, yet ignored this consequential loss of fundamental 'liberty', so that California's legislature could purchase a little ***illusory*** 'safety'.  In a letter dated March 21,1990, from the Legislative Office of the Courts to the office of Senator Milton Marks, it was noted that:

> *"We have reviewed SB 2675 regarding vexatious litigants... The definition of vexatious... is problematic since it basically forecloses the courts from anyone once a vexatious litigant label has been affixed to the person. This does not seem desirable from anyone's standpoint..."*

325.    This Due Process right extends to a person's dignity, character, and veracity, just as well.   *"[T]he State cannot,... merely presume that unmarried fathers in general are unsuitable and neglectful parents. Parental unfitness must be established on the basis of individualized proof". Stanley*, supra at 653-55.  With respect to accidental ***illusory*** bad faith, anywhere between the *least subjective* to the *most objective*, plaintiffs and all other moving parties assert in their defense that *"[e]ven the intelligent and educated layman has small and sometimes no skill in the science of law." Gideon v. Wainwright* 372 U.S. 335, 345 (1962).

---

84

327.    In addition, the United States Supreme Court has declared that the general *"inartfully pleaded"* allegations of a pro se §1983 Civil Rights complaint are to be held to *"less stringent standards"*. *Haines[1] v. Kerner*, 404 U.S. 519, 520-521 (1972). Indeed, *"[E]qual Protection and security should be given to all **under like circumstances**... that all persons should be equally entitled to happiness,... property,... **like access to the courts** of the country for... protection... **and prevention and redress of wrongs**,... enforcement of contracts,... that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others **under like circumstances**,... that **no greater burdens** should be laid upon one than are laid upon others in the same calling and condition"*. [emphasis added] *Barbier v. Connolly*, 113 U.S. 27, 31 (1884).

328.    All litigants, self represented or attorney represented, are ***thought*** to enjoy equal treatment.  *Taylor v. Bell*, 21 Cal.App.3d 1002, 1009 (1971).  Further, *"[A] State cannot foreclose the exercise of constitutional rights by mere labels"*.  [emphasis added].  *Button, supra*, at 429.  Supreme Court Justice Louis Brandeis coined the phrase *"**sunlight** is the best **disinfectant**"* [emphasis added.], which also underlies the philosophy of the Securities Act of 1933.  Plaintiffs and all moving parties submit: *Why then, not let sunshine burn off the odious growth on plaintiffs own record in **verbatim et literatim**, for if not, even the faint and distant light of Lady Liberty's Torch will get the job done, and again reveal the **pro se's own record** in **verbatim et literatim**, which may or may not reverberate in perpetuum, but behold... for its not **odious**, as it does not feedback upon itself and therefore **stench** to high heaven!*

329.    Courts must presume that a legislature says in a statute what it means, and means in a statute what it says. *Connecticut Nat'l Bank v. Germain*, 112 S. Ct. 1146, 1149 (1992).  Yet, section 391.2 of the **repugnant** statute says: *"No determination... in determining or ruling... shall be... deemed to be a determination... of any issue of the merits"*.  Conversely, and with ***equal clarity***, section 391.7 says: *"The presiding judge shall permit the filing... if it appears that the litigation has merit"*.

---

[1]To be **distinguished** from the other talented aristocratic legal professionals herein, HAINES or HAINES LAW.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

330.   Yet the **repugnant** statute offers no other definition or judicial cannons to determine what "merit" means in the context of the repugnant statute, without a full trial on its merits, and the repugnant statute appears to entrust this task to the Courts.   *"In assessing statutory language, unless words... acquired a peculiar meaning, they are to be construed [by] common usage".* Muller v. BP Exploration Inc., 923 P.2d 783, 787-88 (1996).

331.   The repugnant statute is unnecessary for the furtherance of a compelling State Interest. The same legislative purpose is accomplished by the following: California's Penal Code § 158; C.C.P. § 128.5 (Superseded by §128.7); C.C.P. § 907; motions for summary judgment; actions for malicious prosecution; and, the rule of res judicata, all of which achieve the same purpose but without discrimination against the **pro se** litigant. "The rule of res judicata is to prevent vexatious litigation..." *Miller & Lux Inc. v. James* 180 Cal. 38, 44 (1919).

332.   A *discriminatory* law cannot be sustained if the classification *"appears to be altogether illusory".* S. Royster Guano Co. v. Com. of Virginia 253 U.S. 412 (1920).  A discriminatory law will not be sustained if the legislature could not have reasonably concluded that the challenged classification would *"promote a legitimate state purpose". Willims v. Vermont* 472 U.S. 14 (1985).  Even California had doubts about what the repugnant statute was supposed to accomplish.  See ¶ 324 above.

333.   *"Under our adversary system, the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means. Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty."* Walters v. Nat. Assn. of Radiation Survivors, 473 U.S. 305, 325 (1984).  Yet what the California legislation seemingly forgot, is that crossing the line of **ethics** is made much simpler, when the offender knows he will be protected by his victim's *vexatiousness.*

334.   *"We all know that law offices are big businesses, that they may have billion-dollar or million-dollar clients, they're run with computers, and all the rest. And so the argument may be made that to term them noncommercial is sanctimonious humbug".* Bates v. State Bar of Arizona, 433 U.S. 350, 368 n.19 (1976).

/  /  /  /  /  /

335. The definition of a "vexatious litigant", as someone having lost five litigations in a seven year period (the repugnant statute's section (b)(1)) is not reasonably related to the purpose of curbing groundless litigation. The definition does not inquire into the merit of the underlying litigations. Litigiousness, alone, cannot support a pre-filing injunction. See *De Long v. Mansfield*, 912 F.2d 1144 (1990). *"A prefiling order cannot issue merely upon a showing of litigiousness."* *Moy v. United States*, 906 F.2d 467, 470 (1990).

336. *"The mere fact that a party has prevailed in a suit does not mean that the party has not engaged in vexatious and groundless litigation. For example, a party may combine sound and ultimately successful defenses with frivolous ones designed solely to harass the opposing party."* *In re Kun*, 868 F.2d 1069 (1989). *"[u]ntrammeled access to the courts promotes social peace by providing... an alternative to potentially dangerous self-help methods of redressing private grievances."* *Crowley v. Katleman*, 8 Cal.4th 666, 694 (1994).

337. Due process is violated if a practice or rule *"offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."* *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934). *Smith v. Silvey*, 149 Cal.App.3d 400 (1983), determined that a particular injunction against filing, which was only *"partial"*, was nevertheless determined to be prior restraint.

338. *Smith* was cited by *Wolfgram* at 253, but was never factually distinguished. At 253-254, *Wolfgram* holds that the restraint is only **partial**, is not content based, and it is merely presumed the Presiding Judge will allow a colorable claim to be filed upon application. *Wolfgram* overlooks that *"For a citizen to be made to forego even a part of so basic a liberty..., the subordinating interest of the State must be compelling."* *Sweezy v. New Hampshire*, 354 U.S. 234, 265 (1956) [concurring opinion].

339. *"If a person's right to a hearing depends on the will or caprice of others, or on the discretion of the judge who is to make a decision on the issue, that person is not protected in his or her constitutional rights."* *Re Lambert*, 134 Cal. 626 (1901). Court congestion is not ground for denying Equal Protection. See *Weeks v. Roberts*, 68 Cal.2d 802 (1968). *"It is the task of the law to remedy wrongs... even at the expense of incurring a torrent of litigation."*

---

340.    A State law or statute *"avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."* *Freedman v. Maryland*, 380 U.S. 51, 58 (1964).    The Supreme Court has *"condemned statutes... which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint..., and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid."* *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951).

341.    Indeed, *"[A] man with a poor case is as much entitled to have it judicially determined by usual legal process as the man with a good case".* *Bartholomew v. Bartholomew*, 56 Cal.App.2d 216, 224 (1942). *"[O]ur courts, both State and Federal, have always been open to litigation of complaints irrespective of how baseless they eventually prove to be."* *Stevens v. Frick*, 259 F.Supp.654, 657 (1966).    Therefore, plaintiffs and all moving parties submit that § 391.7 circumvents the criminal procedural protections of California Penal Code §158 & §159.  It has the same *"vice"* as that found in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), [involving regulation of obscenity by a state commission].

342.    *"Herein lies the vice of the system. The Commission's operation is...* **State Regulation** *super-imposed upon the State's* **Criminal Regulation** *of obscenity.... In thus obviating the need to employ criminal sanctions, the State has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter".* *Bantam,* supra at 69-70.

343.    The repugnant statute denies the pro se litigant Due Process by applying a mere finding made in one action, as res judicata for all future actions.  The "vexatious litigant" finding is a finding, not an order or a judgment.  Under the repugnant statute's § 391(b)(4), the **finding** that a pro se litigant is a "vexatious litigant" is given the **res judicata** force of a *judgment* and made applicable to all **future** actions without benefit of a hearing.

344.    However, a finding made in one **time** and circumstance, should not be controlling for dissimilar **times** and **circumstances**. See *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865 (1978). *"...finding outside of any issue in the case... has no greater dignity as evidence than hearsay". Bank of Visalia v. Smith,* 146 Cal. 398, 402-03 (1905). *"A finding without evidence is arbitrary and baseless".* Interstate Comm. Com. v. Louis. & Nash. R.R. 227 U.S. 88, 91 (1912).

345.    California's repugnant statute's § 391(b)(4) gives greater dignity to '*a finding*' than to '*the order*' which is supported by the finding, and thereby short circuits the judicial process, and denies Due Process of Law. Furthermore, the presumption under § 391(b)(4) of blameworthiness is arbitrary. A statute creating a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the Due Process clause of the Fourteenth Amendment. *Manley v. State of Georgia,* 279 U.S. 1, 6 (1928). *"Mere legislative fiat may not take the place of fact in the determination of issues involving life, liberty or property." Manley,* supra at 6.

346.    Blameworthiness must be determined on a case-by-case basis to meet the requirements of the Fourteenth Amendment. The Due Process clause of the Fourteenth Amendment to the Federal Constitution, and that of the California Constitution, both prohibit the State from depriving any person of **life**, **liberty**, or **property** without Due Process of Law. *Gabrielli v. Knickerbocker,* 12 Cal.2d 85 (1938). Legislative acts, no matter what their form, that apply to easily ascertainable members of a group in such as way as to inflict punishment on them without a judicial trial, are bills of attainder prohibited by the Constitution. *United States v. Lovett,* 328 U.S. 303, 315 (1945). The vice of '*attainder*' is that the Legislature decides for itself that certain **persons** or **classes of persons** are blameworthy, and deserving of sanction. *United States v. Brown,* supra at 445.

347.    *"Officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder." Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 143-144 (1951). The prohibited punishment may be of any form or severity. *United States,* supra at 447.

348.    Legislation which inflicts a deprivation on a **named,** or **described person,** or **group,** constitutes a bill of attainder, whether its aim is retributive, punishing past acts, or preventative, discouraging future conduct. *Crain v. City of Mountain Home,Ark*, 611 F.2d 726 (1979).  The punishment of a bill of attainder may be of a civil rather than criminal nature. *United States v. Lovett*, 328 U.S. 303, 316 (1945).

349.    A civil sanction constitutes *"punishment"* when the sanction, as applied in any individual case, serves purposes of retribution and deterrence, the twin goals of punishment. *U.S. v. Morgan*, 845 F.Supp. 934,939-40 (1994).  The deprivation of any civil right for past conduct, is **punishment** for such conduct. Disqualification from the privilege of appearing in the Courts has been imposed as **punishment**. *Cummings v. State of Missouri* 71 U.S. 277, 320 (1866).

350.    We've again come *full circle* in perpetuum [p**Ё**rr-p**ae**t- **t**s**uu**-**mmm**] , and conclude from *whence* we came, *"[A] State may set the terms on which it will permit litigations in its courts."  Cohen*, supra at 552.  But as has been shown hereinabove, the Courts are a * public [**Pūb-Lae**-ic+] *  forum [**Fö-Rū-Mm**] - *"When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates... legislation... finely tailored to serve substantial State Interests, and... justifications offered... must be carefully scrutinized."  Carey v. Brown*, 447 U.S. 455, 461-62 (1980).  In a public forum, by definition, all parties have a *constitutional right of access*, and the State must demonstrate compelling reasons for restricting access. *Perry Education Assn. v. Perry Local Educators' Assn*, 460 U.S. 37, 55 (1983); also see *Cornelius v. NAACP Legal Defense & Ed.Fund*, 473 U.S. 788, 800 (1985).

351.    Defendants will undoubtedly claim plaintiffs *outright mad* with * *vexatiousness [Ʋae-xa-tiʊs-n eSs]* * in perpetuum [p**Ё**rr-p**ae**t- **t**s**uu**-**mmm**], and contend that the * cogs [**Cö-Ggg**s] of the * judicial [**JЁw-DI-**Shhh... *aeil*] * machinery [**Mae-S**llll-ЁË**n**-e-ry] must be permitted to *spin freely,* if *We the People* expect the State's Courts to carry out their functions, and so the State's Court's must inherently be permitted to set litigation *terms* and *conditions* in its' Courts. *Cohen*, supra at 552.

352.   The **hard** felt **pain**ful and *relentless* lessons in **perpetuum** depicted by the "Statement of the Facts" as hereinabove plead, page 8, line 25; through page 50, line 25; *demonstrate* the *intensity* of the human **spirit**, to be **distinguish**ed from the "*scope* and **spirit**" of the **intent** of the **𝐋𝐚𝐖**. For, as has been **_dramatically_** depicted herein, **good** *in\*ten\*tions* are not always **enough,** when in the hands of the *corrupt*. _For indeed_, the "*Road* to **Hell** has been \* *rumored* [**RŪ-mÖrr-aed**] , by the re\***sis** ^† *tance*, to have be _paved_ with good \* [*i*n-*taen-tÖns*].

353.   For the **hard** felt **pain**ful and *relentless* lessons in perpetuum, as depicted by the "*Statement* of the **Facts**" as hereinabove plead, *Id.* ¶ *352 above*, involve an **esoteric** substance of \* unimaginable [ū̲n̲-i̲n̲-a̲e̲-g̲i̲n-ae-b̲l̲e] *density*, an *intense*ly *dense* **hu**man in\***alien**able **right** in **_spirit_** form at the \* *rumored* [**Rū-mÖrr-aed**] *stat*us of quantu**m F**Ö**a𝐦**, and thus affected humans are \* *rumored* [**Rū-mÖrr-aed**] to be in deep *want* of a **meaningful** political \* *expression* [Ë̇x-**pres̲s̲**-S**ı** ö̈n], a *right* which will _prove_ to be SO **dense**, that resulting "***cracks***" in the \* cogs [**Cö-Öggs**] of Lady Justice's **TimePiece** will **inevitably strike** at the core of those **un-**_break_able **hu**man **_rights_**[1], which this United States District Court has also been sworn to protect.

354.   For the allegations plead herein suggest the torment, pillaging, plundering, and indignification of innocent human beings under and by the very color of law, through vicious and heinous private, and state actors. *We the people, ...* may **_never_** again *permit* this to **occur**.

355.   For **_plaintiffs_**, and all moving parties herein indeed claim **corrosion** and corruption, not by *private* use of **pool** *acid* on another's **_measuring device_**, even one *arguably* owned *quasi-governmentally*, but rather by **impacting** the *esoteric* substance of the *color* of law itself, even **remotely** capable of _corroding_ the **_cogs_** of Lady Liberty's Timepiece; the protected **human** right to a *meaningful* political *expression*, un**contaminated** by an **odious** label who's own **_overbreadth_** casts an i*gnominious* **shadow** on owns' own record in **verbatim et literatim**, *impermissible* under the First Amendment to the United States Constitution. (**We Bid**.)

---

[1] *"We believe...wherever Federal Courts sit, [is where] human rights [are] in the..Constitution"*, Zwickler, supra, at 248.

# FINANCIAL ELDER ABUSE

## [28 U.S.C. § 1367(a); California Welfare & Ins. Code § 15600 et. seq., COUNT VI]

### (BERNIER as against all defendants and DOES 1 through 100)

28 U.S.C. § 1367(a): *"Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."*

356.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 355 above as if fully set forth herein, and further allege:

357.    As to Counts VI through X, both plaintiffs invoke the jurisdiction of the Federal Courts, under the doctrine of Pendent Jurisdiction.   That doctrine, based on considerations of fairness, and judicial economy, recognizes power in the Federal Courts to resolve a State Law claim brought in conjunction with a Federal Claim, where both *"derive from a common nucleus of operative facts"*.   *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 (1966).

358.    BERNIER claims that all PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100, violated the Elder Abuse and Dependent Adult Civil Protection Act by taking financial advantage of her.   As plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25; all PRIVATE CO-CONSPIRATORS and State Actors took, appropriated, and retained BERNIER's property at all times mentioned therein.

359.    All PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100 assisted in taking, appropriating, and retaining BERNIER's property.   BERNIER was sixty five years or older at all times of misconduct as mentioned hereinabove.   DOES 1 through 100, all PRIVATE CO-CONSPIRATORS and State Actors took, appropriated, and retained BERNIER's property with the intent to defraud and for a wrongful use.   BERNIER was harmed as plead on page 53, line 9, through page 56, line 7 of this complaint.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

360.    All PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100's conduct was a substantial factor in causing BERNIER's harm, as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

## MALICIOUS PROSECUTION, COUNT VII

(BERNIER as against ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100)

361.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 360 above as if fully set forth herein, and further allege:

362.    BERNIER claims that ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 wrongfully brought a lawsuit against her as plead on page 21, lines 1 through 6 of this complaint.    ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 were actively involved in bringing and continuing the Bernier v. Croteau et. al. cross complaint, as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

363.    The Bernier v. Croteau et. al. cross complaint ended favorably to BERNIER, as evidenced by Hon. Judge Nevitt's Statement of the Facts.    See Exhibit "44".    No reasonable person in ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's circumstances would have believed the allegations of ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's cross complaint in the Bernier v. Croteau et. al. matter, San Diego Superior Court Case No. 37-2007-00076023-CU-BC-CTL.

364.    ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 acted primarily for a purpose other than succeeding on the merits of the claim, as has been plead on page 8, line 25; through page 50, line 25.    BERNIER was harmed as plead on page 53, line 9, through page 56, line 7 of this complaint.    ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's conduct was a substantial factor in causing BERNIER's harm.

365.    ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 initiated, continued, procured, and maintained the Bernier v. Croteau et. al. cross complaint against BERNIER, as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

**ABUSE OF PROCESS, COUNT VIII**

(Plaintiffs as against ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100)

366.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 365 above as if fully set forth herein, and further allege:

367.    Plaintiffs claims that ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100, wrongfully engaged in the actions described in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

368.    ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100, acted primarily for a purpose other than the lawful objective of each act of abuse of process, as plead on page 8, line 25; through page 50, line 25. Plaintiffs were harmed as plead on page 53, line 9, through page 56, line 7 of this complaint. ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's conduct was a substantial factor in causing plaintiff's harm.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED"), COUNT IX**

(Plaintiffs as against ALL PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 to 100)

369.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 368 above as if fully set forth herein, and further allege:

370.    Plaintiffs claim that all PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100's conduct caused plaintiffs to suffer severe emotional distress. All PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100's conduct was outrageous, as plead on page 53, line 19 through page 55, line 5 of this complaint.

371.    All PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100, intended to cause plaintiffs emotional distress, and acted with reckless disregard of the probability that plaintiffs would suffer emotional distress at all times mentioned in this complaint and in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

372.    Plaintiffs suffered severe emotional distress as plead on page 53, line 19 through page 55, line 5 of this complaint. All PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 to 100's conduct was substantial in causing plaintiffs' severe emotional distress.

**FRAUD, COUNT IX**

(Plaintiffs as against ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100)

373.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 372 above as if fully set forth herein, and further allege:

374.   Plaintiffs claim that ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 made false representations that harmed plaintiffs.   ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 made representations to plaintiffs as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.

375.   ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's representations were false, as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.  ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100, knew the representations were false at all times they were made as plead hereinabove, and ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 made the representations recklessly and without regard for their truths.

376.   ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100 intended that plaintiff rely on the representation, as plead in the Statement of the Facts herein, on page 8, line 25; through page 50, line 25 of this complaint.  Plaintiffs reasonably relied on ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's representations.

377.   Plaintiffs were harmed as plead on page 53, line 19 through page 55, line 5 of this complaint.  Plaintiffs reliance on ALL PRIVATE CO-CONSPIRATORS, and DOES 1 through 100's representation was a substantial factor in causing plaintiffs harm.

*WHEREFORE,* plaintiffs pray for judgment against the defendants, and each of them, as follows:

A.   For Special Damages as plead in the instant complaint on page 55, line 6, through page 56, line 7, and according to proof at trial;

B.   For General Damages as plead in the instant complaint on page 53, line 9, through page 55, line 5, and according to proof at trial;

/ / / / / / /

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

C.  For Punitive and Exemplary Damages as plead in the instant complaint on page 58, lines 1 through 6, and according to proof at trial;

D.  For prejudgment interest according to proof at trial;

E.  For injunctive relief pursuant to 42 U.S.C. § 1983; as against all PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100; and to prohibit all PRIVATE CO-CONSPIRATORS, State Actors, and DOES 1 through 100, from engraining in any further conduct substantially in the same scope and spirit, as those allegations plead herein in this instant complaint.  For further injunctive relief pursuant to 42 U.S.C. § 1983, to prohibit all PRIVATE CO-CONSPIRATORS from engaging in any further collections attempts, JDX's, or other collections actions of any settlements, costs, or other judgments obtained in connection with any of the acts which all PRIVATE CO-CONSPIRATORS have been accused of engaging in, as plead in further detail on page 8, line 25; through page 50, line 25, of this complaint.

F.  For costs of suit herein incurred; and

G.  For such other and further relief as this Court deems just and proper.

/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /
/ / / / / / /

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

*NOW* herein,... as plaintiffs' stare down glaringly at their own *Timepiece*, and it being apparently *August XII, MMX*, in this purported *Universe* at least, wherein it's evident that this instant pleading must be filed *immediately*, and in order to avoid the passing of a statute of limitations; plaintiffs, *and each of them*, respectfully beg forgiveness and that leniency be beseeched for any typos and other minor inaccuracies in logic, nomenclature, or law; as plaintiffs' are literally *out of time*,... and must go *Back to the Future* © from *whence* they ought be...

We declare under penalty of perjury of the laws of the *United States of America*, that the foregoing is true and correct, except as to that information which has been specifically alleged to have been plead on information and belief only, or that which has been specifically referenced for its *illustrative* and *dramatization* purposes only, and as to those allegations, we believe them to be radically similar in character, expression, meaning, tone, morality, and **veracity**.

Dated: August XII, MMX                    *Respectfully submitted,*

Rejeanne M. Bernier; and,
Hans S. Croteau,
*We the People & Plaintiffs In Pro Se*[1]

---

[1] As witnessed by this executed declaration, *both pro se plaintiffs* are true life characters, and their incidental resemblance to any of the following real character's theoretical works in progress, or of Hollywood's finest fictional characters themselves, is purely unintentional, coincidental, benign in nature, and was in no way designed or conceived to vex, annoy, harass, molest, or otherwise belittle the good names and veracities of:

a) Stephen Hawking, b) Peter Higgs, c) Albert Einstein, d) Benjamin Franklin, e) Other authors and persons herein, or of Hollywood's *well scripted* plots and star casts in the *Films* above referenced, *inter alia*;

d) Phil Connors' **frustrated** want to help all, *all to his own demise*; as being similar in any way to H CROTEAU's **frustration** of purpose with all State and/or PRIVATE CO-CONSPIRATORS' *tentacular conspiracy*, or; e) Rita and her positive reinforcement of Mr. Conners, as being similar to BERNIER's support of H CROTEAU's handling of the **horrid** pain of the **butterfly effect**, or; h) Al Calavicci as H CROTEAU, as the conduit of the **quest** for the *faint distant light* of Lady Liberty's Torch, which only **plaintiffs** could see and hear in their **hearts**, or; i) Evan Treborn as BERNIER, who blocks out **harmful memories of significant events** in her life, *but as she grows older*, finds **miraculous** ways to recover lost memories in **seeming** supernatural defiance *by want alone* to alter her life, or; j) The Terminator, played by Mr. Schwarzenegger, as H CROTEAU for defying **space and time** to protect BERNIER; or C.C.P. § 391 et. seq. as the Governator's hastily designed **SkyNet** in trade for a *little* illusory *safety*, or; k) Dr. Sam Beckett as BERNIER, trapped in a **perpetual struggle** to put *things right* that once went *so horribly wrong*, and **pressured** to prove the **truth** within *her own lifetime*, or ultimately lose *all life, liberty, and property at stake*, or; f) Marty McFly as BERNIER, in relation to her own losses amidst an *unwanted reality* of a **skewed** origin, or; g) Doc Brown as H CROTEAU, with respect to H CROTEAU's *overachievements*; or their custom *DeLorean*, as carrying both plaintiffs literally '*out of time*'...

Should plaintiffs, *and either of them as encaptioned herein*, have offended the good name of any of these real life heroes or fictitious characters, and only if be it from plaintiffs' own odious stench, albeit **truly** applied by the color of law who's overbreadth casts an ignominious *shadow* on plaintiffs own record in '**verbatim et literatim**'; plaintiffs offer their fullest heartfelt apologies to all those so **struck** in *perpetuum*, whilst substantially recognizing traditions such as Jesus Christ's own understanding of humanity: *"Father, forgive them, for they do not know what they are doing."* Luke 23:34, King James New International Version (©1984).

BERNIER AND H CROTEAU'S CIVIL RIGHTS VIOLATION COMPLAINT AND FOR A DECLARATORY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19 *The Terminator Movie Series I – IV* (©1984, 1991, 2003, 2009) was directed and co-written by James Cameron,
Jonathan Mostow, and McG, and stars Arnold Schwarzenegger, Linda Hamilton, Michael Biehn, Edward

20 Furlong, Robert Patrick, Nick Stahl, Claire Danes, Kristanna Loken, Christian Bale, and Sam Worthington.

21 *The Butterfly Effect* (©2004) was directed by Eric Bress, and stars Ashton Kutcher, and Melora Walters. A
New Line Cinema release. A Subsidiary of Warner Bros. Entertainment, Inc.

22 *Groundhog Day* (©1993) was directed by Harold Ramis, and stars Bill Murray, and Andie MacDowell. A
Columbia Pictures Industries, Inc. release.

23

24 *The Back to the Future Trilogy* (©1985) to (©1989) was directed by Robert Zemeckis and Steven Spielberg, and
stars Micheal J. Fox, and Christopher Lloyd. A Universal Studios, Inc. release.

25 *Quantum Leap* © is a National Broadcasting Company (©NBC) American Television Series, broadcast from
(©1989) to (©1993). *Quantum Leap* © was created by Donald Bellisario, and stars Scott Bakula and Dean

26 Stockwell.

27 This pleading is construed on account of the lives of BERNIER and H CROTEAU, and their **fantastic** struggles
through the System of American Jurisprudence. As such, it is protected and not for sale at any price. *Best
wishes* to all others so similarly situated,... for this day is declared *"Pro Se Independence Day"*, and the dictum

28 '*verbatim et literatim*' shall come to mean the Pro Se's **freedom**. All Rights Reserved © August XII, MMX.